# Exhibit C

## ASSIGNMENT AND ASSUMPTION OF FRANCHISE AGREEMENT

This Assignment and Assumption of Franchise Agreement (the "Agreement") is entered into as of June 1, 2018, by and between **NH Philadelphia, LLC**, a Michigan limited liability company ("Assignor"), and **NH Learning Solutions Corporation**, a Michigan limited liability company ("Assignee").

## RECITALS

**WHEREAS**, Assignor and New Horizons Franchising Group, Inc. ("Franchisor") are parties to a Franchise Agreement dated August 1, 2014, as amended, including Exhibits "A" through "H" thereto (collectively "Franchise Agreement") for the New Horizons Computer Learning Center of Philadelphia, Pennsylvania ("Franchised Business"); and

**WHEREAS**, under the Franchise Agreement, a copy of which is attached to this Agreement as Exhibit "1", there are restrictions on the assignment or transfer of Assignor's interests in the Franchised Business; however the parties contemplate that Assignor will, without cost, penalty or adverse consequences, be allowed to assign its interest and obligations under the Franchise Agreement to Assignee; and

**WHEREAS**, Assignor has been directed by its members to convey all of Assignor's rights and obligations under the Franchise Agreement to Assignee.

**NOW, THEREFORE**, in consideration of the following mutual promises and undertakings, the sufficiency and receipt of which is acknowledged, the parties to this Agreement mutually agree that the recitals set forth above are a part of this Agreement and further agree as follows:

**1.**    **Assignment of Franchise Agreement and Related Agreements**.  Assignor does transfer, convey and assign to Assignee, all of its right, title and interest in and to the Franchise Agreement, inclusive of the following Exhibits and agreements previously executed with Franchisor:

1.1    Franchise Agreement, including all ancillary agreements (collectively the "Ancillary Agreements') set forth in Exhibits "A" through "H" thereto; and

1.2    First Amendment to Franchise Agreement dated August 1, 2014 (the "Amendment");

**2.**    **Assumption of Franchise Agreement and Related Agreements**.  On and after June 1, 2018, Assignee agrees to assume and undertake all obligations of Assignor of whatever nature under the Franchise Agreement, including all exhibits thereto, and the Ancillary Agreements, and further agrees to hold harmless and indemnify Assignor from and against any and all costs, claims, demands, defaults, breaches, actions, judgments, court costs, liabilities, expenses, litigation and damages (collectively as "Claims") arising from the terms and provisions of the foregoing agreements occurring or arising subsequent to June 1, 2018, including but not limited to, attorneys' fees and costs related to the Claims.

3.    **Franchisor's Consent to Assignment**. Pursuant to the terms of a Consent to Transfer of Franchise Agreement and Release dated as of June 1, 2018, Franchisor has acknowledged and approved this Agreement between Assignor and Assignee, and the assumption of obligations thereunder.

4.    **No Unidentified Obligations**.   There are no outstanding debts, obligations or claims as between Franchisor and Assignor that have not been expressly identified by either of them in writing to Assignee and that Assignee may rely upon such representation.

5.    **Notices**.  Any notice required or permitted under the terms of this Assignment shall be deemed to have been given when delivered personally or by a recognized national overnight delivery service, or two (2) days after deposited in the United States mail with first-class postage and registered mail or certified mail fees prepaid, to the following address or addresses (or at such other addresses designated by the parties from time to time):

|              |                                    |
|--------------|------------------------------------|
| To Assignor: | NH Philadelphia, LLC               |
|              | 14115 Farmington Road              |
|              | Livonia, MI  48154                 |
|              |                                    |
| To Assignee: | NH Learning Solutions Corporation  |
|              | 14115 Farmington Road              |
|              | Livonia, MI  48154                 |

provided, however, that in the event of a strike or work stoppage by mail carriers or other postal employees which adversely affects mail delivery by U.S. mail, notice shall be deemed to be effective only if actually delivered.

6.    **Choice of Law; Severability**.  This Agreement shall be subject to and construed under the laws of the State of California.  The language of all parts of this Agreement shall be construed as a whole, according to its fair meaning.  This Agreement is the result of negotiations between the parties, who have been represented by counsel.  Accordingly, the parties waive the application of any rule or law that otherwise would require that this Agreement by strictly construed against its drafter.  A judicial determination that any portion of this Agreement is unenforceable shall not affect the enforceability of the remainder of this Agreement.

7.    **Titles and Captions**.  All article, section and paragraph titles or captions contained in this Agreement are for convenience only and shall not be deemed part of the context nor affect the interpretation of this Agreement.

8.    **Pronouns and Plurals**.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the Person or Persons may require.

9.    **Entire Agreement**.  This Agreement contains the entire understanding between and among the parties and supersedes any prior understandings and agreements among them respecting the subject matter of this Agreement.

**10.**     **Agreement Binding**.    This Agreement shall be binding upon the heirs, executors, administrators, successors and assigns of the parties hereto.

**11.**     **Further Action**.   The parties hereto shall execute and deliver all documents, provide all information and take or forbear from all such action as may be necessary or appropriate to achieve the purposes of this Agreement.

**12.**     **Counterparts**.  This Agreement may be executed in several counterparts and all so executed shall constitute one Agreement, binding on all the parties hereto even though all the parties are not signatories to the original or the same counterpart.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first written above.

**ASSIGNOR:**

NH PHILADELPHIA, LLC


By: _____
    Mark A. McManus, Jr.
    President

**ASSIGNEE:**

NH LEARNING SOLUTIONS CORPORATION


By: _____
    Mark A. McManus, Jr.
    President

## EXHIBIT "1"

Franchise Agreement (attached)

## NEW HORIZONS FRANCHISING GROUP, INC.

### FRANCHISE AGREEMENT

NAME OF FRANCHISEE:____NH PHILADELPHIA LLC_____

CITY:_____PHILADELPHIA_____

STATE:_____PENNSYLVANIA_____

CHECK ONE:

☒      This Franchise Agreement is being signed for an Initial Term.

☐      This Franchise Agreement is being signed for a Renewal Term.

# NEW HORIZONS FRANCHISING GROUP, INC.

## FRANCHISE AGREEMENT
## TABLE OF CONTENTS

Article/Section Name   Page

I.     DEFINITIONS ................................................................................................................... 1
    1.1.     Abandoned. ...................................................................................................... 1
    1.2.     Acting as a Computer Learning Center. .......................................................... 2
    1.3.     Affiliate. ........................................................................................................... 2
    1.4.     Applicable Law. ................................................................................................ 2
    1.5.     Assumed Name. ................................................................................................ 2
    1.6.     Business Entity. ................................................................................................ 2
    1.7.     CBT. ................................................................................................................. 3
    1.8.     Center. .............................................................................................................. 3
    1.9.     Classroom Learning Content. .......................................................................... 3
    1.10.    Confidential Operations Manual. ..................................................................... 3
    1.11.    Conversion Franchisee. .................................................................................... 3
    1.12.    Control. ............................................................................................................. 3
    1.13.    Covered Person. ............................................................................................... 3
    1.14.    CMS.net. ........................................................................................................... 3
    1.15.    eBusiness. ......................................................................................................... 4
    1.16.    eContent. ........................................................................................................... 4
    1.17.    Effective Date. .................................................................................................. 4
    1.18.    eLearning. ......................................................................................................... 4
    1.19.    Enterprise Learning Solutions. ........................................................................ 4
    1.20.    Extranet. ........................................................................................................... 4
    1.21.    Equity Holder. .................................................................................................. 4
    1.22.    First Renewal Term. ......................................................................................... 5
    1.23.    Franchised Business. ........................................................................................ 5
    1.24.    Franchisor's Website. ....................................................................................... 5
    1.25.    General Manager. ............................................................................................. 5
    1.26.    Gross Revenues. ............................................................................................... 5
    1.27.    Initial Franchisee Training. .............................................................................. 5
    1.28.    Initial Term. ...................................................................................................... 5
    1.29.    ILT. ................................................................................................................... 5
    1.30.    Integrated Learning Agreement. ...................................................................... 6
    1.31.    Integrated Learning Manager or "ILM". .......................................................... 6
    1.32.    Inter-Franchise Fee. ......................................................................................... 6
    1.33.    Intellectual Property Rights. ............................................................................ 6
    1.34.    Labs on Demand. .............................................................................................. 6
    1.35.    Market Category. .............................................................................................. 6
    1.36.    Mentored Learning. .......................................................................................... 6
    1.37.    Network. ........................................................................................................... 7
    1.38.    New Horizons Franchisee. ............................................................................... 7
    1.39.    New Horizons Online Live or Online Live. ..................................................... 7
    1.40.    New Horizons Online Anytime or Online Anytime. ........................................ 7
    1.41.    Person. .............................................................................................................. 7
    1.42.    Renewal Term. ................................................................................................. 7
    1.43.    Satellite Center. ................................................................................................ 7

|        | 1.44. | Service Marks. | 7 |
|        | 1.45. | Start-Up Franchisee. | 7 |
|        | 1.46. | Strategic Industry Partner. | 8 |
|        | 1.47. | System. | 8 |
|        | 1.48. | Territorial Rules of Conduct or TROC. | 8 |
|        | 1.49. | Territory. | 8 |
|        | 1.50. | Transfer. | 8 |
| II.    |       | THE FRANCHISED BUSINESS | 8 |
|        | 2.1.  | Grant of Franchise. | 8 |
|        | 2.2.  | Territory and Scope of Operations. | 9 |
|        | 2.3.  | Scope of Grant; Franchisor's Retained Rights. | 9 |
|        | 2.4.  | Delegation of Duties. | 10 |
| III.   |       | LOCATION OF BUSINESS | 10 |
|        | 3.1.  | The Center. | 10 |
|        | 3.2.  | Satellite Centers. | 10 |
|        | 3.3.  | Right to Relocate. | 11 |
| IV.    |       | PAYMENTS BY FRANCHISEE | 11 |
|        | 4.1.  | Initial Franchise Fee. | 11 |
|        | 4.2.  | Continuing Royalty During the Initial Term. | 11 |
|        | 4.3.  | Continuing Royalty During the Renewal Term. | 12 |
|        | 4.4.  | Marketing and Advertising Fee. | 12 |
|        | 4.5.  | CMS.net Usage Fee. | 13 |
|        | 4.6.  | eLearning Delivery Fees. | 14 |
|        | 4.7.  | Interest on Delinquent Payments. | 14 |
|        | 4.8.  | No Accord or Satisfaction. | 14 |
|        | 4.9.  | Not Withhold Payment. | 14 |
|        | 4.10. | Advance Deposit. | 14 |
|        | 4.11. | Gross Receipts or Equivalent Taxes. | 15 |
| V.     |       | TERM. | 15 |
|        | 5.1.  | Term. | 15 |
|        | 5.2.  | Conditions for Exercising Renewal Option. | 15 |
|        | 5.3.  | Notice of Expiration Required by Law. | 18 |
|        | 5.4.  | Failure to Satisfy Conditions. | 18 |
|        | 5.5.  | Personal Guarantee. | 18 |
| VI.    |       | INTELLECTUAL PROPERTY RIGHTS | 18 |
|        | 6.1.  | License. | 18 |
|        | 6.2.  | Acts in Derogation of the Intellectual Property Rights. | 19 |
|        | 6.3.  | Use and Modification of Intellectual Property Rights. | 20 |
|        | 6.4.  | Use of Other Service Marks. | 20 |
|        | 6.5.  | Prohibition Against Disputing Franchisor's Rights. | 21 |
|        | 6.6.  | Infringement Claims and Defense of Intellectual Property Rights. | 21 |
| VII.   |       | INSTRUCTION AND OPERATING ASSISTANCE | 21 |
|        | 7.1.  | Initial Franchise Training. | 21 |
|        | 7.2.  | Expenses. | 22 |
|        | 7.3.  | Mandatory Meetings. | 22 |
|        | 7.4.  | Staff Training Courses. | 22 |
|        | 7.5.  | Continuing Assistance. | 22 |
|        | 7.6.  | Site Selection Assistance. | 23 |
|        | 7.7.  | Initial Franchise Training Package and Recruiting Materials. | 23 |

| | 7.8. | Timing. | 23 |
|---|---|---|---|
| VIII. | | OPERATION OF BUSINESS | 23 |
| | 8.1. | Franchisee Operational Requirements | 23 |
| | 8.2. | Operational Systems. | 24 |
| | 8.3. | Confidential Operations Manual. | 24 |
| | 8.4. | Signs and Display Materials. | 25 |
| | 8.5. | Telephone Numbers. | 25 |
| | 8.6. | Insurance. | 26 |
| | 8.7. | Records and Rights of Inspection. | 26 |
| | 8.8. | Review. | 27 |
| | 8.9. | Compliance with Laws. | 27 |
| | 8.10. | Confidentiality, Non- Competition, Acts Prejudicial to the System. | 27 |
| | 8.11. | Enterprise Learning Solutions. | 29 |
| | 8.12. | Transactions with Strategic Industry Partners. | 29 |
| | 8.13. | Local Advertisement. | 29 |
| IX. | | ASSIGNMENT | 30 |
| | 9.1. | Assignment by Franchisor. | 30 |
| | 9.2. | Assignment by Franchisee. | 30 |
| | 9.3. | Right of First Refusal. | 33 |
| | 9.4. | Franchisor Consent to Offerings. | 34 |
| X. | | DEFAULT AND TERMINATION | 34 |
| | 10.1. | General. | 34 |
| | 10.2. | Termination Without Right to Cure. | 35 |
| | 10.3. | Termination With Right to Cure. | 36 |
| | 10.4. | Description of Default. | 37 |
| | 10.5. | Statutory Limitations. | 37 |
| XI. | | ARBITRATION AND OTHER RELIEF | 37 |
| | 11.1. | Arbitration. | 37 |
| | 11.2. | Injunctive or Extraordinary Remedies. | 38 |
| XII. | | FURTHER OBLIGATIONS AND RIGHTS OF THE PARTIES UPON TERMINATION OR EXPIRATION | 38 |
| | 12.1. | Franchisee's Obligations. | 38 |
| | 12.2. | Rights of Parties. | 40 |
| | 12.3. | Franchisor's Right to Cure Defaults by Franchisee. | 40 |
| | 12.4. | Waiver and Delay. | 40 |
| | 12.5. | Attorneys' Fees and Expenses. | 40 |
| XIII. | | GENERAL CONDITIONS AND PROVISIONS | 41 |
| | 13.1. | Relationship of Franchisee to Franchisor. | 41 |
| | 13.2. | Indemnity. | 41 |
| | 13.3. | Guarantee. | 42 |
| | 13.4. | Survival of Covenants. | 42 |
| | 13.5. | Successors and Assigns. | 42 |
| | 13.6. | Joint and Several Liability. | 42 |
| | 13.7. | Counterparts. | 42 |
| | 13.8. | Notices. | 42 |
| | 13.9. | Further Assurances. | 43 |
| XIV. | | CONSTRUCTION OF AGREEMENT | 43 |
| | 14.1. | Governing Law. | 43 |

|  | 14.2. | Entire Agreement; Modification. | 43 |
|  | 14.3. | Titles for Convenience Only. | 44 |
|  | 14.4. | Gender. | 44 |
|  | 14.5. | Severability. | 44 |
|  | 14.6. | No Third Party Beneficiaries. | 44 |
| XV. |  | SUBMISSION OF AGREEMENT | 44 |
| XVI. |  | ACKNOWLEDGMENTS AND REPRESENTATIONS OF FRANCHISEE | 44 |
|  | 16.1. | Certain Acknowledgments and Representations of Franchisee. | 44 |
|  | 16.2. | Additional Information Respecting Franchisee. | 45 |
|  | 16.3. | Integration. | 46 |
|  | 16.4. | Acknowledgements. | 46 |

**List of Exhibits to Franchise Agreement:**

Exhibit A  – Description of the Territory
Exhibit B  – Summary of Enterprise Learning Solutions
Exhibit C  – Schedule of Names and Addresses of Sole Proprietor, Shareholders, Partner and/or Principal Officers, as applicable
Exhibit D  – Extranet Licensing Agreement
Exhibit E-1  – Guarantee
Exhibit E-2  – Limited Guarantee (Intentionally Omitted)
Exhibit F  – CMS.net Agreement
Exhibit G  – Integrated Learning Agreement
Exhibit H  – Schedule of Initial Franchise Fees and Monthly Minimum Continuing Royalty Fees During An Initial and Renewal Term

## NEW HORIZONS FRANCHISING GROUP, INC.
## FRANCHISE AGREEMENT
## (PHILADELPHIA, PA)

This Franchise Agreement ("Agreement") is made and entered into on August 1, 2014 ("Agreement Date"), between New Horizons Franchising Group, Inc., a Delaware corporation ("Franchisor"); NH Philadelphia LLC a Michigan limited liability company proposing to do business in the State of Massachusetts ("Franchisee"); and NHNE LLC ("Equity Holder"), with reference to the following facts:

Franchisor has developed and is engaged in the ongoing development and operation of a "System" (as defined in Article I hereof) identified to the public by certain "Service Marks" (as defined in Article I hereof) and operated in accordance with the provisions of this Agreement and Franchisor's "Confidential Operations Manual" (as defined in Article I hereof), as amended from time to time.

New Horizons Education Corp. ("NHEC"), the affiliate of Franchisor, is the owner of the all of the Intellectual Property Rights (as defined in Article I hereof) included in the System now or in the future. NHEC has delegated to Franchisor the right to license others to use the Intellectual Property Rights.

Franchisor is engaged in the business of licensing independent computer training businesses utilizing the Intellectual Property Rights, operational techniques, service concepts and proprietary information owned or authorized to be used by and identified with Franchisor and incorporated within the scope of the System. Franchisor's activities in general, and its computer training programs in particular, are undertaken to develop, maintain and enhance the Intellectual Property Rights and Franchisor's reputation for total service in all fields of computer training and related services throughout the United States and other countries.

Franchisee desires to be awarded a franchise and license by Franchisor to participate in and use all the System and goodwill of Franchisor to conduct the "Franchised Business" (as defined in Article I hereof) in the manner described in this Agreement. Franchisor is willing to grant to the Franchisee a franchise and license, in accordance with the provisions of this Agreement and the Confidential Operations Manual on the terms and conditions set forth below.

## I.
## DEFINITIONS

In addition to other capitalized terms that may first be defined in the body of this Agreement, the following terms shall have the following meanings when they appear capitalized in this Agreement.

### 1.1. Abandoned.

The term "Abandoned" shall mean closure of the "Center" (as defined in this Article I) for a period of five consecutive days without Franchisor's prior written consent, or any shorter period after which it is not unreasonable under the facts and circumstances for the Franchisor to conclude that the Franchisee does not intend to continue to operate the Franchised Business. A repeated pattern of closures of any Center for periods of more than three consecutive business days may result in the Center being deemed Abandoned if in the reasonable judgment of Franchisor such closure adversely impacts the Franchised Business. The Center shall not be deemed Abandoned if the closure is due to acts of God or other matters beyond the control of Franchisee (other than Franchisee's inability to procure money),

provided that (i) Franchisee gives notice of any such closure to Franchisor within ten days after the initial occurrence of the event resulting in the closure, (ii) Franchisor acknowledges in writing that the closure is due to one of the foregoing causes and (iii) Franchisee re-establishes the Franchised Business and is fully operational in another approved Center within 60 days or such longer period as Franchisor may permit after the initial occurrence of the event which resulted in the closure.

1.2. Acting as a Computer Learning Center.

The term "Acting as a Computer Learning Center" shall include, without limitation: (i) the sale and delivery of ILT; (ii) the sale and/or delivery of CBT and other methods of asynchronous and synchronous online training; (iii) the operation of eBusiness and the sale and delivery of eLearning and other forms of electronic training enabled by the Internet or comparable or enhanced forms of electronic technology now existing or hereinafter developed; (iv) the delivery or performance of other computer and professional skills training services that Franchisor incorporates in the System; (v) the sale and delivery of computer and professional skills classroom training through Mentored Learning; and (vi) the sale of Classroom Learning Content and other training products, including third party content vendors' products, all of which shall be performed or conducted in accordance with this Agreement.

1.3. Affiliate.

The term "Affiliate" shall mean a Business Entity that directly or indirectly controls, is controlled by, or is under common control with, a party to this Agreement.

1.4. Applicable Law.

The term "Applicable Law" shall mean and includes the applicable common law and all statutes, laws, rules, regulations, ordinances, policies and procedures established by any governmental authority with jurisdiction over the operation of the Franchised Business that are in effect on or after the Effective Date, as they may be amended from time to time. Applicable Laws includes, without limitation, those relating to building permits and zoning requirements applicable to the use, occupancy and development of the Center; business licensing requirements; privacy of electronic and other communications; anti-terrorism; hazardous waste; occupational hazards and health; consumer protection; trade regulation; worker's compensation; unemployment insurance; withholding and payment of Federal and State income taxes and social security taxes; federal, state and local educations acts and ordinances, collection and reporting of sales taxes; and the American With Disabilities Act.

1.5. Assumed Name.

The term "Assumed Name" shall mean the name (or, with Franchisor's consent, names) under which Franchisee shall conduct the Franchised Business. Unless otherwise agreed by Franchisor, the Assumed Name shall consist of the Service Mark together with the name of the city and the state, punctuated with a comma (for example, "New Horizons Computer Learning Center of Santa Ana, California").

1.6. Business Entity.

The term "Business Entity" means a corporation, LLC, partnership, trust or other form of legal entity capable of owning property and entering into contracts regardless of whether third party consent is required in order for it to act.

1.7.    CBT.

The term "CBT" shall mean computer-based training using CD-ROM formatted training products.

1.8.    Center.

The term "Center" shall mean the business premises described in Section 3.1 hereof identified to the public by the Service Marks where Franchisee conducts the Franchised Business using the System.

1.9.    Classroom Learning Content.

The term "Classroom Learning Content" shall mean all printed materials and eContent provided to customers in ILT and Mentored Learning for use during and after the class.

1.10.    Confidential Operations Manual.

The term "Confidential Operations Manual" or "COM" shall mean the confidential and proprietary manual or manuals containing policies and procedures to be adhered to by Franchisee in performing under this Agreement, including all updated versions, amendments and supplements thereto provided to Franchisee by Franchisor at any time, either in hard copy or electronic medium which is incorporated herein by this reference.

1.11.    Conversion Franchisee.

The term "Conversion Franchisee" shall mean a Person that, for at least 12 months before the Effective Date, has owned, directly or indirectly, Control of an existing computer training business from specific premises that will be re-branded under the Service Marks and conformed to Franchisor's design, appearance and operating standards in consideration of the award of franchise rights.

1.12.    Control.

The term "Control" shall mean the possession of the direct or indirect power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

1.13.    Covered Person.

The term "Covered Person" shall mean: (i) the Person executing this Agreement as Franchisee; (ii) each Franchisee Affiliate; and (iii) each officer, director, shareholder, member, manager, trustee or general partner of Franchisee and each Franchisee Affiliate.

1.14.    CMS.net.

The term "CMS.net" shall refer to the Center Management System, a mandatory service that manages contacts, student enrollments, class inventories and accounts receivable support. The CMS.net Agreement, which is attached to this Agreement as Exhibit F, is a Web-based program hosted by Franchisor. Fees are payable according to the number of users under CMS.net as set forth in Exhibit F.

1.15.    eBusiness.

The term "eBusiness" shall mean the use of CMS.net and all electronic commerce transactions that occur on any Network website, the collection and use of demographic information, scheduling of course delivery from any Network website, and/or the use of any Network website or electronic system for managing the existing Network business processes. It is anticipated that students will purchase and enroll in classes through eBusiness web technology.

1.16.    eContent.

The term "eContent" shall mean any learning content distributed via electronic means, including but not limited to, electronic versions of printed, instructional and support materials in electronic form including electronic materials known as "Labs on Demand".

1.17.    Effective Date.

The term "Effective Date" shall be (i) with respect to a Conversion Franchisee is the date this Agreement is executed or (ii) with respect to a Start-Up Franchisee is the earlier of (A) the date the Center commences the Franchised Business, or (B) the 120th day after completion of Initial Franchise Training at or near the headquarters of Franchisor, as described in Section 7.1 hereof.

1.18.    eLearning.

The term "eLearning" shall mean Franchisor's eLearning programs and all other forms of computer training and professional skills training available over the internet, or electronically behind a firewall, including synchronous and asynchronous classes such as New Horizons Online Live, New Horizons Online Anytime, Labs on Demand and any other form of training delivered in whole or in part electronically.

1.19.    Enterprise Learning Solutions.

The term "Enterprise Learning Solutions" shall mean the coordinated delivery of services constituting Acting as a Computer Learning Center to employees of enterprise accounts on the terms summarized in Exhibit B and more specifically defined in the COM.

1.20.    Extranet.

The term "Extranet" shall mean that certain electronic communications device implemented by Franchisor for the benefit of Franchisor and the Network, or any successor electronic communications device implemented by Franchisor, for use by Franchisor and the Network.

1.21.    Equity Holder.

The term "Equity Holder" shall mean a Person or Business Entity who now, or after the Effective Date, owns 5% or more of the outstanding voting stock or other equity ownership interests of Franchisee that are coupled with voting rights.

1.22.  First Renewal Term.

The term "First Renewal Term" shall mean any Renewal Term in which the first day of such Renewal Term commences during the period between April 1, 2008 and March 31, 2018, regardless of how many times the Franchise Agreement may have been previously renewed.

1.23.  Franchised Business.

The term "Franchised Business" shall mean Acting as a Computer Learning Center from a Center or other location, utilizing the System.

1.24.  Franchisor's Website.

The term "Franchisor's Website" shall mean www.newhorizons.com and any other Franchisor owned URL or domain name, which is linked to or leads a customer to www.newhorizons.com.

1.25.  General Manager.

The term "General Manager" shall mean the employee or agent of Franchisee who has been designated by Franchisee as the individual responsible for the day-to-day operation of the Franchised Business and who has satisfactorily completed "Initial Franchise Training".

1.26.  Gross Revenues.

The term "Gross Revenues" shall mean all money, credit card payments or other things of value received, recognized on an accrual accounting basis (including the recognized portion of deferred revenue) in accordance with generally accepted accounting principles by Franchisee in payment of, for or on account of, the Franchised Business without deducting Franchisee's cost of revenues or selling, general and administrative costs or expenses, including all salaries, commissions, bonuses or other fees payable to its employees or contractors. Gross Revenues of the Franchised Business include, but are not limited to, amounts for computer or other training services delivered by the Franchised Business, room rentals, courseware fees, testing fees, on-site cafeteria revenue, or similar items. "Gross Revenues" excludes, however: (1) interest income; (2) capitalized asset sales; (3) the non-recognized portion of deferred revenue; and (4) receipt from other franchisees for the transferred-in delivery of training services pursuant to an inter-franchise transaction.

1.27.  Initial Franchisee Training.

The term "Initial Franchisee Training" or "IFT" shall mean training in the System provided by Franchisor to the General Manager, and other responsible management personnel designated by Franchisee, as provided in Article VII of this Agreement.

1.28.  Initial Term.

The term "Initial Term" refers specifically to the 10- year period beginning on the Agreement Date and is only applicable to the parties if this Agreement is being entered into in connection with the initial award of Franchise rights.

1.29.  ILT.

The term "ILT" shall mean instructor-led computer and professional skills classroom training.

1.30.   Integrated Learning Agreement.

The term "Integrated Learning Agreement" shall mean the Integrated Learning Agreement attached hereto as Exhibit "G" and by this reference incorporated herein.

1.31.   Integrated Learning Manager or "ILM".

The term "Integrated Learning Manager" or "ILM" is the name of the NH hosted, Web-based platform that we operate known as "New Horizons LMS" which provides support to deliver and manage online and classroom learning through a single point of access.

1.32.   Inter-Franchise Fee.

Subject to the TROC, when one Network member contracts with a customer for the delivery of services in locations both within and outside of the contracting Network member's territory, the fee that the contracting Network member must pay to other Network members who deliver training services to the customer. The Inter-Franchise Fee shall be set forth in the COM and subject to adjustment according to the procedures set forth in the COM.

1.33.   Intellectual Property Rights.

The term "Intellectual Property Rights" means, collectively, all rights under Applicable Law available under patent, copyright, trademark, service mark, trade name, product configuration, industrial design, or trade secret law or any other statutory provision or common law doctrine with respect to intellectual property, including rights in or to designs, formulas, algorithms, procedures, methods, techniques, ideas, know-how, programs, subroutines, tools, inventions, creations, improvements, works of authorship, other similar materials, and all recordings, graphs, drawings, reports, analyses, other writings, and any other embodiment of the above, whether known, existing or in use on the Agreement Date or discovered, created or put into use afterwards, in any form whether or not specifically identified in this Section.

1.34.   Labs on Demand.

The term "Labs on Demand" refers to a New Horizons-branded, cloud-based, hands-on lab service we provide to our students so they can practice the knowledge gained during the lecture part of their class in a real world environment.

1.35.   Market Category.

The term "Market Category" shall mean the "Small", "Medium", "Large" and "Mega" territories set forth on Exhibit H but shall not include any of the subcategories set forth on Exhibit H.

1.36.   Mentored Learning.

The term "Mentored Learning" means a premier classroom solution offering the student a multi-dimensional approach to learning which is adaptive to individual learning styles through a mentor who guides and teaches the student by using assessments, reinforcement techniques and content consisting of written courseware and streaming video or other technologies.

1.37.   Network.

The term "Network" shall mean, depending on the context, all of the New Horizons franchisees and Affiliates of Franchisor that own Centers, or all of their Centers, or both.

1.38.   New Horizons Franchisee.

The term "New Horizons franchisee" shall refer to other franchisees of Franchisor licensed to operate a Franchised Business.

1.39.   New Horizons Online Live or Online Live.

The terms "New Horizons Online Live" or "Online Live" refer to Franchisor's synchronous Elluminate platform, the details of which are available on the Extranet.

1.40.   New Horizons Online Anytime or Online Anytime.

The terms "New Horizons Online Anytime" or "Online Anytime" refer to Franchisor's asynchronous eLearning program, the details of which are available on the Extranet.

1.41.   Person.

The term "Person" means a natural person (i.e., an individual) or Business Entity.

1.42.   Renewal Term.

The term "Renewal Term" refers specifically to the 5-year period beginning on the day following the expiration of the Initial Term (as it may be extended by Franchisor under the specific circumstances set forth in Article V).

1.43.   Satellite Center.

The terms "Satellite" or "Satellite Center" shall mean an additional classroom location that Franchisee opens within the Territory as permitted with Franchisor's prior written consent that receives administrative support from Franchisee's Center and which is not required to have either a dedicated General Manager or Account Executives. Instructors of classes held at a Satellite Center shall perform the same check-in, collections and other services typically performed by non-instructor staff members who perform these duties onsite at a Center.

1.44.   Service Marks.

The term "Service Marks" shall mean the specific Intellectual Property Rights consisting of the proprietary marks owned by NHEC and registered with the United States Patent and Trademark Office, and all other trademarks, service marks, trade names, logo types, insignias, designs and other commercial symbols which Franchisor now or hereafter designates for use by Network Members and other licensed third parties to identify the Franchised Business whether or not registered with any government agency.

1.45.   Start-Up Franchisee.

The term "Start-Up Franchisee" shall mean" shall mean a Person that does not qualify as a Conversion Franchisee.

1.46.    Strategic Industry Partner.

        The term "Strategic Industry Partner" shall mean a computer software, computer hardware or
intellectual property provider which supplies, or makes available, programs, services or intellectual
property to Franchisor, or to the Network and customers of the Network, and shall include, by example
but not be limited to, Cisco, Microsoft, CompTia and other providers.

1.47.    System.

        The term "System" shall mean a comprehensive marketing and operational system prescribed by
Franchisor to be used in the conduct of the Franchised Business, as set forth in this Agreement and the
Confidential Operations Manual, as amended from time to time. The System shall include, without
limitation, the Service Marks, Classroom Learning Content, eLearning and certain advertising, marketing
and sales programs and techniques, the Franchisor's Website, eBusiness, business processes and methods
of operation, knowledge and know-how, trade secrets, training programs, artwork, graphics, layouts,
slogans, names, titles, text, and the other Intellectual Property Rights of Franchisor that Franchisor
specifically designates and makes available to Franchisee. In its sole discretion, Franchisor may improve
and/or change the System from time to time (including without limitation adding to, deleting or
modifying elements of the System, establishing categories or classifications of New Horizons Franchisees
and amending the Confidential Operations Manual) for the intended purpose of making the System more
effective, efficient, economical or competitive; adapting to or taking advantage of competitive conditions,
opportunities, technology, materials or local marketing needs and conditions; enhancing the reputation or
public acceptance of the System; and/or better serving the public.

1.48.    Territorial Rules of Conduct or TROC.

        The term "Territorial Rules of Conduct" or "TROC" refer to the rules and guidelines that govern
the relationships between and among Network Members and are set forth in the COM.

1.49.    Territory.

        The term "Territory" shall mean that designated geographic area defined in Exhibit A attached
hereto, Franchisee's rights and limitations in respect of which are set forth in Section 2.3 hereof.

1.50.    Transfer.

        The term "Transfer" shall mean to sell, assign, transfer, convey, pledge, mortgage, encumber,
abandon, eliminate or give away, voluntarily or involuntarily, by operation of law or otherwise.

## II.
## THE FRANCHISED BUSINESS

2.1.    Grant of Franchise.

        (a)    Franchisor hereby grants to Franchisee, and Franchisee hereby accepts, a non-exclusive
license and franchise ("Franchise") to operate a Franchised Business in the Territory in strict accordance
with this Agreement and the Confidential Operations Manual, starting on the Agreement Date and ending
on the last day of the Initial Term or, if this Agreement is being signed in connection with Franchisee's
exercise of a Renewal Option (as hereinafter defined) ending on the last day of the then-applicable
Renewal Term, unless this Agreement is sooner terminated. Franchisor grants Franchisee no rights other
than the rights expressly stated in this Agreement.

(b) In operating the Franchised Business, Franchisee shall participate in and use the System in the manner authorized or required by this Agreement. Franchisee's use of the System for any purpose, or in any manner, not expressly permitted by this Agreement shall constitute a breach of this Agreement and infringement of Franchisor's intellectual property rights.

(c) Except as provided in this Section, Franchisee shall conduct the Franchised Business only (i) at or from the Center; (ii) at Franchisee's customers' business premises in the Territory; and (iii) if Franchisee obtains Franchisor's prior written approval, at or from other locations in the Territory, including at any Satellite Center. Except as expressly permitted by Franchisor and subject to the Territorial Rules of Conduct, Franchisee shall not perform services constituting Acting as a Computer Learning Center outside of the Territory, with the exception that, subject to the Territorial Rules of Conduct, Franchisee may offer and sell eLearning courses to the public from the subpage on Franchisor's Website, but not from any third party website. Franchisee shall adhere to the Confidential Operations Manual's (i) standards and specifications for engaging in activities constituting Acting as a Computer Learning Center, including offering and selling eLearning, and (ii) procedures in applying for Franchisor's approval to conduct the Franchised Business at or from locations in the Territory outside of the Center.

2.2.    Territory and Scope of Operations.

(a) Subject to the Territorial Rules of Conduct set forth in the Confidential Operations Manual and Franchisor's retained rights, for as long as Franchisee is not in default under this Agreement, Franchisor shall not provide, or authorize or license any other Person or New Horizons Franchisee to provide, ILT identified to the public by the Service Marks from business premises in the Territory.

(b) Franchisee acknowledges and agrees that, subject to the Territorial Rules of Conduct, Franchisor and other New Horizons Franchisees may offer or sell services constituting Acting as a Computer Learning Center to Persons residing or maintaining a place of business in the Territory.

(c) Franchisee shall perform in a first rate and timely manner all of the duties and services constituting Acting as a Computer Learning Center that Franchisor incorporates in the System and requires New Horizons Franchisees to perform including, without limitation, selling and delivering services in support of Franchisor's eLearning programs. Franchisee has no right to offer or sell any goods or services branded with the Service Marks not authorized by Franchisor, including, without limitation, training programs enabled by the Internet or comparable or enhanced forms of electronic technology that Franchisor does not incorporate in the System. Franchisee agrees at all times to faithfully, honestly and diligently perform its obligations under this Agreement and to continuously exert its best efforts to promote and enhance the Franchised Business and the goodwill associated with the System.

(d) Franchisee shall comply with all Applicable Law, and shall obtain and maintain in good standing all required business licenses and other permits.

2.3.    Scope of Grant; Franchisor's Retained Rights.

(a) Nothing in this Agreement gives Franchisee (i) any right, title or interest in or to any of the elements of the System other than a license to use the same on the terms and conditions of this Agreement; (ii) the right to object to Franchisor's award of franchises to others or any interest in Franchisor; (iii) the right to participate in Franchisor's business activities, investment or corporate opportunities; or (iv) the right to grant sublicenses of any kind.

(b)      Franchisor retains the right, in its sole discretion, to offer and sell, and to license others to offer and sell, goods and services of any kind not constituting Acting as a Computer Learning Center through any channel of distribution, whether now existing or hereinafter developed, that are identified to the public by the Service Marks or by other trademarks or service marks, or utilize other elements of the System, anywhere in the world, including within the Territory, pursuant to terms and conditions that Franchisor deems appropriate.

(c)      Except as provided in Section 2.2(a), and pursuant to the Integrated Learning Agreement Franchisor retains the right, in its sole discretion, to offer and sell, and to license others to offer and sell, goods and services of any kind, including, without limitation, services constituting Acting as a Computer Learning Center, through any channel of distribution whether now existing or hereinafter developed, that are identified to the public by the Service Marks or by other trademarks or service marks, or utilize other elements of the System, anywhere in the world, including within the Territory, in which case Franchisee will share in revenues derived from the Territory.

(d)      Franchisee acknowledges and agrees that, subject to the Integrated Learning Agreement Franchisor's retained rights include, without limitation, the right to offer eLearning and other forms of electronic training enabled by the Internet or comparable or enhanced forms of electronic technology now existing or hereinafter developed anywhere in the world, including within the Territory.

(e)      Except as set forth in Section 8.10 (Non Competition/Acts Prejudicial to the System), nothing in this Agreement forbids Franchisee from engaging in other business activities of any kind.

2.4.    Delegation of Duties.

In addition to Franchisor's right to assign this Agreement, Franchisor has the absolute right to delegate performance of any portion or all of its obligations under this Agreement to any third party designee of its own choosing, whether the designee is Franchisor's Affiliate, agent or independent contractor. In the event of a delegation of duties, the third party designee will perform the delegated functions in compliance with this Agreement. When Franchisor delegates its duties to a third party (in contrast to when Franchisor transfers and assigns all of its rights under this Agreement to a third party that assumes Franchisor's obligations), Franchisor will remain responsible for the performance of the third party to whom Franchisor's duties are delegated.

## III.
## LOCATION OF BUSINESS

3.1.    The Center.

Franchisee's Center(s) shall be located at the following address(es):

Address of Center(s):    565 East Swedesford Road, Wayne, PA 19087

3.2.    Satellite Centers.

(a)      Except for the duty to have a dedicated General Manager and Account Executives as set forth in Section 8.1, Franchisee's obligations with respect to the performance and operation of a Satellite Center shall be the same as those set forth in this Agreement pertaining to the Center and references in this Agreement to "Center" shall include each Satellite Center.

(b)     For each Satellite Center which Franchisee opens, the parties shall assign specific zip codes, which shall be shown on Exhibit A.

(c)     Franchisee understands and agrees that nothing in this Agreement authorizes Franchisee to open additional centers of any kind in the Territory and Franchisee shall have no right to do so without Franchisor's prior written consent, which Franchisor agrees not to withhold unreasonably. The foregoing does not apply to engaging in services constituting Acting as a Computer Learning Center at or from Franchisee's customers' business premises in the Territory. If Franchisor consents to Franchisee's request to open an additional location, Franchisee's obligations with respect to the additional location shall be the same as those set forth in this Agreement pertaining to the Center and references in this Agreement to "Center" shall include the additional location that Franchisee opens with Franchisor's permission.

3.3.    Right to Relocate.

If Franchisee desires or is required to relocate its Center, it must request Franchisor's consent to relocate such Center upon the following conditions:

(a)     Not less than 30 days prior to the desired date of relocation (unless prior notice is impractical because of a relocation necessitated by unanticipated occurrences (such as fire, flood, earthquake, etc.) in which event notice shall be made as soon as possible), Franchisee must make a written request for consent to relocate, describing the reasons for the relocation and providing details respecting the proposed new Center.

(b)     Within 30 days after receiving Franchisee's request, Franchisor shall either approve or disapprove such new Center in writing in the exercise of its reasonable business judgment (which may be based on consideration of the following types of factors, among others in Franchisor's discretion: alternative locations, proximity of the proposed location to existing and potential locations, increased market penetration expected, quality of location and effect on the System). In the event of disapproval, Franchisee may request an alternative proposed new Center pursuant to the provisions of this Section 3.3.

## IV.
## PAYMENTS BY FRANCHISEE

4.1.    Initial Franchise Fee.

Concurrently upon Franchisee's execution of this Agreement, Franchisee shall pay to Franchisor a non-refundable Initial Franchise Fee ("Initial Franchise Fee") in the amount shown on Exhibit H according to the following two factors: (i) the population size of the Territory, which shall be determined according to the latest census data as of the Effective Date that has been compiled and published by the United States Census Bureau in Washington, D.C. (or by any successor government agency responsible for officially compiling census information); and (ii) whether Franchisee is a Conversion Franchisee or Start-Up Franchisee.

4.2.    Continuing Royalty During the Initial Term.

(a)     If this Agreement is being entered into in connection with the initial award of Franchise rights, Franchisee shall pay to Franchisor during the Initial Term, in addition to the Initial Franchise Fee, a Continuing Royalty equal to 6% of all monthly Gross Revenues generated each month (or portion thereof) from the operation of the Franchised Business after the Effective Date.

(b)     Commencing with either the first day of the 4th full calendar month after the Effective Date if Franchisee is a Start-Up Franchisee, or the first day of the 6th full calendar month after the Effective Date if Franchisee is a Conversion Franchisee (the "Minimum Royalty Commencement Date") and continuing each month for the remainder of the Initial Term, Franchisee shall pay to Franchisor a minimum Continuing Royalty equal to the greater of (x) 6% of all monthly Gross Revenues, or (y) the minimum amount shown on Exhibit H according to the type and subclass of the Territory as shown on Exhibit H determined as of the Effective Date. The parties agree that the same type and subclass of the Territory used to calculate the Initial Franchise Fee shall also be used to determine the minimum amount of the Continuing Royalty applicable throughout the Initial Term regardless of changes in the population in the Territory that may later occur during the Initial Term.

(c)     Continuing Royalty payments must be received by Franchisor on or before the 15th day (or if this day is not a business day, on the next business day) of each applicable month during the term of this Agreement, and will be computed on Gross Revenues earned by Franchisee in the prior month. Franchisee's Continuing Royalty shall be paid to Franchisor regardless of the type of consideration received by Franchisee. In circumstances involving non-cash Gross Revenues, the method and timing of payment of Continuing Royalty may be varied in Franchisor's sole discretion and these non-cash Gross Revenues will be valued at their then fair market value (in the case of a promissory note, its then fair market value shall be equal to the stated face value of the note). Franchisor shall have the right, in its sole discretion and in extraordinary circumstances (e.g., natural disasters which make it extraordinarily difficult for Franchisee to conduct the Franchised Business), to reduce the Continuing Royalty rate. If Franchisor reduces the Continuing Royalty rate for the benefit of certain of its franchisees, then such reduction (and any related changes in contract terms) shall be made available on the same terms, conditions and qualifications to all similarly situated New Horizons franchisees (for purposes of this Agreement, "similarly situated" shall refer to franchisees of Franchisor who are in the same general condition or subject to the same general business circumstances as Franchisee). Franchisor retains the right, in its sole discretion, upon not less than ten days prior written notice, to partially or totally restore the Continuing Royalty rate to the amount set forth herein.

4.3.    Continuing Royalty During the Renewal Term. If this Agreement is being entered into in connection with Franchisee's exercise of a Renewal Option and the first day of such renewal term commences between April 1, 2008 and March 31, 2018 (the "First Renewal Term"), Franchisee shall pay to Franchisor a Continuing Royalty equal to the greater of: (i) 6% of all monthly Gross Revenues generated each month (or portion thereof) from the operation of the Franchised Business during the Renewal Term, or (ii) the minimum amount shown on Exhibit H for a First Renewal Term.

(b)     If this Agreement is being entered into in connection with Franchisee's exercise of a Renewal Option and the first day of such renewal term commences on or after April 1, 2018, Franchisee shall pay to Franchisor a Continuing Royalty equal to the greater of: (i) 6% of all monthly Gross Revenues generated each month (or portion thereof) from the operation of the Franchised Business during a Renewal Term , or (ii) the minimum amount shown on Exhibit H applicable to a Renewal Term other than the First Renewal Term.

4.4.    Marketing and Advertising Fee.

(a)     Commencing on the Effective Date, Franchisee shall pay to Franchisor a Marketing and Advertising Fee equal to 1% of Franchisee's monthly Gross Revenues. Marketing and Advertising Fees are the property of Franchisor and may be deposited by Franchisor into its general operating account.

(b)    The Marketing and Advertising Fee shall be computed on Gross Revenues earned by Franchisee in the prior month and shall be payable on the 15th day of each month during the term hereof (unless the 15th day is not a business day in which event it shall be paid on the next business day), and continuing until the date of expiration or termination of this Agreement. Franchisee's Marketing and Advertising Fee shall be paid to Franchisor regardless of the type of consideration received by Franchisee. In circumstances involving non-cash Gross Revenues, the method and timing of payment of Marketing and Advertising Fee may be varied in Franchisor's sole discretion and these non-cash Gross Revenues will be valued at their then fair market value (in the case of a promissory note, its then fair market value shall be equal to the stated face value of the note). Franchisor shall have the right, in its sole discretion, to reduce the Marketing and Advertising Fee rate. If Franchisor reduces the Marketing and Advertising Fee rate for the benefit of certain franchisees, then such reduction (and any related changes in contract terms) shall be made available on the same terms, conditions and qualifications to all similarly situated New Horizons franchisees. Franchisor retains the right, in its sole discretion, upon not less than ten days prior written notice, to partially or totally restore such Marketing and Advertising Fee rate to the amount set forth herein.

(c)    On a national basis, Franchisor may impose an additional assessment upon all of its franchisees for special designated advertising or promotional activities (so long as such assessment is not in substance merely an increase in the general advertising fee referred to in Section 4.3(a) hereof) if New Horizons franchisees owning 2/3 of all franchised Centers agree to such additional assessment by affirmative vote, confirmed in writing by each respective New Horizons franchisee.

(d)    Franchisor shall spend the Marketing and Advertising Fees collected from all of its franchisees for the purposes of supporting the Franchisor Website and eBusiness and other electronic communications media, national advertising, market research, public relations and sales support designed to promote and enhance the value of the System (including, without limitation, the Service Marks) and general public recognition and acceptance thereof, and research and development of eBusiness expansion programs (together "Marketing and Advertising") less Franchisor's (A) administrative expenses relating to such Marketing and Advertising not to exceed 15% of the annual aggregate Marketing and Advertising Fees received or receivable by Franchisor, and (B) actual production costs.

(e)    No interest on unexpended Marketing and Advertising Fees shall be imputed for the benefit of, or payable to Franchisee and no interest on Franchisor expenditures in excess of Marketing and Advertising Fees collected shall be imputed for the benefit of, or payable to, Franchisor.

(f)    Franchisor shall determine the cost, form of media, content, format, production, timing (including regional or local concentration and seasonal exposure) location and all other matters relating to Marketing and Advertising.

(g)    On or before March 31 of each year, Franchisor shall make available to Franchisee, upon request from Franchisee, a statement of receipts and expenditures of the aggregate Marketing and Advertising Fees relating to the preceding calendar year, certified to be correct by an officer of Franchisor.

4.5.    CMS.net Usage Fee.

Franchisee shall pay to Franchisor a monthly CMS.net Usage Fee as described in Exhibit F to this Agreement.

4.6.    eLearning Delivery Fees.

Franchisee shall participate in Franchisor's eLearning programs and shall pay to Franchisor eLearning Delivery Fees in accordance with the terms and conditions of the Integrated Learning Agreement.

4.7.    Interest on Delinquent Payments.

All delinquent payments of any sums due Franchisor shall bear interest at the rate of (i) 10% per annum or (ii) the highest rate permitted by law, whichever is lower.

4.8.    No Accord or Satisfaction.

If Franchisee pays, or Franchisor otherwise receives, a lesser amount than the full amount provided for under this Agreement for any payment due hereunder, such payment or receipt shall be applied against the earliest amount due Franchisor. Franchisor may accept any check or payment in any amount without prejudice to Franchisor's right to recover the balance of the amount due or to pursue any other right or remedy. No endorsement or statement on any check or payment or in any letter accompanying any check or payment or elsewhere shall constitute or be construed as an accord or satisfaction between Franchisor and Franchisee.

4.9.    Not Withhold Payment.

Franchisee shall not have any right to withhold payments due to Franchisor or any of its Affiliates on the grounds of Franchisor's or Franchisor's Affiliates' alleged breach of obligations under this Agreement or under any other agreement between the parties or otherwise.

4.10.    Advance Deposit.

In addition to all other rights given to Franchisor by this Agreement, if Franchisee shall default in any obligation to make timely payment of any sums due Franchisor under this Agreement three times within any period of 12 consecutive months, Franchisor may require upon not less than 14 days prior written notice that Franchisee deposit with Franchisor an amount equal to the highest monthly Continuing Royalty and Advertising Fees that became payable from Franchisee to Franchisor under this Agreement during any 30-day period designated by Franchisor occurring within the 12 months preceding such notice ("Advance Deposit"). Franchisor shall hold the Advance Deposit in its general funds but shall keep a separate accounting thereof, without allowance for interest, for a period of six months following the date of creation of the Advance Deposit, provided that if Franchisee shall default in any obligation to make timely payment of any sums due Franchisor under this Agreement during such period, Franchisor shall hold the Advance Deposit for a period of six months following the date of Franchisee's latest default. If Franchisee defaults in its obligations to pay any sums due Franchisor under this Agreement while funds are held as an Advance Deposit, Franchisor may withdraw from the Advance Deposit such sums as are necessary to pay deficiencies created by Franchisee's default. Franchisee shall be obligated to replace any sums as may be withdrawn by Franchisor within seven days of such withdrawal. Nothing contained in this Section 4.10 shall in any way affect the amount or manner of payment of sums due Franchisor under this Agreement during any period in which such Advance Deposit is held. Franchisor's right to withdraw the highest monthly Continuing Royalty and Advertising sums from the Advance Deposit does not and will not in any manner act to cure Franchisee's monetary defaults under this Agreement.

4.11.   Gross Receipts or Equivalent Taxes.

Franchisee shall pay to Franchisor the amount of any state or local sales, use, gross receipts, or similar tax that Franchisor may be required to pay on payments which Franchisee makes to Franchisor under this Agreement, regardless of whether the state or local tax is imposed directly on Franchisor, is required to be withheld by Franchisee from amounts due to Franchisor under this Agreement, or is otherwise required to be collected by Franchisee from Franchisor. Franchisee's obligation under this Section 4.11 shall not be reduced or offset by any type of claim, credit or deduction of any kind. This provision shall not apply to income taxes or comparable taxes measured by income to which Franchisor may be subject.

**V.**
**TERM**

5.1.   Term.

(a)   If the parties are entering into this Agreement in connection with the initial award of Franchise rights to Franchisee, the term of this Agreement shall be the Initial Term, unless this Agreement is sooner terminated pursuant to the provisions hereof. Additionally, Franchisee shall have an option to renew the Franchise relationship for consecutive terms of 5 years each (each 5 year period is called the "Renewal Term"). In order to exercise the first renewal option (which is referred to as the "Renewal Option" for purposes of this section), Franchisee shall be required to comply with the conditions for renewal set forth in this section. In order to exercise any subsequent renewal option for an additional five-year Renewal Term, Franchisee shall comply with the conditions for renewal set forth in the successor Franchise Agreement to this one, which may be materially different than this Agreement.

(b)   If the parties are entering into this Agreement in connection with Franchisee's exercise of a renewal option granted to Franchisee by the very first Franchise Agreement entered into by the parties, the term of this Agreement shall be the five-year Renewal Term, unless this Agreement is sooner terminated pursuant to the provisions hereof. If the very first Franchise Agreement entered into by the parties granted Franchisee multiple additional renewal options to extend the Franchise relationship after the Renewal Term expires, the parties agree that the conditions for renewal set forth in this section shall only apply to Franchisee's exercise of the next renewal option (which is referred to as the "Renewal Option" for purposes of this section) and shall not apply to any subsequent right which may have been granted to Franchisee to further extend the Franchise relationship. The intention of this section is to protect the renewal rights granted to Franchisee by the very first Franchise Agreement entered into by the parties, but make the exercise of each subsequent renewal right subject to the conditions set forth in the successor form of Franchise Agreement governing the parties' relationship at the time when Franchisee must give notice of its election to exercise the next renewal right, if any.

5.2.   Conditions for Exercising Renewal Option.

(a)   In order to exercise the Renewal Option, Franchisee must comply with all of the following conditions:

(i)   Franchisee must give Franchisor written notice of Franchisee's election to renew (the "Renewal Notice") at least 270 days, but not more than one year before the expiration of the Initial Term or the then-expiring Renewal Term. Franchisee's rights under this section shall be cancelled if Franchisee does not give timely written notice.

      (ii)     Franchisee's Renewal Notice shall be accompanied by payment of a renewal fee in the amount of $7,500. Franchisee understands and agrees that the renewal fee shall not be refundable if Franchisee does not satisfy the conditions for renewal.

      (iii)    Franchisee recognizes that Franchisor has the absolute right to cease granting new and renewal Franchises at any time, in any area in the world, for any reason without prior notice or compensation to Franchisee and that, as a condition to exercising the Renewal Option, Franchisor must be granting both new and renewal Franchises pursuant to this or any successor form of Franchise Agreement in the state in which the Franchised Business is operating when Franchisee gives the Renewal Notice. If Franchisor has ceased to grant both new and renewal Franchises in the state in which the Franchised Business is operating before receiving Franchisee's Renewal Notice, the Franchise relationship shall end on the last day of the Initial Term or then-expiring Renewal Term, as applicable, and any unexercised renewal rights granted by this Agreement, or by the very first Franchise Agreement entered into by the parties, shall be cancelled without compensation to Franchisee. Franchisor shall notify Franchisee of the cancellation of any unexercised renewal rights at such time, if any, that Franchisee gives a Renewal Notice attempting to exercise the Renewal Option and shall return any renewal fee to Franchisee.

      (iv)    Franchisee must not be in default under this Agreement at the time it gives the Renewal Notice or on the last day of the Initial Term or the then-expiring Renewal Term, as applicable. Further, Franchisee must not have received more than 3 notices of default during the 24 months before Franchisee gives the Renewal Notice whether or not the notices relate to the same or to different defaults and whether or not each default has each been timely cured by Franchisee.

      (v)     If the parties are entering into this Agreement in connection with Franchisee's exercise of a renewal option granted by the very first Franchise Agreement entered into by the parties (and not in connection with the initial award of Franchise rights), the parties agree that the following terms and conditions shall apply to them and supersede any provisions of this Agreement to the contrary: (i) the Renewal Term shall be 5 years; (ii) Franchisee's right to further extend the Franchise relationship shall be the rights set forth in the very first Franchise Agreement entered into by the parties in connection with Franchisor's initial award of Franchise rights to Franchisee instead of the Renewal Options described in this Agreement; (iii) Franchisee shall not be required to pay the Initial Franchise Fee stated in this Agreement, but shall instead pay a renewal fee of $7,500, which is the amount of the renewal fee set forth in the very first Franchise Agreement entered into by the parties; (iv) Franchisee shall not be required to participate in the initial training program described in this Agreement which Franchisor provides to new franchisees; and (v) the parties further amend this Agreement to modify any provisions which, by their nature or terms, do not apply to a renewing franchisee operating an existing Center under the terms of an expiring Franchise Agreement. Franchisee recognizes that this Agreement may be materially different than the expiring Franchise Agreement, including, without limitation, requiring payment of additional or different fees to Franchisor. If, after the exercise of the renewal option, Franchisee still has additional unexpired renewal options granted by the very first Franchise Agreement entered into by the parties, Franchisee agrees that the term of any unexpired renewal option shall be 5 years, but the conditions under which Franchisee may exercise the unexpired renewal option shall be the same terms and conditions set forth in this section that apply to a Franchisee that executes this Agreement in connection with the initial award of Franchise rights.

      (vi)    If the parties are entering into this Agreement in connection with the initial award of Franchise rights, the parties agree that the following terms and conditions shall apply to Franchisee's exercise of the first Renewal Option granted by this Agreement: (i) within 30 days after Franchisee gives its Renewal Notice and pays the renewal fee, Franchisor shall deliver a copy of the form of Franchise Agreement which Franchisor is then offering to new or renewing franchisees in the state in which the

Franchised Business is operating together with any disclosure document required by Applicable Law; (ii) the term of the new Franchise Agreement shall be 5 years; (iii) the new Franchise Agreement shall supersede this Agreement in all respects except as follows: (a) Franchisee's right to further extend the Franchise relationship shall not be the rights set forth in the new Franchise Agreement, but shall instead be the rights set forth in this section or in the very first Franchise Agreement entered into by the parties, as applicable; (b) Franchisee shall not be required to pay the Initial Franchise Fee stated in the new Franchise Agreement, but shall instead pay the renewal fee set forth in this Agreement; (c) Franchisee shall not be required to participate in any initial training program described in the new Franchise Agreement then offered by Franchisor to new franchisees; and (d) the parties shall further amend the new Franchise Agreement to modify any provisions which, by their nature or terms, do not apply to a renewing franchisee operating an existing Center under the terms of an expiring Franchise Agreement. In accordance with Section 5.1, the conditions for renewal set forth in this subsection shall only apply to Franchisee's exercise of the first Renewal Option and shall not apply to Franchisee's exercise of the second Renewal Option granted by this Agreement. Franchisee recognizes that Franchisor has the absolute right to modify the terms of its Franchise Agreement at any time and for any reason. The parties further agree:

(1)     If Franchisor is in the process of revising, amending or renewing its franchise disclosure documents or registration to sell franchises in the state or otherwise under Applicable Law cannot lawfully offer or sell a franchise at the time when this section requires that Franchisor deliver a copy of its then-current form of Franchise Agreement, the term of this Agreement shall be automatically extended on a month-to-month basis for up to 12 months until such time as Franchisor notifies Franchisee that it may lawfully offer or sell franchises. Franchisor shall then deliver to Franchisee the form of Franchise Agreement and disclosure document which Franchisor at that time may lawfully enter into with new or renewing franchisees in the state in which the Franchised Business is operating. Franchisee understands and agrees that the form of Franchise Agreement which Franchisor ultimately delivers to Franchisee may be materially different than the form of Franchise Agreement in effect on the date when Franchisee gives the Renewal Notice.

(2)     If Franchisee satisfies all other conditions set forth in this section, but after 12 months, Franchisor still cannot lawfully offer or sell a franchise in the state in which the Franchised Business is operating, the parties agree that this Agreement shall continue in effect during the Renewal Term, which shall begin immediately following the end of the 12- month period.

(vii)     Within 30 days after Franchisor delivers the form of Franchise Agreement which Franchisor is then offering to new or renewing franchisees in the state in which the Franchised Business is operating together with any disclosure document required by Applicable Law, Franchisee shall execute and return the Franchise Agreement together with any other contracts which Franchisor requires that Franchisee execute in order to renew the Franchise relationship. Upon receipt of the executed documents, Franchisor shall execute one copy thereof and return the same to Franchisee. If Franchisee fails or refuses to execute and return to Franchisor all of the documents within the time frame set forth in this subsection, the Franchise relationship shall end on the last day of the Initial Term or then-expiring Renewal Term and any unexercised renewal options shall be cancelled without compensation to Franchisee.

(viii)     Franchisee shall satisfy Franchisor's then-current training requirements, if any, for renewing franchisees.

(ix)     Franchisee shall execute and deliver a general release, in form satisfactory to Franchisor, of any and all claims against Franchisor, Franchisor's Affiliates and their respective officers, directors, shareholders, employees and agents.

(x)    Franchisee must have achieved a market penetration in the Territory equal to or greater than the market penetration achieved by at least 25% of other franchisees in the same Market Category as Franchisee. For purposes of this Section 5.2(iii), (y) "market penetration" for a year shall be calculated by dividing the Gross Revenue of Franchisee during a twelve (12) month period by the population of the Territory, and (z) Franchisee must have achieved the required market penetration calculated at the end of either of the twelve (12) month periods for the two (2) years which precede the date of the Renewal Notice.

(b)    Subsequent to the execution by Franchisee of a Franchise Agreement for a Renewal Term, and prior to the effective date of the new Franchise Agreement, at Franchisee's sole cost, Franchisee shall bring the Center, and all other authorized business sites from which the Franchised Business is conducted into compliance with the standards then applicable to new Franchises. Franchisor is unable to estimate the costs to comply with this Section 5.2(b).

## 5.3.    Notice of Expiration Required by Law.

Franchisor shall not be required to give Franchisee notice of the expiration of this Agreement before the Initial Term or then-expiring Renewal Term expires unless Applicable Law so requires, in which case, if Franchisor fails to give timely notice of the expiration as required by Applicable Law, this Agreement shall remain in effect on a month-to-month basis only until Franchisee has received such required additional notice unless Franchisee waives the need for such additional notice.

## 5.4.    Failure to Satisfy Conditions.

If Franchisee fails to satisfy any of the conditions set forth in this section in a timely manner, this Agreement will expire on the last day of the Initial Term or then-expiring Renewal Term and any unexercised renewal rights shall be cancelled without compensation to Franchisee and without the requirement of any further notice from Franchisor; provided, however, Franchisee shall remain obligated to comply with all provisions of this Agreement which expressly, or by their nature, survive the expiration or termination of this Agreement.

## 5.5.    Personal Guarantee.

Upon the exercise of a renewal option, Franchisee may, at its option, substitute the personal guarantee which the Equity Holders had previously executed in connection with the grant of the initial term with a limited personal guarantee in the form attached to this Agreement as Exhibit E-2, but only if Franchisee fully and completely satisfies each of the conditions set forth in Section 5.2.

## VI.
## INTELLECTUAL PROPERTY RIGHTS

## 6.1.    License.

Franchisor hereby grants to Franchisee the right during the term hereof to use and display the Service Marks and the other elements of Franchisor's Intellectual Property Rights that Franchisor designates in accordance with this Agreement and the Confidential Operations Manual, solely in connection with the operation of the Franchised Business. Franchisee acknowledges that Franchisor prescribes minimum standards respecting the nature and quality of the goods and services that may be identified by the Service Marks. Franchisee agrees that as between Franchisor and Franchisee, the Intellectual Property Rights are the exclusive property of Franchisor. Franchisee does not now and will not in the future assert any claim to any goodwill, reputation or ownership of the Intellectual Property

Rights by virtue of Franchisee's franchised or licensed use thereof or otherwise. It is expressly understood and agreed that ownership and title of the Intellectual Property Rights and the goodwill therein are and, as between Franchisor and Franchisee, shall remain vested solely in Franchisor, and the use thereof is only permitted for the term of this Agreement. Franchisee acknowledges that the material and information now and hereafter provided and/or revealed to Franchisee pursuant to this Agreement (including in particular, but without limitation, the contents of the Confidential Operations Manual) are confidential trade secrets of Franchisor and are revealed in confidence, and Franchisee expressly agrees to keep and respect the confidences so disclosed, both during the term of this Agreement and thereafter. Franchisor and the owner of the Intellectual Property Rights expressly reserve all rights to the Intellectual Property Rights, except for the license granted to Franchisee in this Agreement. Franchisee agrees to be responsible for and supervise all of its principals, officers, directors, partners, employees and agents in order to insure the proper use of the Intellectual Property Rights in compliance with this Agreement. Franchisee shall use the Intellectual Property Rights solely in connection with the Franchised Business and shall not use or display the Service Marks or use any of the other Intellectual Property Rights in connection with the operation of any business, the performance of any other service or the conduct of any activity outside the scope of the Franchised Business. Franchisee shall use the Intellectual Property Rights only in connection with the Franchised Business and agrees that all of Franchisee's use under this Agreement inures to the benefit of Franchisor. Nothing herein shall give Franchisee any right, title or interest in or to any of the Intellectual Property Rights, except a mere privilege and license during the term hereof to display and use the same strictly according to the limitations provided in this Agreement and the Confidential Operations Manual. By its signature below, Franchisee acknowledges that no equity interest in the Intellectual Property Rights or the Franchise or any goodwill associated with either inures to the benefit of Franchisee. Franchisee agrees that all improvements, ideas, know-how, artwork, graphics, layouts, slogans, names, titles, text or similar materials incorporating any of the Intellectual Property Rights which may be created by Franchisee, its employees, agents and subcontractors and any other party with whom it may contract to have such improvements, ideas or materials produced pursuant to this Agreement shall become the sole property of Franchisor, and Franchisee agrees on its behalf and on behalf of its employees, agents, subcontractors and any other party with whom it may contract to have such improvements, ideas and materials produced, promptly to execute any and all appropriate documents to perfect Franchisor's rights. If required by Applicable Law, Franchisee agrees to join with Franchisor in any application to enter Franchisee as a registered or permitted user, or the like, of the Intellectual Property Rights with any appropriate governmental agency or entity. Upon termination of this Agreement for any reason whatsoever, Franchisor may immediately apply to cancel Franchisee's status as a registered or permitted user and Franchisee shall consent in writing to the cancellation and shall join in any cancellation petition. The expense of any of the foregoing recording activities shall be borne by Franchisee.

6.2. Acts in Derogation of the Intellectual Property Rights.

Franchisor shall disclose its Intellectual Property Rights, including its trade secrets, to Franchisee by loaning to Franchisee for the term of this Agreement the Confidential Operations Manual and other manuals, videotapes and other recorded and electronic media and written materials containing Franchisor's trade secrets, through training and assistance provided to Franchisee hereunder, and by and through the performance of Franchisor's other obligations under this Agreement. Franchisee acknowledges that any trade secrets are being imparted to Franchisee because of Franchisee's special status as a franchisee of the System; and that any trade secrets included in the Intellectual Property Rights shared with Franchisee are not generally known to the computer and professional skills training industry or public at large and are not known to Franchisee except by reason of such disclosure. Franchisee further acknowledges that it shall acquire no interest in Intellectual Property Rights, including the trade secrets, other than the right to use them in the development and operation of the Franchised Business

during the term of this Agreement. In addition, Franchisee acknowledges that the use or duplication of the Intellectual Property Rights, including the trade secrets, except as expressly permitted by this Agreement shall constitute an unfair method of competition and that Franchisor shall suffer irreparable injury thereby. Franchisee agrees that it will not do or permit any act or thing to be done in derogation of any of the rights of Franchisor in connection with the Intellectual Property Rights, either during the term of this Agreement or thereafter, and that it will use same only for the uses and in the manner franchised and licensed in this Agreement. Furthermore, Franchisee and its employees and agents will not engage in any acts or conduct that materially impair or impugn the name, reputation, market recognition or goodwill associated with the Network or any of the elements of the System.

6.3.    Use and Modification of Intellectual Property Rights.

(a)    In connection with the operation of the Franchised Business, Franchisee agrees that at all times and in all advertising, promotions, signs and other display materials, regardless of the media or method of use, including use in Franchisee website, on its letterheads, business forms, and at the Center and other authorized business sites, in all of its business dealings related thereto and in communications with the general public, it will identify the Franchised Business under the Assumed Name, in such form, size and style as prescribed in the Confidential Operations Manual. Franchisee shall file and keep current a "Fictitious Business Name Statement" (or similar document) with respect to its Assumed Name in the county or other jurisdiction in which Franchisee is conducting business and at such other places as may be required by law. Prior to commencing business under the Service Marks, Franchisee shall supply evidence satisfactory to Franchisor that Franchisee has complied with relevant laws regarding the use of fictitious or assumed names. Franchisee further agrees that it will not identify itself as (i) Franchisor, (ii) the owner of the Intellectual Property Rights, (iii) a subsidiary, parent, division, shareholder, partner, consultant, joint venturer, agent or employee of Franchisor, or (iv) any of Franchisor's other franchisees. If Franchisee is a corporation, Franchisee shall not use the Service Marks in its corporate name. Without limiting the scope of the foregoing restrictions, Franchisee agrees not to use any website, domain name or other electronic communication method without conforming to Franchisor's instructions for domain name, content, permitted and required links and other protocol.

(b)    Franchisor may add to, substitute or modify any or all of the Intellectual Property Rights, including the Service Marks, from time to time, by directive in the Confidential Operations Manual. Franchisee shall accept, use, display, or cease using, as may be applicable, the modified Intellectual Property Rights, including but not limited to, any modified or additional Service Marks, and shall within 30 days of receiving notification, commence to implement such changes and use its best efforts to complete such changes as soon as practicable. Changes which Franchisor may make to the Intellectual Property Rights shall not modify any of the fees payable to Franchisor under this Agreement. On expiration or sooner termination of this Agreement, Franchisor may, if Franchisee does not do so, execute in Franchisee's name and on Franchisee's behalf any and all documents necessary, in Franchisor's judgment, to end and cause a discontinuance of the use by Franchisee of the Intellectual Property Rights (including, without limitation, the Service Marks) and Assumed Name registrations, and Franchisor is hereby irrevocably appointed and designated as Franchisee's attorney-in-fact to do so.

6.4.    Use of Other Service Marks.

Franchisee shall not use or display or permit the use or display of any other trademarks, trade names, service marks, insignias or logo types other than the Service Marks approved for use by Franchisor (i) in any advertisement that contains the words "New Horizons Computer Learning Center", (ii) in or on any Center or place of business of Franchisee in any manner that is reasonably visible from outside such Center or place of business, (iii) in any computer system used at any Center or place of

August 1, 2014                                                                                                    Philadelphia, PA

20

business of Franchisee, (iv) in answering telephones at the Center or otherwise in connection with the Franchised Business, in any manner that could lead any Person to believe that such other trademarks, trade names, service marks, insignias or logo types or the products or services with which they are associated are owned or offered by Franchisor or its Affiliates, except as otherwise expressly permitted herein or in the Confidential Operations Manual. If Franchisee is a Conversion Franchise, Franchisee may continue to use its existing trade name together with the Assumed Name for a period not to exceed 12 months from the Effective Date.

## 6.5. Prohibition Against Disputing Franchisor's Rights.

Franchisee agrees that it will not, during or after the term of this Agreement, in any way dispute or impugn the validity of the Intellectual Property Rights licensed hereunder, or the rights of Franchisor thereto, or the right of Franchisor or other franchisees of Franchisor to use the same during the term of this Agreement or thereafter.

## 6.6. Infringement Claims and Defense of Intellectual Property Rights.

If Franchisee receives notice or otherwise becomes aware of any claim, suit or demand ("Third Party Claim") threaten or brought against it by any party other than Franchisor on account of Franchisee's alleged infringement, unfair competition or similar matter arising from Franchisee's use of the Intellectual Property Rights, Franchisee shall promptly notify Franchisor of the Third Party Claim. Franchisee shall have no power, right or authority to negotiate, handle, settle or compromise the Third Party Claim without the prior written consent of Franchisor. Franchisor shall have the sole discretion to determine whether the intellectual property used by a third party infringes upon, or is confusingly similar to, the Intellectual Property Rights licensed to Franchisee and whether and what subsequent action, if any, it will take with respect to the Third Party Claim. If Franchisor decides to take action in response to the Third Party Claim, Franchisor, alone, shall select legal counsel and decide whether to defend, compromise or settle the Third Party Claim. Franchisee agrees to cooperate fully in Franchisor's handling of the Third Party Claim. As long as the Third Party Claim does not arise directly or indirectly as a result of action or inaction or gross negligence of Franchisee or Franchisee's breach of this Agreement, Franchisor agrees to indemnify, defend and hold Franchisee harmless from and against the Third Party Claim subject to the limitation that Franchisor's indemnity shall be limited to (i) the amount of any settlement, damages or award for which Franchisee is held liable to pay to a third party arising from Franchisee's conduct in accordance with this Agreement, and (ii) reimbursing Franchisee for costs or expenses to cease using or modify the use of any of the Intellectual Property Rights in accordance with a court order or settlement of the Third Party Claim; provided, however, nothing in this Agreement obligates Franchisor to indemnify Franchisee for its lost profits or consequential damages of any kind arising from the Third Party Claim or the duty to adopt new Service Marks.

## VII.
## INSTRUCTION AND OPERATING ASSISTANCE

### 7.1. Initial Franchise Training.

Franchisor shall provide instruction at IFT to the General Manager and other responsible management personnel designated by Franchisee within a reasonable time after the Effective Date. Persons attending IFT must have a demonstrable relationship to the management and operation of the Center. The General Manager and designated persons must attend the next available IFT after execution of this Agreement except as otherwise provided in writing by Franchisor. IFT consists of (i) ten days of training at or near the headquarters of Franchisor and (ii) one week of training at the Center, under the supervision of Franchisor's personnel; provided that if Franchisee has prior experience in businesses

similar to the Franchised Business and both parties agree, IFT may be for less than an aggregate of three weeks. Franchisee shall be entirely responsible for the salaries and expenses of all of its trainees, and Franchisor reserves the right to limit the number of attendees. IFT is usually provided on a quarterly basis at the corporate headquarters of Franchisor or such other suitable location as may be designated by Franchisor. IFT must be completed to the reasonable satisfaction of Franchisor before commencement of operations of the Franchised Business by Franchisee. Upon satisfactory completion of IFT, Franchisee will receive a Certificate of Completion and Franchisee must sign a Receipt for Certificate of Completion - Initial Franchisee Training in the form provided by Franchisor.

7.2.    Expenses.

Franchisee shall make arrangements for and pay the travel and hotel room expenses for attendees at IFT. Franchisor reserves the right to assess a reasonable charge (not to exceed $250 per day) for training more than three attendees from Franchisee.

7.3.    Mandatory Meetings.

Not more often than once each year, Franchisor may conduct a system-wide or series of regional meetings to discuss New Horizons business activities or other matters relating to the Franchised Business. Attendance of the General Manager at these meetings is mandatory (and is highly recommended for other principals of Franchisee). Franchisee must pay all costs incurred as a result thereof including the cost of transportation, accommodations and living expenses. Franchisor may charge Franchisee a reasonable fee to attend such annual meetings. The annual meetings referenced in this Section 7.3 are in addition to any voluntary convention or sales conference which may be coordinated by Franchisor.

7.4.    Staff Training Courses.

(a)      Franchisor may make available to Franchisee optional staff training courses, other training courses, seminars, conferences or other programs, at a suitable location in Franchisor's discretion.

(b)      Attendance at staff or other training courses, seminars, conferences or other programs which are deemed by Franchisor to be relevant or appropriate to the successful operation of the System is highly recommended but not mandatory.

(c)      No fees shall be charged by Franchisor for required training courses, seminars, conferences or other programs; however, other costs and expenses incurred by Franchisee in respect of required training courses, seminars, conferences or other programs shall be borne solely by Franchisee.

7.5.    Continuing Assistance.

Franchisor shall provide periodic supervision and assistance as it deems appropriate. The nature, frequency and duration of such assistance by representatives of Franchisor shall be in the sole discretion of Franchisor. In addition, Franchisor will be available by telephone, facsimile or email on an ongoing basis for consultation and guidance with respect to the operation and management of the Franchised Business. In addition to the Confidential Operations Manual, Franchisor may from time to time provide Franchisee with additional materials relating to the Franchised Business.

7.6.    Site Selection Assistance.

Franchisor provides space planning consultation and advice but does not provide assistance in actual site selection for the Center. Franchisor must approve the proposed site for the Center, which approval shall not be withheld unreasonably.

7.7.    Initial Franchise Training Package and Recruiting Materials.

At or before IFT, Franchisor shall provide to Franchisee proprietary information and related materials for use in connection with the training of Franchisee's staff. Such materials may include manuals, videotapes and other recorded and electronic media and written materials. Such items are and shall remain the property of Franchisor. Franchisor may also from time to time make available to Franchisee for purchase manuals, videotapes and other recorded and electronic media and written materials relevant to the System and the Franchised Business. Franchisee shall not, and shall not allow its employees or others to, copy, reproduce, disseminate or otherwise reveal to third parties any of the foregoing proprietary information and related materials without Franchisor's express prior written consent.

7.8.    Timing.

Franchisee acknowledges that Franchisor's ability to provide IFT, other training, continuing assistance and other services provided for under this Article VII (and Article VIII below) may be affected by various factors including the number of franchisees being incorporated into the System within approximately the same time frame. Franchisor shall establish a reasonable schedule to provide such services taking such factors into account, and shall exercise its best efforts to provide such services within the times otherwise provided hereunder.

## VIII.
## OPERATION OF BUSINESS

8.1.    Franchisee Operational Requirements.

(a)    Franchisee shall at all times employ or engage the services of, on a full time basis, at least one General Manager who has successfully completed IFT prior to the Effective Date or subsequent IFT as agreed in writing by Franchisor. Each General Manager shall devote his or her full time to the management, operation and development of the Franchised Business.

(b)    Franchisee shall employ or retain on a full time basis no fewer than the number of Account Executives ("AEs") shown on Schedule H based on the type of Territory that the parties have used to calculate the minimum Continuing Royalty during the Initial Term or Renewal Term, as applicable.

(c)    Franchisee shall at all times ensure that its employees and agents conduct the Franchised Business professionally, courteously and in compliance with Applicable Law.

(d)    Subject to the terms and conditions of the Confidential Operations Manual from time to time, at all times Franchisee's Center shall accommodate no fewer than the number of classrooms shown on Exhibit H based on the type of Territory that the parties have used to calculate the minimum Continuing Royalty during the Initial Term or Renewal Term, as applicable. Furthermore, the Center must remain open on a full time and continuous basis, except for closures caused by acts of God or other matters beyond the control of Franchisee (other than Franchisee's inability to procure money).

Franchisee shall file periodic sales and training activity reports in the frequency specified in the Confidential Operations Manual.

8.2. Operational Systems.

(a) Franchisee shall execute and comply with all the terms and conditions of the CMS.net Agreement (attached hereto as Exhibit "F") Franchisee shall pay to Franchisor the CMS.net fees in accordance with the terms of the CMS.net Agreement.

(b) Franchisee shall execute the Extranet Licensing Agreement in the form attached hereto as Exhibit D and by this reference incorporated herein.

(c) Franchisee must obtain and maintain adequate quantities of computers and related equipment necessary and appropriate for the conduct of the Franchised Business. Minimum quantities per classroom and type of computer may be prescribed by Franchisor from time to time in the Confidential Operations Manual as updated from time to time by notice on the Extranet.

(d) Franchisee shall maintain, at its sole cost, computer equipment capable of running any electronic communication services which Franchisor may from time to time require of System members. Franchisor has implemented the Extranet and reserves the right to modify or change the Extranet and to change, increase or impose additional fees, or discontinue or replace the Extranet as improvements in technology occur as Franchisor believes will best benefit the System. Franchisee agrees to comply with all changes in accordance with Franchisor's instructions.

(e) Franchisee shall use the Integrated Learning Manager to participate in eBusiness and to provide students with the full range of Integrated Learning resources. NH-Branded Classroom Learning Content must be used whenever Franchisee delivers a course with a curriculum that incorporates Mentored Learning or eContent.

8.3. Confidential Operations Manual.

(a) Franchisee shall operate the Franchised Business in accordance with the Confidential Operations Manual, a copy of which shall be provided to Franchisee at or before Initial Franchise Training. If Franchisee loses or destroys the Confidential Operations Manual, it may be required to pay Franchisor upon demand the sum of $5,000.

(b) Franchisor shall have the right to modify the Confidential Operations Manual at any time by the addition, deletion or other modification of the provisions thereof. Franchisor agrees that although such modifications to the Confidential Operations Manual may be material in that they may have an effect on the operation of the business, they may not conflict with or materially alter the terms of this Agreement. All such additions, deletions or modifications shall be effective three business days after Franchisor has deposited notification to Franchisee of same with the United States Postal Service or one business day after deposit with a reliable overnight courier service or by the next business day after communication (with confirmed receipt) by facsimile or other electronic communications medium to which Franchisor and Franchisee both have access (e.g., the New Horizons Extranet). The Confidential Operations Manual is deemed to be an integral part of this Agreement and references to the Confidential Operations Manual made in this Agreement, or in any amendments or exhibits hereto, shall be deemed to mean the Confidential Operations Manual, as amended from time to time. Any breach of the Confidential Operations Manual is a breach of this Agreement.

(c)     Other applicable manuals, videotapes, audiotapes, or other printed or recorded media containing information proprietary to Franchisor may be provided to Franchisee at or before Initial Franchise Training. The Confidential Operations Manual, together with all other Franchisor manuals provided to Franchisee, shall at all times remain the sole, confidential, trade secret property of Franchisor. Upon expiration or termination of this Agreement for any reason, Franchisee shall immediately cease using or accessing or return the Confidential Operations Manual to Franchisor. Except as specifically permitted by Franchisor, at no time may Franchisee, or its employees or agents, make, or cause to be made, any copies or reproductions of all or any portion of the Confidential Operations Manual and shall not disclose the terms thereof to anyone except employees and agents of Franchisee when required in the operation of the Franchised Business.

(d)     If Franchisor furnishes the Confidential Operations Manual to Franchisee in electronic form, Franchisee will not share Franchisee's password or other login information necessary to access the electronic version of the Confidential Operations Manual or other information that Franchisor maintains on any system-wide intranet or private computer network maintained by Franchisor for the benefit of all Franchisees. Franchisee will furthermore take steps to ensure that Franchisee's employees do not share their individual passwords or other login information with any other person.

8.4.    Signs and Display Materials.

All signs, display materials and other materials shall be in full compliance with the specifications provided in, and in conformity with, the Confidential Operations Manual. Said materials may be purchased and procured by Franchisee from Franchisor or suppliers designated or approved by Franchisor in accordance with Confidential Operations Manual guidelines.

8.5.    Telephone Numbers.

At its sole expense, Franchisee shall obtain appropriate telephone directory listings in the form, size and content and in accordance with procedures prescribed by the Confidential Operations Manual, in at least one applicable telephone directory of general distribution covering the Center, or such other areas as Franchisor may direct, of its authorized Assumed Name as promptly as possible after the Effective Date of this Agreement, and shall list telephone numbers for the Center. If Franchisee is engaged in businesses other than the Franchised Business, Franchisee must maintain different telephone numbers and may make no reference to the Franchised Business in any telephone directory listings of such other businesses. Upon termination of this Agreement, for any reason, Franchisee shall comply with the provisions of Article XII of this Agreement and change any listed telephone numbers, including all internet listings carried by any internet search engines relating to the Franchised Business, shall not provide a call forwarding or telephone number referral with respect to any such disconnected telephone number (except to a telephone number designated by Franchisor) and shall not indicate in any manner it was previously Affiliated with Franchisor. Franchisee agrees to execute any applicable supersedure or other telephone transfer forms relating to telephone numbers for the Center. Also, Franchisee hereby irrevocably appoints and designates Franchisor as Franchisee's attorney-in-fact to change any listed telephone numbers, including all internet listings carried by any internet search engines relating to the Franchised Business and to discontinue telephone directory listings, including all internet listings carried by any internet search engines using the Assumed Name, in the event of termination of this Agreement. Franchisee must answer the telephones solely in the manner prescribed in the Confidential Operations Manual.

8.6.    Insurance.

Franchisee shall have in effect on the Effective Date and maintain during the term hereof insurance in such types and amounts as specified in the Confidential Operations Manual. All policies of insurance to be maintained by Franchisee shall contain a separate endorsement naming Franchisor, and if required, its Affiliates, as additional insured parties. These policies of insurance shall not be subject to cancellation or modification except with 30 days prior written notice to Franchisor. Franchisee shall cause certificates of insurance showing compliance with the above requirements to be delivered to Franchisor annually, as a condition of exercise of the Renewal Option, and at such other times as Franchisor may request.

8.7.    Records and Rights of Inspection.

(a)    Franchisee covenants and agrees that it shall keep and maintain during the term hereof, and for a period of 36 months following expiration or termination for any reason, full, true and complete records of all revenues and expenditures respecting the Center, related to the Franchised Business, in the form and manner specified by Franchisor and shall permit Franchisor or its representatives or agents selected in the sole discretion of Franchisor, during normal business hours, to examine or audit the books of accounts, bank statements, documents, records (including without limitation club memberships, coupon records, paid vendor invoices, customer invoices and cash receipts), papers, class registrations and telemarketing contacts, and federal, state and local tax return records relating to the Franchised Business or individual officers, directors, owners, partners, Affiliates or shareholders (not including (i) shareholders who are not officers or directors or (ii) outside directors). If Franchisor should cause an audit to be made and the Gross Revenues or business transacted as shown by Franchisee's records should be found to be understated by any amount, Franchisee shall immediately pay to Franchisor the additional amount payable as shown by such audit, plus interest thereon at the rate of 10% per annum or the highest rate of interest allowed by law, whichever is lower, computed from the date (or dates) said understated amount (or amounts) were due. If Franchisee's Gross Revenues are found to be understated by 3% or more or if Franchisee's financial records require a substantial effort (as determined in the sole judgment of Franchisor, exercised in good faith) on behalf of Franchisor's auditors to be placed in a condition readily conducive to audit due to a failure to follow reasonable accounting procedures, Franchisee will be required to immediately pay to Franchisor the entire cost of such audit; otherwise, the cost of the audit shall be borne by Franchisor. Franchisee shall furnish Franchisor with a copy of any and all certified financial statements respecting Franchisee's business, without any cost or expense to Franchisor. Franchisee acknowledges and agrees that the remedies for understatement of Gross Revenues setout herein are in addition to, and not in lieu of, Franchisor's rights to terminate this Agreement.

(b)    Within 90 days after the end of each of Franchisee's fiscal years, Franchisee shall furnish Franchisor with its most recent federal tax return and a Profit and Loss Statement and Balance Sheet of the Franchised Business for the previous fiscal year. All such financial statements shall be prepared in accordance with generally accepted accounting principles, and shall be attested to with respect to accuracy by Franchisee, or if Franchisee is a Business Entity, by an authorized signatory of that Business Entity, as being true and correct.

(c)    Franchisor shall have the right, at any time, to use any financial report or statement, or any information derived there from, relating to the Franchised Business or the Center, for aggregate statistical and marketing purposes. Unless Franchisee notifies Franchisor in writing, Franchisee's monthly revenues will be published for system wide internal purposes, but neither these revenues nor any other financial report or statement to be provided hereunder will be disclosed to any other Person without Franchisee's prior written consent.

(d)     Franchisee certifies that all reports, forms, records, information and data that Franchisee is required to maintain or submit, or voluntarily maintains or submits, or directs a third party to maintain or submit on its behalf, to Franchisor, will be true and correct and not omit material facts that are necessary in order to make the information disclosed not misleading.

8.8.    Review.

Franchisor shall have the right to send representatives at reasonable intervals during normal business hours, into the Center to inspect Franchisee's other records, operations, business methods, service, management and administration, to determine the quality thereof and the faithfulness of Franchisee's compliance with the provisions of this Agreement and the Confidential Operations Manual. If such other records are not located at the Center, Franchisor's representatives shall have the right to inspect said other records, wherever located.

8.9.    Compliance with Laws.

(a)     Franchisee shall (i) operate the Franchised Business in compliance with all Applicable Law, (ii) prepare and file all necessary tax returns, and (iii) pay promptly all taxes imposed upon Franchisee or upon its business or property. Franchisee represents and warrants that it shall obtain and at all times maintain all necessary permits, certificates, registrations and/or licenses necessary to operate the Center. Franchisee shall immediately notify Franchisor of any litigation or arbitration, criminal proceeding, or any other legal proceeding or action brought against or involving Franchisee, or any Business Entity affiliated with Franchisee, or any agent, employee, owner, director or partner of Franchisee, which notification shall include all relevant details in respect thereof.

(b)     Any forms or materials provided by Franchisor as examples of forms or materials used by Franchisor or others in connection with the Franchised Business do not constitute an assurance or implication that such forms or materials comply with all laws specific to Franchisee. Such forms and materials are used by Franchisee at its own risk, and Franchisor recommends that before such use, Franchisee consult with its counsel to insure compliance with Applicable Law.

8.10.   Confidentiality, Non- Competition, Acts Prejudicial to the System.

Franchisee and each Equity Holder hereby acknowledges and agrees that pursuant to this Agreement Franchisee and each Equity Holder will receive valuable specialized training and trade secrets, including without limitation technology, software, trade secrets, strategies and financial, marketing, merchandising, operating, performance, cost and business information, product and business development plans, customer information, outsourcing strategies and information regarding the operational, sales, promotional and marketing methods and techniques of the System and other information concerning the actual or anticipated business, research or development of Franchisor and its Affiliates (the "Confidential Information"). In consideration for the use and license of the Confidential Information, Franchisee and each Person who is now, or in the future, an Equity Holder agrees that:

(a)     Franchisee's and Equity Holder's use, publication or duplication of Confidential Information for any purpose not authorized by this Agreement constitutes an unfair method of competition by Franchisee and Equity Holder and, additionally, grounds for termination of this Agreement.

(b)     Franchisee and Equity Holders agree to: (i) confine disclosure of Confidential Information to those of its employees and agents who require access in order to perform the functions for which they have been hired or retained; and (ii) observe and implement reasonable procedures prescribed

from time to time by Franchisor to prevent the unauthorized or inadvertent use, publication or disclosure of Confidential Information.

(c)     All agreements contained in this Agreement pertaining to Confidential Information shall survive the expiration, termination or Franchisee's assignment of this Agreement.

(d)     The provisions concerning non-disclosure of Confidential Information shall not apply if disclosure of Confidential Information is legally compelled in a judicial or administrative proceeding, provided Franchisee and Equity Holders shall have used their respective best efforts, and shall have afforded Franchisor the opportunity, to obtain an appropriate protective order or other assurance satisfactory to Franchisor of confidential treatment for the information required to be disclosed.

(e)     Franchisee understands and agrees that Franchisor will suffer irreparable injury not capable of precise measurement in money damages if any Confidential Information is obtained by any Person and is used to compete with Franchisor or another New Horizons franchisee or Affiliate or otherwise in a manner adverse to Franchisor's interest. Accordingly, in the event a breach of any provision regarding use of Confidential Information, Franchisee, on behalf of itself and each Covered Person, hereby consents to entry of a temporary restraining order or other injunctive relief as well as to any other equitable relief which may be granted by a court having proper jurisdiction, without the requirement that Franchisor in the event of such breach is reasonable and necessary for the protection of the business and goodwill of Franchisor.

(f)     Neither Franchisee nor any Equity Holder shall engage in activities that constitute Acting as a Computer Learning Center with respect to any business other than the Franchised Business (i) during the term hereof and (ii) for a period of one year after the termination of this Agreement for any reason either within the Territory or within 25 miles of any Network Center, nor shall it operate, manage, own, consult, assist or hold an interest, direct or indirect (as an employee, officer, director, shareowner, partner, joint venturer or otherwise), in any computer training business other than the Franchised Business.

(i)     The parties acknowledge that the restrictions in this section are independent of the other covenants and provisions of this Agreement. If any provision in this section is void or unenforceable under California law, but would be enforceable as written or as modified under the laws of the state in which the Franchised Business is located (the "Local Laws"), the parties agree that the Local Laws shall govern any dispute concerning or involving the construction, interpretation, validity or enforcement of the provisions of this Agreement with respect to the agreements in this section, but only with respect to those subjects.

(ii)     Franchisee expressly authorizes Franchisor to conform the scope of any void or unenforceable covenant in order to conform it to the Local Laws. Franchisee and the Equity Holders each expressly agree, on behalf of itself and each Covered Person, to be bound by any modified covenant conforming to the Local Laws as if originally stated in this Agreement.

(g)     It is the intention of the parties that Franchisee maximize the Gross Revenues of the Franchised Business for the mutual benefit of Franchisor and Franchisee, and any action of Franchisee which diverts business to another Person or diminishes the Gross Revenues of the Franchised Business is a material breach of this Agreement.

(h)     Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with, any Person, divert or attempt to divert any business or customer of the Franchised Business to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the System.

(i)     Neither Franchisee nor Franchisor shall solicit any individual who is at that time employed by the non-soliciting party, or its Affiliates, to leave his or her employment, without the advance prior written consent of the non-soliciting party. If either party violates the above non-solicitation of employee covenant and employs, or if one of its Affiliates employs, the individual so solicited, the soliciting party must pay to the non-soliciting party a sum equal to 50% of the annual salary rate being paid to the employee at the time of the solicitation.

(j)     This Section 8.10 shall apply to each individual who is now, or who becomes, an Equity Holder of Franchisee.

Franchisee and each Equity Holder acknowledges that the restrictions contained in this section are reasonable and necessary in order to protect legitimate interests of Franchisor, and in the event of violation of any of these restrictions, Franchisor shall be entitled (i) to terminate this Agreement, (ii) to obtain damages, including without limitation Continuing Royalty and other fees that would have been payable if such business were included in the Franchised Business, and (iii) to require an accounting by Franchisee of all earnings, profits and other benefits arising from such violation. These rights and remedies of Franchisor under this Section 8.10 shall be cumulative and in addition to any other rights or remedies to which Franchisor may be entitled at law or in equity. Notwithstanding the provision of damages, Franchisee also understands and agrees that Franchisor will suffer irreparable injury not capable of precise measurement in money damages if Franchisee or any Covered Person breaches the covenants set forth in this Section 8.10. Accordingly, if a breach occurs, Franchisee and the Equity Holders, on behalf of itself and each Covered Person, each hereby consents to entry of a temporary restraining order or other injunctive relief as well as to any other equitable relief which may be granted by a court having proper jurisdiction, without the requirement that Franchisor post bond or comparable security. Franchisee and the Equity Holders, on behalf of itself and each Covered Person, each hereby further agree that the award of equitable remedies to Franchisor in the event of such breach is reasonable and necessary for the protection of the business and goodwill of Franchisor.

8.11.   Enterprise Learning Solutions.

By executing this Agreement, Franchisee agrees to participate in Franchisor's program of coordinated delivery of Franchised Business to regional, national or international accounts (the "Enterprise Learning Solutions Program") summarized in Exhibit B and more specifically defined in the Confidential Operations Manual.

8.12.   Transactions with Strategic Industry Partners.

Franchisee agrees that nothing in this Agreement shall preclude Franchisor from participating in marketing programs, executing operating agreements or entering into other transactions with Strategic Industry Partners for the benefit of the Network, provided that such transactions do not involve or result in Franchisor Acting as a Computer Learning Center.

8.13.   Local Advertisement.

Franchisee shall comply with Franchisor's written guidelines for advertising, marketing and promotional materials and activities that Franchisee creates or produces for use in any format or in any media channel (whether print, broadcast, electronic or digital, including, but not limited to, third party websites and social media websites) to promote its Center ("Local Advertising") as set forth in the Confidential Operations Manual. Upon Franchisor's request, Franchisee must provide Franchisor with a copy of all Local Advertising for Franchisor's review according to the procedures set forth in the Confidential Operations Manual. Franchisor may require that Franchisee suspend use of any Local

Advertising based on Franchisor's evaluation that the Local Advertising is inconsistent with System standards or uses the Service Marks in violation of the terms of this Agreement or the Confidential Operations Manual. Should Franchisor direct Franchisee to suspend use of objectionable Local Advertising, Franchisee must submit the revised Local Advertising to Franchisor according to the procedures set forth in the Confidential Operations Manual before using them in any manner or media channel.

## IX.
## ASSIGNMENT

### 9.1. Assignment by Franchisor.

Franchisor shall have the right to Transfer any or all of its direct or indirect interest in this Agreement (including without limitation the economic benefits derived from this Agreement), and any or all of its rights and privileges hereunder to any other Person, firm or corporation (in such context, "Assignee of Franchisor"); provided that, in respect to any Transfer (in such context, "Assignment by Franchisor") resulting in the subsequent performance by such Assignee of Franchisor of the functions of Franchisor, (i) at the time of Assignment by Franchisor, Assignee of Franchisor is financially responsible and economically capable of performing the obligations of Franchisor hereunder, (ii) the Assignee of Franchisor expressly assumes and agrees to perform such obligations, and (iii) Franchisor shall be relieved of all obligations or liabilities then existing or thereafter assertable under this Agreement (except that if Franchisee continues to comply with all terms and conditions of this Agreement, including but not limited to Articles II, VI and VIII hereof, then Franchisee shall be entitled during such continued compliance to use the Intellectual Property Rights licensed hereunder until the end of the then current term of this Agreement. At the end of such period of continued compliance and use of the Intellectual Property Rights, Franchisee shall comply with the terms of Section 12.1 below).

### 9.2. Assignment by Franchisee.

(a)    Restriction on Transfer.  This Agreement is being entered into in reliance upon and in consideration of the singular personal skills and qualifications of Franchisee and/or principals and the trust and confidence placed in them by Franchisor. Therefore, except as otherwise provided in this Article IX, neither Franchisee nor any immediate or remote successor to Franchisee, nor any Person that directly or indirectly owns an equity interest (as that term is defined herein) in Franchisee, shall Transfer any direct or indirect interest in this Agreement, in the Franchised Business or in the economic benefits derived there from, or any equity interest in Franchisee, in whole or in part, in any manner (in such context, "Assignment by Franchisee"), except as permitted by this Agreement. Any purported Transfer of any interest in this Agreement, the Franchised Business or an equity interest in Franchisee not in accordance with this Agreement shall be void and shall constitute a material breach of this Agreement, for which Franchisor may terminate this Agreement without prior notice or opportunity to cure, pursuant to Section 10.2 of this Agreement.

(b)    Transfers to Employees, Officers, Owners.  Except as otherwise provided in this Agreement, without Franchisor's prior written consent, (i) Franchisee or any Equity Holder may Transfer or issue in any single transaction less than 49% of the equity interest in Franchisee to an employee or officer of Franchisee who has been directly involved in the operation of the Franchised Business on a full-time basis (working an average of 35 or more hours per week) for at least one year as of the time of such Transfer or issuance, and (ii) an Equity Holder may receive a Transfer of up to 49% of the equity interest in Franchisee from other Equity Holders; provided (in either case) that such Transfer, when combined with all other Transfers that have occurred since Franchisee shall have been a franchisee of Franchisor,

does not exceed 49.9% of the equity interest or otherwise effect a change in Control of Franchisee. Any transfer under this section is not subject to Franchisor's right of first refusal under Section 9.3 nor is payment of the Transfer Fee set forth in Section 9.2(k) required.

(c)     Transfers to Family Members. Franchisee or an Equity Holder, if a natural person, may with Franchisor's consent, which will not be withheld unreasonably, Transfer the Franchised Business or an equity interest in Franchisee to such natural person's spouse, parent, sibling, niece, nephew, descendant or spouse's descendant provided that (i) adequate provision is made for the management of the Franchised Business, (ii) any successor General Manager has successfully completed Initial Franchise Training, and (iii) a transferor who has demonstrated adequate financial capacity guarantees in form and substance satisfactory to Franchisor the performance of the transferee's obligations under this Agreement. Any transfer under this section is not subject to Franchisor's right of first refusal under Section 9.3 nor is payment of the Transfer Fee set forth in Section 9.2(k) required.

(d)     Transfers to Corporations with Same Ownership. At any time within six months after the Effective Date, Franchisee or an Equity Holder, if a natural person, sole proprietorship or partnership, may without the consent of Franchisor, but upon 30 days prior written notice to Franchisor, Transfer the Franchised Business or an equity interest in Franchisee to a corporation entirely owned by such natural person, sole proprietorship or partnership, as the case may be, in the same proportionate amount of ownership as prior to such Transfer, provided that (i) adequate provision is made for the management of the Franchised Business, (ii) any successor General Manager has successfully completed Initial Franchise Training, and (iii) the transferor guarantees, in form and substance satisfactory to Franchisor, the performance of the transferee's corporation's obligations under this Agreement. Any transfer under this section is not subject to Franchisor's right of first refusal under Section 9.3 nor is payment of the Transfer Fee set forth in Section 9.2(k) required.

(e)     Transfers Upon Death, Incapacity. In the event of the death or legal incapacity of Franchisee or an Equity Holder, if a natural person, Franchisor will recognize that such natural person's interest in this Agreement or its equity interest in the Franchisee will Transfer in accordance with such person's will or, if such person dies intestate, in accordance with laws of intestacy governing the distribution of such person's estate, provided that (i) adequate provision is made for the management of the Franchised Business, (ii) any successor General Manager has successfully completed Initial Franchise Training, and (iii) the transferee is one or more of the decedent's spouse, parents, siblings, nieces, nephews, descendants or spouse's descendants. Any transfer under this section is not subject to Franchisor's right of first refusal under Section 9.3 is payment of the Transfer Fee set forth in Section 9.2(k) required.

(f)     Restrictions on Granting Security Interests and Subfranchising. Except as otherwise set forth below, Franchisee shall not have the right to pledge, encumber, hypothecate or otherwise give any third party a security interest in this Agreement, nor subfranchise or otherwise Transfer, or attempt to subfranchise or otherwise Transfer the Center so long as it is operated as a Center, or to Transfer or subfranchise a portion but not all of Franchisee's rights hereunder without the express prior written permission of Franchisor, which permission may be withheld for any reason in Franchisor's sole discretion. However, without the prior written consent of Franchisor and for the sole purpose of obtaining financing for the operation of the Franchised Business and provided Franchisee is in full compliance with all of the terms and conditions of this Agreement, and any other agreement, arrangement or understanding with Franchisor, (i) Franchisee shall have the right to enter into a commercial, third party equipment lease or financing arrangement for the provision of equipment for use in the Franchised Business, (ii) Franchisee shall have the right to pledge its accounts receivable and (iii) shareholders of Franchisee (if a corporation) may pledge their shares of stock in Franchisee as additional collateral security provided that

such pledge if foreclosed upon would not result in a transfer of Control or Transfer of Franchisee to another Person.

(g)     Other Transfers. Except as otherwise provided in this Agreement including Section 9.4 below, and subject to Franchisor's right of first refusal under Section 9.3 hereof, Franchisee or an Equity Holder may effect any Transfer of a direct or indirect interest in this Agreement, in the Franchised Business or in the economic benefits derived there from, or any equity interest in Franchisee, not permitted by the preceding Sections 9.2(b) through 9.2(f), only after written notice to Franchisor and only with Franchisor's written consent, which may not be withheld unreasonably. Franchisor must exercise its good faith business judgment in determining whether to give or withhold its consent to a Transfer under this Section 9.2(g). In exercising good faith business judgment, Franchisor must consider skills and qualifications of the prospective transferee which are of business concern to Franchisor, including without limitation the following: (i) entrepreneurial and managerial abilities; (ii) financial and operational skills; (iii) qualifications, financial resources, reputation and character of the prospective transferees; (iv) the ability of the prospective transferee(s) to fully and faithfully conduct the Franchised Business as contemplated by this Agreement; and (v) the effect that the Transfer and the prospective transferees will have or may reasonably be expected to have on the reputation or business operations of the Franchised Business, the System, Network, Franchisor or any of Franchisor's Affiliates.

(h)     Equity Interest Defined. An "equity interest" in a Business Entity shall mean any stock, partnership, membership, or other direct or indirect beneficial interest in the Business Entity or in the economic benefits derived there from. "Equity interest" in Franchisee shall also include any direct or indirect interest in this Agreement, in the Franchised Business or in the economic benefits derived there from or in the assets of the Franchised Business if such assets are Transferred in connection with a Transfer of a substantial portion of such assets.

(i)     Computing Equity Interests. In computing the percentages of equity interests in Franchisee, limited partners will not be distinguished from general partners and Franchisor's judgment will be final if there is any question of the definition of "equity interest" or as to the computation of relative equity interests, the principal considerations being: (i) direct and indirect power to exercise control over the affairs of Franchisee; (ii) direct and indirect right to share in Franchisee's profits; and (iii) amounts directly or indirectly exposed to risk in Franchisee's business. Equity interests may be Transferred only if the Transfer is registered or exempt from registration under federal securities laws.

(j)     Registration of Proposed Transfer. If a proposed Transfer of an equity interest in Franchisee requires registration under any federal or state securities law, Franchisee shall: (i) request Franchisor's consent at least 45 days before the proposed effective date of the registration; (ii) accompany such requests with payment of the non-refundable transfer fee set forth in Section 9.2(k) below; (iii) reimburse Franchisor for expenses incurred by Franchisor in connection with review of materials concerning the proposed registration, including without limitation attorneys fees and travel expenses; and (iv) together with all participants in the proposed offering subject to registration, agree (A) to fully indemnify Franchisor against any costs or liabilities in writing (in form and substance satisfactory to Franchisor) in connection with the registration, (B) to furnish Franchisor all information requested by Franchisor, (C) avoid any implication of Franchisor's participating in or endorsing the offering, and (D) to use the Intellectual Property Rights only as directed by Franchisor.

(k)     Transfer Fees. Excepting transfers pursuant to Sections 9.2(b), 9.2(c), 9.2(d) or 9.2(e) hereof, in the event of any Transfer pursuant to this Article IX, Franchisee shall pay to Franchisor a non-refundable transfer fee of $5,000.

(l)     Conditions Precedent to Transfer. Franchisor may impose certain conditions precedent to its consent to a Transfer including without limitation the following:

(i)     the proposed transferee (or the principal equity holders thereof) presents himself, herself or themselves for a personal interview at Franchisor's corporate office, or such other location designated by Franchisor, at such date and time reasonably requested by Franchisor, without expense to Franchisor and prior to such Transfer;

(ii)     Franchisee shall have complied fully as of the date of any such Transfer with all of its obligations to Franchisor under this Agreement, or any other agreement, arrangement or understanding with Franchisor and Franchisee and all Equity Holders shall execute and deliver a general release in a form satisfactory to Franchisor of any and all claims against Franchisor, Franchisor's Affiliates, and their respective officers, directors, shareholders, employees and agents;

(iii)     the proposed transferee agrees that all of Franchisor's training and orientation programs then required by Franchisor shall be satisfactorily completed by transferee's necessary personnel within 30 days after the effective date of such Transfer or at the completion of the first available training and orientation programs if that date is later, and such transferee agrees to pay for all of its expenses incurred in connection therewith, including travel, hotel and meal expenses; and

(iv)     in the sole discretion of Franchisor, the assignee executes Franchisor's then current form of Franchise Agreement for a term equal to the term remaining under Franchisee's Franchise Agreement.

(m)     No Waiver. Franchisee acknowledges that (i) any consent granted or withheld by Franchisor under this Article IX shall not serve to waive Franchisor's right to grant or withhold consents thereafter and (ii) Franchisor may consider the effect (cumulative or otherwise) of prior Transfers in determining whether to grant or withhold its consent to any Transfer.

(n)     Notice. If a Transfer occurs that is permitted without Franchisor's prior written consent pursuant to this Section 9.2, Franchisee and the transferor shall give Franchisor notice of such Transfer within ten days after such Transfer and shall provide all related information reasonably requested by Franchisor.

9.3.     Right of First Refusal.

(a)     Except as otherwise provided in Section 9.2 hereof, the right of Franchisee and Equity Holders to Transfer any equity interest in Franchisee or any direct or indirect interest in this Agreement, the Franchised Business or the economic benefits derived there from, or in the assets of the Franchised Business (if the Transfer of these assets would result in a transfer of a substantial portion of Franchisee's assets), shall be subject to Franchisor's right of first refusal with respect thereto if such Transfer (i) is in excess of 49.9% of such equity interest in any single transaction (or series of related transactions) or (ii) otherwise effects a change in Control of Franchisee, unless the transferee is an Equity Holder. Franchisor's right of first refusal may be exercised in the following manner:

(i)     Franchisee or the Equity Holder shall serve upon Franchisor a written notice setting forth (A) all of the terms and conditions of any bona fide offer relating to a proposed Transfer , and (B) all available information concerning the proposed transferee.

(ii)     Within ten business days after Franchisor's receipt of such notice (or if it shall request additional information, within ten business days after receipt of such additional information), Franchisor shall notify the proposed transferor of one of the following:

(A)     Franchisor will be exercising its right of first refusal as provided herein; or

(B)     Franchisor grants its consent to the Transfer under the terms stated in the notice; or

(C)     Franchisor will not be exercising its right of first refusal but for other reasons within its discretion (Franchisor's right of first refusal in no way modifies or diminishes its right to withhold consent to a Transfer), Franchisor does not consent to the Transfer.

(b)     If Franchisor elects to exercise its right of first refusal, it shall purchase the equity interests or assets proposed to be Transferred on the same terms and conditions as set forth in the bona fide offer. If Franchisor elects not to exercise its right of first refusal and consents to the Transfer, the proposed transferor shall for a period of 90 days be free to Transfer to the proposed transferee upon the terms and conditions specified in said notice. If, however, the terms of the offer are materially changed, or if the 90-day period expires, Franchisor shall again have a right of first refusal with respect thereto and the proposed transferor shall again be required to comply with Section 9.3(a) above.

9.4.    Franchisor Consent to Offerings.

Securities, units or other ownership interests in Franchisee may be offered by public or private offering, or otherwise, only with the prior written consent of Franchisor (whether or not Franchisor's consent is required under Section 9.2 of this Agreement), which consent Franchisor may grant or withhold in its sole discretion based solely upon what Franchisor deems to be in its best interests. All materials required for such offering by the laws applicable to the jurisdiction where Franchisee makes its offering shall be submitted to Franchisor for review prior to their being filed with any governmental agency, and any materials to be used in any exempt offering shall be submitted to Franchisor for review prior to their use. No Franchisee offering shall imply (by use of the Proprietary Marks or otherwise) that Franchisor is participating in an underwriting, issuance or offering of Franchisee of Franchisor securities, and Franchisor's review of any offering shall be limited solely to the subject of the relationship between Franchisee and Franchisor. Franchisee and the other participants in the offering must fully indemnify Franchisor in connection with the offering. Prior to Franchisor's commencing its review of any proposed public offering and for each proposed public or private offering, Franchisee shall pay to Franchisor a nonrefundable fee of U.S. $25,000, or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing and approving or disapproving the proposed public or private offering. Franchisee shall give Franchisor written notice at least 90 days prior to the date of commencement of any offering or other transaction covered by this section.

## X.
## DEFAULT AND TERMINATION

10.1.    General.

(a)     This Agreement may be terminated unilaterally by Franchisor only for good cause, which for purposes of this Agreement means a material violation of this Agreement, including any failure by Franchisee to substantially comply with any obligation, duty or promise under the Agreement. Franchisor shall exercise its right to terminate this Agreement in the manner described in this Article X.

(b)     If Franchisor gives Franchisee written notice to cure a violation of Article VI of this Agreement (which may include a statement of the method of cure to be employed), Franchisee shall commence such cure within 24 hours and must effect a complete cure and remedy the damage caused by such violation as fully as possible in the shortest possible time, but in no event more than seven days; and Franchisee shall take suitable actions to prevent recurrence of the same type of violation.

(c)     Notwithstanding anything contained herein to the contrary, in those circumstances in which Franchisor has a right to terminate this Agreement, Franchisor or Franchisee shall have the right to exercise any and all remedies available to either of them at law or in equity, including specific performance and damages. All rights and remedies provided herein shall be in addition to and not in substitution of other rights and remedies available to a party at law or in equity. Franchisor may elect to pursue any remedy it may choose in its sole discretion.

10.2.    Termination Without Right to Cure.

Franchisor has the right to terminate this Agreement effective immediately upon written notice to Franchisee upon the occurrence of any or all of the following events, each of which shall be deemed an incurable breach of this Agreement:

(a)     If Franchisee fails to open the Center within six months after execution of the Franchise Agreement without Franchisor's written agreement to an extension of time to open.

(b)     If Franchisee Abandons its Center.

(c)     To the extent permitted by law, if (i) Franchisee or a general partner thereof becomes insolvent (as revealed by its records, its inability or failure to pay its debts to third parties when due or otherwise), or (ii) Franchisee or a general partner thereof files a voluntary petition and is adjudicated bankrupt, or an involuntary petition is filed against Franchisee or general partner thereof and such petition is not dismissed within 30 days, or (iii) Franchisee or a general partner thereof shall make an Assignment by Franchisee for the benefit of creditors, or (iv) a receiver or trustee in bankruptcy or similar officer, temporary or permanent, be appointed to take charge of Franchisee's affairs or any of its property, or (v) dissolution proceedings are commenced by or against Franchisee (if a Business Entity) and are not dismissed within 30 days thereafter, or (vi) any final judgment against Franchisee from which no further appeal is available and which is not currently on appeal remains unsatisfied or unbonded of record for 30 days after receipt by Franchisee of actual or constructive notice thereof, with the amount of such judgment exceeding $10,000 or 10% of Franchisee's Gross Revenues for the preceding 12 consecutive months, whichever is less (Franchisee shall forward to Franchisor within one business day after Franchisee's receipt thereof copies of all summons, complaints or other documents relating to proceedings naming Franchisee which may have any material impact on the Franchised Business).

(d)     If (i) Franchisee has knowingly either inaccurately reported or withheld the reporting of any Gross Revenues, or (ii) an Equity Holder having a 10% or greater equity interest in Franchisee has knowingly and directly caused or authorized Franchisee to either inaccurately report or withhold the reporting of any Gross Revenues, or (iii) if either Franchisee or an Equity Holder having a 10% or greater equity interest in Franchisee makes materially false statements or representations to Franchisor in connection with Franchisee obtaining its New Horizons franchise.

(e)     If Franchisee Transfers or attempts to transfer this Agreement without the prior written consent of Franchisor as provided in Sections 9.2 and 9.4 hereof.

(f)     If Franchisee defaults in any material obligation in respect of which Franchisee twice previously within the preceding 12 months has received a notice of default from Franchisor respecting the same or similar breach.

(g)     If Franchisee defaults in its obligation to permit Franchisor or its representative or agents to examine or audit books of accounts, bank statements, documents, records, papers or tax return records under Sections 8.7 or 8.8 hereof.

(h)     If Franchisee fails, for a period of ten (10) days after Franchisee receives notification of non-compliance from any Person, to comply with Applicable Law.

10.3.    Termination With Right to Cure.

(a)     As provided in Section 10.1(b) hereof, if Franchisee fails to cure a violation of Article VI of this Agreement (which may include a statement of the method of cure to be employed), Franchisee must commence such cure within 24 hours and must effect a complete cure and remedy the damage caused by such violation as fully as possible in the shortest possible time, in no event more than seven days, Franchisor may terminate this Agreement immediately upon written notice to Franchisee.

(b)     Franchisor may terminate this Agreement if Franchisee uses the Intellectual Property Rights in any manner not permitted by this Agreement, or takes any action that incorrectly indicates that certain products or services are associated with the Intellectual Property Rights, and Franchisee fails to cure such violation within 24 hours of receipt of written notice by Franchisor to cure.

(c)     Franchisor may terminate this Agreement if Franchisee engages in conduct which reflects materially and unfavorably upon the operation and reputation of the Franchised Business or System.

(d)     With respect to any default by Franchisee of an obligation to pay any sums due Franchisor under this Agreement, Franchisor may terminate this Agreement upon 14 days written notice of such default.

(e)     Franchisor may terminate this Agreement if Franchisee fails to cure a violation of any other agreement entered into with Franchisor within the cure period specified in that agreement.

(f)     Except for (i) incurable violations referred to in Section 10.2, (ii) Service Mark violations referred to in Sections 10.3(a) and 10.3(b), or (iii) as otherwise expressly provided herein, Franchisor may terminate this Agreement upon 30 days prior written notice to Franchisee setting forth the breach complained of in this Agreement or any other agreement to which both Franchisor or any of its Affiliates and either Franchisee or any of its Affiliates or Equity Holders are party. Upon receipt of such notice, Franchisee shall immediately commence diligently to cure said breach, and if Franchisee cures the breach during such period, Franchisor's right to terminate this Agreement shall cease; provided, however, that if, because of the nature of said breach, Franchisee is unable to cure the same within said 30 day period, Franchisee shall be given additional time as Franchisor determines is reasonably necessary within which to cure the breach (not to exceed an additional 30 days) on condition that Franchisee immediately commences to cure the breach upon receipt of a notice of extension from Franchisor and continues to use its best efforts to do so.

10.4.    Description of Default.

The description of default in any notice served by Franchisor hereunder upon Franchisee shall in no way preclude Franchisor from specifying additional or supplemental defaults in any action, arbitration, hearing or suit relating to this Agreement or the termination thereof.

10.5.    Statutory Limitations.

Notwithstanding anything to the contrary in this Article X, in the event any valid, Applicable Law or regulation of a competent governmental authority having jurisdiction over this Agreement or the parties hereto shall limit Franchisor's rights of termination hereunder or shall require longer notice periods than those set forth herein, this Agreement shall be deemed amended to conform to the requirements of such laws and regulations, but in such event the provisions of the Agreement thus affected shall be amended only to the extent necessary to bring it within the requirements of the law or regulation.

## XI.
## ARBITRATION AND OTHER RELIEF

11.1.    Arbitration.

Except as specifically modified by this Article XI, and excepting matters involving provisional remedies as set forth in Section 11.2 below, any dispute between (i) Franchisor and its Affiliates and (ii) Franchisee, Equity Holders or their respective Affiliates, arising out of or relating to this Agreement or its breach, including without limitation, any claim that this Agreement or any of its parts, is invalid, illegal or otherwise voidable or void, will be resolved by submission to binding arbitration before an arbitrator referred by the American Arbitration Association ("AAA"), in accordance with its Commercial Arbitration Rules. If all parties to the dispute agree, the dispute may be arbitrated by any other arbitration organization. All arbitrations must be conducted on an individual (and not class-wide or multiple plaintiff) basis. All hearings and other proceedings shall take place in Orange County, California, or, at Franchisor's sole discretion and if Franchisor so elects, in the county where the principal place of business of Franchisee is then located.

(a)    The arbitrators of any dispute hereunder are hereby affirmatively instructed to apply the appropriate law as provided in Section 14.1 hereof. Specifically excepting the location of the arbitration, all issues relating to the arbitrability or the enforcement of the agreement to arbitrate contained herein shall be governed by the Federal Arbitration Act (9 U.S.C. §1 *et seq.*) and the federal common law of arbitration. California discovery law will apply to provide all discovery available in California Superior Court cases. California evidence law shall apply.

(b)    At the arbitration hearing either party may present briefs and deposition testimony of witnesses who are unable to attend the hearing in person, regardless of where such witnesses reside. Judgment upon an arbitration award may be entered in any court having competent jurisdiction and shall be binding, final and non-appealable. No punitive or exemplary damages shall be awarded against either Franchisor or Franchisee, their respective Equity Holders or Affiliates, in an arbitration proceeding (or other proceeding) and are hereby waived.

(c)    Prior to any arbitration proceeding taking place, either party may, at its option, elect to (i) have the arbitrator conduct, in a separate proceeding prior to the actual arbitration, a preliminary hearing, at which hearing testimony and other evidence may be presented and briefs may be submitted, including without limitation a brief setting forth the then applicable statutory or common law methods of measuring

damages in respect of the controversy or claim being arbitrated, or (ii) conduct non-binding mediation in Orange County, California, before AAA or other mutually agreeable mediator, in which event the parties shall execute a confidentiality agreement.

(d)     This arbitration provision shall be deemed to be self-executing and shall remain in full force and effect after expiration or termination of this Agreement. If either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party by default or otherwise notwithstanding said failure to appear.

(e)     The provisions of this Section 11.1 shall be construed as independent of any other covenant or provision of this Agreement; provided, however, that if a court of competent jurisdiction determines that any of such provisions are unlawful in any way, the court shall modify or interpret such provisions to the minimum extent necessary to comply with the law.

## 11.2.   Injunctive or Extraordinary Remedies.

Notwithstanding the provisions of Section 11.1 above, Franchisor may bring an action in any court of competent jurisdiction for injunctive or other extraordinary relief, without the necessity of posting any bond (and if bond shall nevertheless be required by a court of competent jurisdiction, the parties agree that the sum of $100 shall be sufficient bond), as Franchisor deems necessary or appropriate (i) to compel Franchisee to comply with its obligations hereunder respecting Franchisor's rights to examine or audit books and records under Sections 8.7 or 8.8 hereof, or respecting violations of Franchisee's obligations under Section 8.10 hereof, or (ii) respecting the use or display of the Intellectual Property Rights, or (iii) to otherwise compel Franchisee to take steps reasonably necessary to preserve Franchisor's reputation, goodwill and proprietary rights. Franchisee acknowledges that it is one of a number of licensed franchisees using the Intellectual Property Rights and that failure on its part to comply fully with any of the terms of this Agreement respecting the foregoing obligations regarding examinations, audits and the Intellectual Property Rights could cause irreparable damage to Franchisor or other franchisees of Franchisor. Therefore, Franchisor shall have the immediate right to seek a preliminary order or injunction enforcing the foregoing obligations during the pendency of all arbitration or other proceedings, without the necessity of posting a bond. This covenant shall be independent, severable and enforceable notwithstanding any other rights or remedies which Franchisor may have. ·

## XII.
## FURTHER OBLIGATIONS AND RIGHTS OF THE PARTIES
## UPON TERMINATION OR EXPIRATION

## 12.1.   Franchisee's Obligations.

(a)     Except as otherwise set forth in Section 9.1 respecting Assignment by Franchisor of any or all of its interest in this Agreement, in the event of termination or expiration of this Agreement whether by reason of Franchisee's breach, default, non-renewal, lapse of time, or other cause, in addition to any other monetary and non-monetary obligations provided for in this Agreement, Franchisee shall forthwith discontinue the use and/or display of the Intellectual Property Rights including, without limitation, the Service Marks and cease distributing any and all materials containing or bearing the Intellectual Property Rights including, without limitation, the Service Marks, and shall not thereafter operate or do business under the Assumed Name or any other name or in any manner that might tend to give an average person the impression that Franchisee is in any way associated or affiliated with Franchisor, or any of the businesses conducted by it or the owner of the Intellectual Property Rights. In such event, Franchisee also shall comply with Section 12.2 respecting the return to Franchisor of certain materials and shall not thereafter use in any manner or for any purpose, directly or indirectly, any of Franchisor's trade secrets,

procedures, techniques, or materials acquired by Franchisee by virtue of the relationship established by this Agreement, including without limitation (i) any training or other materials, manuals, bulletins, instruction sheets, or supplements thereto, or (ii) any equipment, videotapes, videodiscs, forms, advertising matter, marks, devices, insignias, slogans or designs used from time to time in connection with the Franchised Business. As and when requested by Franchisor, Franchisee shall make its books and records available to Franchisor's representatives for a termination audit.

(b)     In the event of termination or expiration as described in Section 12.1(a) above, Franchisee shall promptly:

(i)     remove at Franchisee's expense all signs erected or used by Franchisee which bear the Service Marks, or any word or mark indicating that Franchisee is associated or affiliated with Franchisor;

(ii)     erase or obliterate from letterhead, stationery, printed matter, website, advertising or other forms used by Franchisee the Service Marks and any word or mark indicating that Franchisee is associated or affiliated with Franchisor;

(iii)     cease using all other elements of the Intellectual Property Rights;

(iv)     permanently discontinue any advertising of Franchisee which indicates directly or indirectly that Franchisee is associated or affiliated with Franchisor; and

(v)     refrain from doing anything which would indicate that Franchisee is or ever was an authorized Franchisee including without limitation indicating (directly or indirectly) that Franchisee was licensed to use the Intellectual Property Rights or any other distinctive System features or that Franchisee at any time operated under any name, word or mark associated or affiliated with Franchisor.

(c)     If Franchisee engages in any business thereafter, it shall (i) use trade names, service marks or trademarks (if any) which are significantly different from the Intellectual Property Rights; (ii) use sign formats (if any) which are significantly different in color and type face; and (iii) take all necessary steps to ensure that its present and former employees, agents, officers, shareholders and partners observe the foregoing obligations.

(d)     In the event of such termination or expiration, Franchisee shall assign to Franchisor all of its interest in and rights to all telephone numbers and all telephone directory listings applicable to the Franchised Business in use at the time of such termination to Franchisor and take all actions necessary to change immediately all such telephone numbers and telephone directory listings.

(e)     If Franchisee fails or omits to make or cause to be made any removal or change described in Section 12.1(b), 12.1(c) or 12.1(d) above, then Franchisor shall have the right within 15 days after written notice to Franchisee to enter upon Franchisee's premises where the Franchised Business was being conducted without being deemed guilty of trespass or any other tort, and make or cause to be made such removal and changes at the sole expense of Franchisee, which expense Franchisee agrees to pay to Franchisor promptly upon demand. Franchisee hereby irrevocably appoints Franchisor as its lawful attorney upon termination of this Agreement with authority to file any document in the name of and on behalf of Franchisee for the purpose of terminating any and all of Franchisee's rights in the Assumed Name and any of the Intellectual Property Rights.

(f)     If the Center is Abandoned or otherwise closed for a period of ten consecutive business days without Franchisor's prior written consent, Franchisee must promptly take action to remove any

indication that the Center is associated or affiliated with either Franchisee or Franchisor, and remove at Franchisee's sole expense all signs erected or used by Franchisee in connection with such Center and bearing either the Service Marks or any word or mark indicating that the Center is associated or affiliated with either Franchisee or Franchisor, except as otherwise prohibited by law.

12.2.   Rights of Parties.

(a)   If Franchisee is in material default of its lease for the premises on which the Center is located (the "Lease") or upon termination of this Agreement for any reason, Franchisor has the right to directly assume the Lease, and thereafter operate the Center directly or through an affiliate or other franchisee. Franchisee shall cooperate in preparing any addendum or amendment to the lease to reflect this assumptive right of Franchisor.

(b)   The expiration or termination of this Agreement shall be without prejudice to any rights of either party against the other and such expiration or termination shall not relieve either party of any of its obligations to the other existing at the time of expiration or termination or terminate those obligations of either party which, by their nature, survive the expiration or termination of this Agreement. Upon expiration or termination, Franchisee is obligated to return, at no expense to the Franchisor, any and all copies of the Confidential Operations Manual, other New Horizons manuals, software manuals and documentation, and any other communications media and material provided for Franchisee's use without additional charge in connection with the operation of the Franchised Business.

12.3.   Franchisor's Right to Cure Defaults by Franchisee.

In addition to all other remedies herein granted, if Franchisee defaults in the performance of any of its obligations or breach any term or condition of this Agreement or any related agreement involving third parties, Franchisor may at its election immediately or at any time thereafter, without waiving any claim for breach hereunder and after ten business days written notice to Franchisee, cure such default for the account of and on behalf of Franchisee, and all costs or expenses including attorney's fees incurred by Franchisor on account thereof shall be due and payable by Franchisee to Franchisor on demand.

12.4.   Waiver and Delay.

No waiver by Franchisor of any breach or series of breaches or defaults in performance by Franchisee and no failure, refusal or neglect of Franchisor either to exercise any right, power or option given to it hereunder or to insist upon strict compliance with or performance of Franchisee's obligations under this Agreement or the Confidential Operations Manual, shall constitute a waiver of the provisions of this Agreement or the Confidential Operations Manual with respect to any subsequent breach thereof or a waiver by Franchisor of its rights at any time hereafter to require exact and strict compliance with the provisions thereof.

12.5.   Attorneys' Fees and Expenses.

If any party hereto commences any action or proceeding to enforce or prevent the breach of any provision hereof, whether by arbitration, judicial or quasi-judicial action or otherwise or any appeal there from or for damages for any alleged breach of any provision hereof or for a declaration of such party's rights or obligations hereunder, then the prevailing party shall be reimbursed by the losing party for all costs and expenses incurred in connection therewith, including without limitation reasonable attorney's fees for services rendered to the prevailing party.

# XIII.
## GENERAL CONDITIONS AND PROVISIONS

13.1.   <u>Relationship of Franchisee to Franchisor.</u>

It is expressly agreed that the parties intend by this Agreement to establish between Franchisor and Franchisee the relationship of franchisor and franchisee. It is further agreed that Franchisee has no authority to create or assume in Franchisor's name or on behalf of Franchisor, any obligation, express or implied, or to act or purport to act as agent or representative on behalf of Franchisor for any purpose whatsoever. Neither Franchisor nor Franchisee is the employer, employee, agent, partner, fiduciary or co-venturer of or with the other, each being independent. Franchisee agrees that it will not hold itself out as the agent, employee, partner or co-venturer of Franchisor or the owner of the Intellectual Property Rights. All employees or agents hired or engaged by or working for Franchisee shall be only the employees or agents of Franchisee and shall not for any purpose be deemed employees or agents of Franchisor or the owner of the Intellectual Property Rights, nor subject to Franchisor's control; and in particular, Franchisor shall have no authority to exercise control over the hiring or termination of such employees, independent contractors or others who work for Franchisee, their compensation, working hours or conditions, or the day-to-day activities of such persons, except to the extent necessary to protect the Intellectual Property Rights. Franchisee agrees to respond to customer indications of dissatisfaction with services rendered by Franchisee in a diligent and professional manner and agrees to cooperate with representatives of Franchisor or the owner of the Intellectual Property Rights in any investigation undertaken by Franchisor of complaints respecting Franchisee's activities. Each of the parties agrees to file its own tax, regulatory and payroll reports with respect to its respective employees or agents and operations, saving and indemnifying the other party hereto of and from any liability of any nature whatsoever by virtue thereof.

13.2.   <u>Indemnity.</u>

Except as otherwise expressly provided in Section 6.6 hereof, Franchisee hereby agrees to protect, defend and indemnify Franchisor and its Affiliates and designees, and hold them harmless from and against any and all costs and expenses actually incurred by them or for which they are liable, including attorney's fees, court costs, losses, liabilities, damages, claims and demands of every kind or nature, and including those incurred pursuant to a settlement entered into in good faith, arising out of or in connection with the Franchised Business, including specifically without limitation any claim or controversy arising out of (i) any Transfer by Franchisee referred to in Section 9.2 hereof, (ii) acts or omissions of Franchisee which are not in strict compliance with this Agreement and the Confidential Operations Manual in respect of use or display of the Intellectual Property Rights, or (iii) acts or omissions of Franchisee which tend to create an impression that the relationship between the parties hereto is other than one of franchisor and franchisee. Notwithstanding the foregoing, Franchisee shall have no obligation to protect, defend and indemnify Franchisor, or Franchisor's Affiliates or designees, from and against any such costs or expenses arising from the conduct of Franchisor found to be willful, malicious or grossly negligent. In any proceeding in which Franchisor has been found to have been actively negligent (as opposed to passively negligent or vicariously liable), Franchisor and Franchisee shall each bear all of such costs and expenses either in proportion to any finding of comparative negligence made in such proceeding or, if no such finding has been made, as shall be determined in an arbitration proceeding pursuant to Section 12.1 hereof, based on application of comparative negligence standards.

13.3.   Guarantee.

The Equity Holders of Franchisee shall each guarantee the obligations of Franchisee in this Agreement and shall execute a form of continuing guarantee as attached hereto as Exhibit "E" and incorporated herein by this reference.

13.4.   Survival of Covenants.

The covenants contained in this Agreement which by their terms require performance by the parties after the expiration or termination of this Agreement shall be enforceable notwithstanding said expiration or other termination of this Agreement for any reason whatsoever.

13.5.   Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Franchisor and shall be binding upon and inure to the benefit of the Franchisee and its heirs, executors, administrators, successors and assigns, subject to the restrictions on Assignment by Franchisee contained herein in Article IV.

13.6.   Joint and Several Liability.

If Franchisee consists of more than one Person, or a combination thereof, the obligation and liabilities to Franchisor of each Person are joint and several.

13.7.   Counterparts.

This Agreement may be executed in any number of copies, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument.

13.8.   Notices.

(a)   All notices which the parties hereto may be required or may desire to give under or in connection with this Agreement shall be in writing and shall be actually delivered or sent by (x) certified mail, return receipt requested, postage prepaid, (y) reliable overnight delivery service, or (z) facsimile with confirmation copy sent by first-class mail, addressed as follows:

If to Franchisor, to:

New Horizons Franchising Group, Inc.
Attention: Legal Department
1900 S. State College Blvd., Suite 450
Anaheim, CA 92806
Facsimile: 1-714-938-6007

If to Franchisee, to:

> NH Philadelphia LLC
> Attention: Mr. Mark McManus, Jr.
> 14115 Farmington Road
> Livonia, MI 48154
> Facsimile: 1-734-525-1681

(b)     The addresses herein given for notices may be changed at any time by either party by written notice given to the other party as herein provided. Notices shall be deemed given (i) when delivered in person, (ii) three business days after deposit with the United States Postal Service, (iii) on the next business day after deposit with a reliable overnight delivery service, or (iv) on the next business day after being sent (with confirmed receipt) by facsimile transmission.

13.9.   Further Assurances.

Each party agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform the terms, provisions and conditions of this Agreement.

## XIV.
## CONSTRUCTION OF AGREEMENT

14.1.   Governing Law.

To the extent applicable, procedural and jurisdictional issues respecting arbitration of disputes under this Agreement shall be governed by the United States Arbitration Act (9 U.S.C. §1 *et seq.*). To the extent applicable, any issue involving the Intellectual Property Rights shall be governed by the applicable common law and either the Lanham Act (15 U.S.C. §1051 *et seq.*) or comparable statutes specifically addressing intellectual property. All issues involving (i) non-competition after termination or assignment of this Agreement and/or (ii) modification of this Agreement while it is in effect shall be governed by the laws of the state in which Franchisee is domiciled. Except as otherwise provided in Article XI hereof and this Section 14.1, this Agreement and the totality of the legal relations among the parties hereto shall be governed by and construed in accordance with the laws of the State of California.

14.2.   Entire Agreement; Modification.

This Agreement, together with any and all exhibits, addenda or attachments, contains all of the terms and conditions agreed upon by the parties hereto with reference to the subject matter hereof. To the fullest extent permitted by Applicable Law, no other agreements oral or otherwise shall be deemed to exist or to bind any of the parties hereto and all prior agreements and understandings are superseded hereby. However, nothing in this Agreement or any related agreement is intended to disclaim the Franchisor's representations made in the Franchise Disclosure Document. No officer or employee or agent of Franchisor has any authority to make any representation or promise not contained in this Agreement. Franchisee agrees that it has executed this Agreement without reliance upon any such unauthorized representation or promise. This Agreement cannot be modified or changed except by (i) written instrument signed by all of the parties hereto, or (ii) by Franchisor's reduction of the scope of any of Franchisee's obligations under this Agreement, which may be done without Franchisee's consent (except as restricted by Applicable Law) and which is effective immediately upon notice.

14.3. Titles for Convenience Only.

Section titles used herein are for convenience only and shall not be deemed to affect the meaning or construction of any of the terms, provisions, covenants or conditions hereof.

14.4. Gender.

All terms used in any one number or gender shall be extended to mean and include any other number and gender as the facts, context or sense of this Agreement or any article or section may require.

14.5. Severability.

Nothing contained in this Agreement shall be construed as requiring the commission of any act contrary to law. Whenever there is any conflict between any provisions of this Agreement or the Confidential Operations Manual and any present or future statute, law, ordinance, regulation or judicial decision, contrary to which the parties have no legal right under this Agreement, the latter shall prevail, but in such event the provision of this Agreement or the Confidential Operations Manual thus affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law. If any article, section, sentence or clause of this Agreement or the Confidential Operations Manual shall be held to be indefinite, invalid or otherwise unenforceable, the indefinite, invalid or unenforceable provision shall be deemed deleted, and the remaining parts thereof shall continue in full force and effect, unless said provision pertains to the payment of fees pursuant to Article IV hereof, in which case this Agreement shall terminate.

14.6. No Third Party Beneficiaries.

This Agreement is not intended to benefit any other Person except the named parties hereto and no other Person shall be entitled to any rights hereunder by virtue of so-called "third party beneficiary rights" or otherwise.

## XV.
## SUBMISSION OF AGREEMENT

The submission of this Agreement to Franchisee does not constitute an offer and this Agreement shall become effective only upon the execution thereof by Franchisor and Franchisee. THIS AGREEMENT SHALL NOT BE BINDING ON FRANCHISOR UNLESS AND UNTIL IT SHALL HAVE BEEN ACCEPTED AND SIGNED BY AN OFFICER OF FRANCHISOR. THIS AGREEMENT SHALL NOT BECOME EFFECTIVE UNTIL AND UNLESS FRANCHISEE SHALL HAVE BEEN FURNISHED BY FRANCHISOR WITH ANY DISCLOSURE, IN WRITTEN FORM, AS MAY BE REQUIRED UNDER APPLICABLE LAW.

## XVI.
## ACKNOWLEDGMENTS AND REPRESENTATIONS OF FRANCHISEE

16.1. Certain Acknowledgments and Representations of Franchisee.

Franchisee represents and warrants that the following statements are true and accurate:

(a) Franchisee does not seek to obtain the Franchise for speculative or investment purposes and has no present intention to sell or transfer or attempt to sell or transfer the Franchised Business and/or the Franchise.

(b)     Franchisee understands and acknowledges the value to the System of uniform and ethical standards of quality, appearance and service described in and required by the Confidential Operations Manual and the necessity of operating the Franchised Business under the standards set forth in the Confidential Operations Manual. Franchisee represents that it has the capabilities, professionally, financially and otherwise, to comply with the standards of Franchisor.

(c)     If Franchisee is a Business Entity, Franchisee is duly incorporated or organized and qualified to do business in the state and any other applicable jurisdiction within which the Center is located.

(d)     The execution of this Agreement by Franchisee will not constitute or violate any other agreement or commitment to which Franchisee is a party.

(e)     Any individual executing this Agreement on behalf of Franchisee is duly authorized to do so and the Agreement shall constitute a valid and binding obligation of Franchisee.

(f)     Franchisee, and, if Franchisee is a Business Entity, its owners, officers, directors, managers and general partners (i) have carefully read this Agreement and all other related documents to be executed by it concurrently or in conjunction with the execution hereof; (ii) have had the opportunity to obtain the advice of counsel in connection with this Agreement; (iii) understand the nature of this Agreement; and (iv) intend to comply herewith and be bound hereby.

16.2.   Additional Information Respecting Franchisee.

(a)     Attached hereto as Exhibit C is a schedule containing complete information respecting the owners, partners, officers and directors, as the case may be, of Franchisee.

(b)     The address (written notice of any change in this information after the Effective Date must be delivered to Franchisor pursuant to Section 13.7 hereof) where Franchisee's financial and other records are maintained is:

> 14115 Farmington Road
> Livonia, MI 48154

(c)     The name, business address and facsimile number (written notice of any change in this information after the Effective Date must be delivered to Franchisor pursuant to Section 13.7 hereof) of Franchisee's "General Manager" is:

> Name:     Brenden Mcnerney
> Address:     565 East Swedesford Road
>                     Wayne, PA 19087
> Facsimile Number:   TBD

(d)     Upon request by Franchisor, Franchisee shall deliver to Franchisor complete and accurate copies of all organizational documents relating to Franchisee, including without limitation all partnership agreements, limited liability company operating agreements, articles or certificates of incorporation, by-laws and shareholder agreements, and any amendments, side letters and other items modifying such documents.

(e)     The term of this Agreement (whether an Initial Term or a Renewal Term as indicated on the cover page of this Agreement, whichever is applicable) expires on July 31, 2019.

16.3.    Integration.

Franchisor and Franchisee each acknowledge and warrant to each other that they wish to have all terms of their business relationship defined in this written Agreement. Neither Franchisor nor Franchisee wishes to enter into a business relationship with the other in which any terms or obligations are the subject of alleged oral statements or in which oral statements serve as the basis for creating rights or obligations different than or supplementary to the rights and obligations set forth herein. Accordingly, Franchisor and Franchisee agree that this Agreement, together with any other documents or agreement executed by the parties contemporaneously herewith, supersede and cancel any prior and/or contemporaneous discussions (whether described as presentations, inducements, promises agreements or any other term), between Franchisor or anyone acting on its behalf and Franchisee or anyone acting on his or her behalf, which might be taken to constitute agreements, representations, inducements, promises or understandings (or any equivalent to such terms) with respect to the relationship between the parties, and Franchisor and Franchisee each agree that they have placed, and will place, no reliance on any such discussions. This Agreement, together with any other documents or agreements executed by the parties contemporaneously herewith, constitutes the entire agreement between the parties and contains all terms, conditions, rights and obligations of the parties with respect to any aspect of the relationship between the parties. No future franchise rights or offer of franchise rights have been promised to Franchisee and no such franchise rights or offer of franchise rights shall come into existence, except by means of a separate writing, executed by an officer of Franchisor or such other Business Entity granting the Franchise Agreement and specifically identified as a modification of this Agreement. No change, modification amendment or waiver of any of the provisions hereof shall be effective and binding upon either party unless it is in writing, specifically identified as an amendment hereto and signed by the party to be charged.

16.4.    Acknowledgements.

Franchisee understands and agrees and represents to Franchisor, to induce Franchisor to enter into this Agreement, that:

(a)    Acceptance of Conditions.    Franchisee has read this Agreement and Franchisor's Franchise Disclosure Document and understands and accepts the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain Franchisor's standards of service and quality and the uniformity of those standards in all Franchised Business in order to protect and preserve the System and the goodwill of the Intellectual Property Rights;

(b)    Independent Investigation. Franchisee has conducted an independent investigation of the business contemplated by this Agreement. Franchisee recognizes that the Franchise Business may evolve and change over time; that an investment in this franchise involves business risks; and that the success of the investment depends upon Franchisee's business ability and efforts;

(c)    Reliance. Franchisee has not received or relied upon any promise or guaranty, expressed or implied, about the revenues, profits or success of the business venture contemplated by this Agreement;

(d)    No Representations: Status of Franchisee.

(i)    No representations have been made by Franchisor, Franchisor's Affiliate or their respective officers, directors, shareholders, employees or agents that are contrary to statements made in the Franchise Disclosure Document previously received by Franchisee or to the terms contained in this Agreement; and

(ii)    Franchisee (if an individual) or each Person executing a guaranty of Franchisee's obligations, is a United States citizen or a lawful resident alien of the United States; if Franchisee is a Business Entity, it shall remain duly organized and in good standing for as long as this Agreement is in effect and it owns the franchise rights; and all financial and other information provided to Franchisor in connection with Franchisee's application is true and correct and no material information or fact has been omitted which is necessary in order to make the information disclosed not misleading.

[End of Page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be effective as of the Agreement Date first written above.

**FRANCHISOR:**

**NEW HORIZONS FRANCHISING GROUP, INC.**

By: _____

Earle Pratt
President

**FRANCHISEE:**

**NH PHILADELPHIA LLC**

By: _____

Mark McManus, Jr.
President

**EQUITY HOLDERS:**

NHNE LLC

By: _____

Mark McManus, Jr.
President

**EXHIBIT A TO FRANCHISE AGREEMENT**

**DESCRIPTION OF TERRITORY; PERFORMANCE REQUIREMENTS**

1.  The Territory licensed to Franchisee is described as follows:

    a.  The name of the area defined in this exhibit is Philadelphia, PA.

    b.  The territory consists of the zip code list.

2.  The size of the area defined in this exhibit is:

| MARKET CATEGORY | TERRITORY POPULATION AS OF EFFECTIVE DATE OF FRANCHISE AGREEMENT |
| --- | --- |
| M-3 | 5,774,939 |

FA 2014: Exhibit A

1

| | | | |
|---|---|---|---|
| 08001 | 08035 | 08068 | 08098 |
| 08002 | 08036 | 08069 | 08099 |
| 08003 | 08037 | 08070 | 08101 |
| 08004 | 08038 | 08071 | 08102 |
| 08007 | 08039 | 08073 | 08103 |
| 08008 | 08043 | 08075 | 08104 |
| 08009 | 08045 | 08077 | 08105 |
| 08010 | 08046 | 08078 | 08106 |
| 08012 | 08048 | 08079 | 08107 |
| 08014 | 08049 | 08080 | 08108 |
| 08016 | 08051 | 08081 | 08109 |
| 08019 | 08052 | 08083 | 08110 |
| 08020 | 08053 | 08084 | 08201 |
| 08021 | 08054 | 08085 | 08202 |
| 08022 | 08055 | 08086 | 08203 |
| 08023 | 08056 | 08087 | 08204 |
| 08026 | 08057 | 08088 | 08205 |
| 08027 | 08059 | 08089 | 08210 |
| 08028 | 08060 | 08090 | 08212 |
| 08029 | 08061 | 08091 | 08213 |
| 08030 | 08062 | 08092 | 08214 |
| 08031 | 08063 | 08093 | 08215 |
| 08032 | 08065 | 08094 | 08217 |
| 08033 | 08066 | 08096 | 08218 |
| 08034 | 08067 | 08097 | 08219 |

FA 2014: Exhibit A

| | | | |
|---|---|---|---|
| 08220 | 08314 | 08353 | 18916 |
| 08221 | 08315 | 08360 | 18917 |
| 08223 | 08316 | 08361 | 18918 |
| 08225 | 08317 | 08401 | 18922 |
| 08226 | 08318 | 08402 | 18923 |
| 08230 | 08319 | 08403 | 18924 |
| 08231 | 08320 | 08404 | 18925 |
| 08232 | 08321 | 08405 | 18926 |
| 08234 | 08322 | 08406 | 18927 |
| 08241 | 08323 | 08411 | 18928 |
| 08242 | 08324 | 08505 | 18929 |
| 08243 | 08326 | 08511 | 18931 |
| 08244 | 08327 | 08518 | 18932 |
| 08245 | 08328 | 08554 | 18933 |
| 08246 | 08330 | 08562 | 18934 |
| 08247 | 08332 | 08641 | 18936 |
| 08248 | 08340 | 18054 | 18938 |
| 08250 | 08341 | 18084 | 18940 |
| 08251 | 08342 | 18901 | 18943 |
| 08252 | 08343 | 18902 | 18944 |
| 08260 | 08344 | 18910 | 18946 |
| 08270 | 08345 | 18911 | 18947 |
| 08302 | 08346 | 18912 | 18949 |
| 08310 | 08348 | 18913 | 18950 |
| 08311 | 08349 | 18914 | 18954 |
| 08312 | 08350 | 18915 | 18956 |

FA 2014:  Exhibit A

| | | | |
|---|---|---|---|
| 18957 | 19015 | 19046 | 19082 |
| 18958 | 19017 | 19047 | 19083 |
| 18960 | 19018 | 19049 | 19085 |
| 18962 | 19020 | 19050 | 19086 |
| 18963 | 19021 | 19052 | 19087 |
| 18964 | 19022 | 19053 | 19088 |
| 18966 | 19023 | 19054 | 19089 |
| 18969 | 19025 | 19055 | 19090 |
| 18971 | 19026 | 19056 | 19091 |
| 18974 | 19027 | 19057 | 19093 |
| 18976 | 19028 | 19060 | 19094 |
| 18979 | 19029 | 19061 | 19095 |
| 18980 | 19030 | 19063 | 19096 |
| 18991 | 19031 | 19064 | 19098 |
| 19001 | 19032 | 19065 | 19099 |
| 19002 | 19033 | 19066 | 19101 |
| 19003 | 19034 | 19070 | 19102 |
| 19004 | 19035 | 19072 | 19103 |
| 19006 | 19036 | 19073 | 19104 |
| 19007 | 19037 | 19074 | 19105 |
| 19008 | 19038 | 19075 | 19106 |
| 19009 | 19039 | 19076 | 19107 |
| 19010 | 19040 | 19078 | 19108 |
| 19012 | 19041 | 19079 | 19109 |
| 19013 | 19043 | 19080 | 19110 |
| 19014 | 19044 | 19081 | 19111 |

FA 2014:  Exhibit A

4

| | | | |
|---|---|---|---|
| 19112 | 19138 | 19177 | 19335 |
| 19113 | 19139 | 19178 | 19341 |
| 19114 | 19140 | 19179 | 19342 |
| 19115 | 19141 | 19181 | 19345 |
| 19116 | 19142 | 19182 | 19346 |
| 19117 | 19143 | 19183 | 19347 |
| 19118 | 19144 | 19184 | 19348 |
| 19119 | 19145 | 19185 | 19350 |
| 19120 | 19146 | 19187 | 19351 |
| 19121 | 19147 | 19188 | 19352 |
| 19122 | 19148 | 19191 | 19353 |
| 19123 | 19149 | 19192 | 19354 |
| 19124 | 19150 | 19193 | 19355 |
| 19125 | 19151 | 19196 | 19357 |
| 19126 | 19152 | 19197 | 19358 |
| 19127 | 19153 | 19244 | 19360 |
| 19128 | 19154 | 19255 | 19366 |
| 19129 | 19155 | 19301 | 19372 |
| 19130 | 19160 | 19311 | 19373 |
| 19131 | 19162 | 19312 | 19374 |
| 19132 | 19170 | 19317 | 19375 |
| 19133 | 19171 | 19318 | 19380 |
| 19134 | 19172 | 19319 | 19381 |
| 19135 | 19173 | 19320 | 19382 |
| 19136 | 19175 | 19331 | 19383 |
| 19137 | 19176 | 19333 | 19390 |

FA 2014: Exhibit A

| | | | |
|---|---|---|---|
| 19395 | 19440 | 19484 | 19801 |
| 19397 | 19441 | 19485 | 19802 |
| 19398 | 19442 | 19486 | 19803 |
| 19399 | 19443 | 19487 | 19804 |
| 19401 | 19444 | 19488 | 19805 |
| 19403 | 19446 | 19489 | 19806 |
| 19404 | 19450 | 19490 | 19807 |
| 19405 | 19451 | 19492 | 19808 |
| 19406 | 19452 | 19493 | 19809 |
| 19407 | 19453 | 19494 | 19810 |
| 19408 | 19454 | 19495 | 19850 |
| 19409 | 19455 | 19496 | 19880 |
| 19420 | 19456 | 19701 | 19884 |
| 19421 | 19457 | 19702 | 19885 |
| 19422 | 19460 | 19703 | 19886 |
| 19423 | 19462 | 19706 | 19887 |
| 19424 | 19468 | 19707 | 19888 |
| 19425 | 19473 | 19710 | 19889 |
| 19426 | 19474 | 19711 | 19890 |
| 19428 | 19475 | 19713 | 19891 |
| 19429 | 19477 | 19718 | 19892 |
| 19430 | 19478 | 19720 | 19893 |
| 19432 | 19480 | 19721 | 19894 |
| 19436 | 19481 | 19732 | 19895 |
| 19437 | 19482 | 19735 | 19896 |
| 19438 | 19483 | 19736 | 19897 |

FA 2014:  Exhibit A

19898                    19899

FA 2014:  Exhibit A



**PHL 2014**

INTELLIGENT DIRECT OTW



## EXHIBIT B TO FRANCHISE AGREEMENT

## SUMMARY OF ENTERPRISE LEARNING SOLUTIONS

The Enterprise Learning Solutions (or "ELS") has been established by Franchisor to obtain and administer computer-training business relating to "Enterprise Accounts". Enterprise Accounts are defined as a large account usually national or global.

Under the ELS program, Franchisor is responsible for the following:

(a) Using its best efforts to negotiate the most favorable pricing obtainable for Centers from Enterprise Accounts with consideration for volume and competitive conditions;

(b) Making available information concerning the agreed scope and pricing of training and materials for each Enterprise Account via ELS Announcements delivered on the Extranet;

(c) Administering a program for Enterprise Accounts under which credits can be issued by ELS and sold to Enterprise Accounts for redemption at Centers;

(d) Coordinating the delivery of training services and materials to Enterprise Accounts from any Center;

(e) Billing and collecting from the Enterprise Account; and

(f) Paying each Center the Fees in accordance with the ELS fee structure as posted on the Extranet from time to time.

Each Center is responsible for the following:

(a) Providing services and materials to each Enterprise Account in accordance with the terms of the applicable Enterprise Account contract;

(b) Honoring credits for Enterprise Accounts issued by ELS;

(c) Working with ELS or the Enterprise Account to coordinate the scheduling of the delivery of training services and materials to the Enterprise Account;

(d) Billing ELS for training and materials provided pursuant to a Enterprise Account within 10 days after such training and materials were rendered and providing, as a condition of payment, such documentation as may be required by ELS or the Enterprise Account; and

(e) Providing high quality training to Enterprise Accounts pursuant to the schedules committed to by the Center and permitting representatives of ELS to periodically monitor such training; and

(f) Working with Enterprise Account in local market to penetrate and identify training opportunities. This should be done using a consultative sales approach. All training must be run through the ELS process for billing and reporting as noted on the ELS announcements.

The terms of the operation of ELS from time to time are contained on the Extranet, access which will be provided to Franchisee at IFT.

## EXHIBIT C TO FRANCHISE AGREEMENT

## SCHEDULE OF NAMES AND ADDRESSES OF SOLE PROPRIETOR, SHAREHOLDERS, MANAGERS, MEMBERS, PARTNERS AND/OR PRINCIPAL OFFICERS, AS APPLICABLE

1.      If the prospective franchisee is a sole proprietorship, list below the name and residence address of the owner:

N/A

2.      If the prospective franchisee is a partnership, list below the names, residential addresses and respective percentage ownership interests in the partnership of each partner (and whether any partner is a managing partner) and submit a copy of the partnership agreement, if any, to Franchisor (if more space is required, attach additional sheets):

N/A

3.      If the prospective franchisee is a corporation, list the names, residential addresses and percentage ownership of each shareholder (if more space is required, attach additional sheets):

N/A

4.      If the prospective franchisee is a corporation, list the names and residential addresses of each director of the corporation, if not previously provided (if more space is required, attach additional sheets):

N/A

5.      If the prospective franchisee is a limited liability company, list the names, residential addresses and percentage ownership of each equity owning member (if more space is required, attach additional sheets):

NHNE LLC
14115 Farmington Road
Livonia, MI 48154
98%

NH Northeast LLC
40900 N. Woodward Avenue, Suite 130
Bloomfield Hills, MI 48304
2%

6.      If the prospective franchisee is a limited liability company, list the names and residential addresses of the manager (or each co-manager) of the limited liability company, if not previously provided (if more space is required, attach additional sheets):

Member:        Mark McManus, Jr.
               3950 Commerce Road
               Orchard Lake, MI 48324

FA 2014: Exhibit C

1

7.     If the prospective franchisee is a corporation or a limited liability company, list the names, residential addresses and respective offices of each executive officer, if not previously provided in section 4 (if necessary, list other corporate executive officers on additional sheets attached):

President / Secretary:     Mark McManus, Jr.

Treasurer:                John Morgan
                          1393 Bicentiennial Parkway
                          Ann Arbor, MI 48108

## EXHIBIT D TO FRANCHISE AGREEMENT

## NEW HORIZONS FRANCHISING GROUP, INC.
### EXTRANET LICENSE AGREEMENT

(Note: This is an example of the Extranet License Agreement which you must execute either in concurrently with the Franchise Agreement or on the New Horizons Extranet site)

This Extranet License Agreement ("Agreement") is made between New Horizons Franchising Group, Inc., ("Franchisor") and the owners and general managers of its franchisees and company owned computer learning centers, (the "Network Member").

A.      This Agreement describes the terms and conditions upon which Franchisor shall allow Network Member to subscribe to the Extranet Services as described below. As used in this Agreement the term "Extranet Services" shall include but are not limited to access to an administration tool for the input of names and email addresses to effect mail forwarding, global contact lists, online discussion forums, file libraries, access to the Extranet, and the publishing of such data and other information as Franchisor may provide from time to time in its sole discretion.

B.      If you agree to each term and condition please click on "Agree" below, or use such other method to indicate your agreement as may be presented. Agreement to these terms is required for admission to the Extranet Services. Agreement to these terms by all Network Members is necessary to protect and serve the interests of all Network Members using the Extranet Services.

1.      EXTRANET SERVICE

In consideration of the payment of the monthly fee to Franchisor by Network Member, and the compliance with the other terms and conditions of this Agreement, Franchisor shall provide to Network Member the Extranet Services and information and other content that may be provided by third parties ("Third Party Material").

2.      RULES OF CONDUCT ON THE EXTRANET

Network Member agrees not to upload, post or otherwise publish on or over the Extranet Service, and not to seek on or over the Extranet Service, any software, file, information, communication or other content: (a) which violates or infringes upon the rights of any other; (b) which, under the circumstances and in Franchisor's good faith judgment, is, or is likely to be perceived by an intended recipient or target as, defamatory, deceptive, misleading, abusive, profane, offensive or inappropriate, (c ) which constitutes a threat to, harassment of, or stalking of another; (d) which adversely affects the performance or availability of the Extranet Service; (e) which contains any virus, worm, Trojan, harmful component or corrupted data; or (f) which, without the written approval of Franchisor, contains any advertising, promotion or solicitation of goods or services for commercial purposes. This paragraph shall not be interpreted to restrict Network Member from utilizing mail services in conducting legitimate franchise business. Network Member may not, without the written approval of Franchisor, send unsolicited advertising or promotional material. Network Member shall comply with the mail forwarding policies posted on the Extranet from time to time.

3.    LEGAL REQUIREMENTS

Network Member agrees to comply with the terms and conditions of its Franchise Agreement and the Confidential Operations Manual, all applicable laws, rules and regulations in connection with the use of the Extranet Service and this Agreement. If there is conflict between the terms and conditions of this Agreement and the terms and conditions of the Franchise Agreement then the terms and conditions of this Agreement shall prevail. Network Member is responsible for reading and paying appropriate attention to warnings, notices and instructions presented in various areas of the Extranet Service, and shall also comply and ensure that its employees and representatives comply with any other rules and restrictions relating to the use of the Extranet Service.

4.    DISCLAIMER AS TO CONTENT

Franchisor does not and shall not be deemed to verify, endorse or in any way vouch for the accuracy, completeness, truthfulness or reliability of any service, opinion, advice, communication, information or other content on or made available through the Extranet Service.

5.    OWNERSHIP OF CONTENT

Network Member acknowledges and agrees that any information posted in the libraries or forums shall be the property of Franchisor and Franchisor may reproduce, distribute, transmit, publish or otherwise transfer, or commercially exploit, any software, file, information, communication or other content received or accessed in the libraries and forums through the Extranet Service.

6.    MISUSE OF ACCOUNTS

No User shall use another User's account. No Network Member shall use another Network Member's account.

7.    NETWORK MEMBER RESPONSIBILITY

Network Member shall be responsible for all access to and use of the Extranet Service through Network Member's account or password(s). Network Member agrees that only Network Member and its owners and employees ("Users") shall be granted access to the Extranet Services. When any employee or agent of Network Member leaves the employment or agency of Network Member, Network Member shall immediately terminate that person's access to the Extranet.

8.    ONGOING RELATIONSHIP

8.1.    Franchisor may at any time by notice published electronically using the Extranet Service modify this Network Member Agreement, including, without limitation, pricing and billing terms. It is Network Member's responsibility to review from time to time and stay familiar with this Network Member Agreement.

8.2.    Franchisor, in its sole discretion and without notice, may (i) discontinue, add to or revise any part of the Extranet Service and (ii) modify, supplement, delete, discontinue or remove any software, file, publications, information, communication or other content appearing on or transmitted through the Extranet Service (a "Modification"). This may be amended in the manner expressly provided for in this Agreement. If any term of this Agreement is found by a court of competent jurisdiction to be illegal or unenforceable, the term shall be considered to be stricken from this Agreement as if it had not been included from the beginning.

FA 2014: Exhibit D

8.3. If Franchisor makes a Modification, Network Member may immediately terminate its Network Member account and this Agreement. Network Member may terminate its Network Member Account at any other time and for any reason or for no reason. Network Member shall carry out any termination in accordance with the methods established by Franchisor. Instructions for termination are provided online.

8.4. Franchisor may terminate your account and this Agreement if Network Member or any of its Users breach any term or condition of this Agreement. Franchisor may terminate the Network Member's account and this Agreement or may suspend (with or without notice) access to the Extranet Service, in whole or in part at any time. If Franchisor has not determined in its sole discretion that there has been a breach of this Agreement then any such termination or suspension shall require 30 days advance notice.

8.5. After termination of this Agreement or any Network Member's account, and after suspension of access to the Extranet Service, Network Member remains responsible for any obligations accrued to that date. Network Member shall pay all fees due to Franchisor through the end of the month in which suspension or termination occurs. Except as specifically provided for in this Agreement, neither Franchisor nor Network Member shall have any obligation whatsoever to the other after any cancellation or termination of this Agreement.

9.    FEES AND PAYMENT

9.1. The monthly fee shall be payable by Network Member at the same time that it pays its royalties and other fees payable pursuant to its franchise agreement with Franchisor. The initial monthly fee shall be twenty five dollars ($25.00) per Network Member. Network Member shall pay any and all applicable taxes related to use of the Extranet Service by Network Member or by Users of Network Member's account. Network Member acknowledges that Franchisor incurs substantial costs in maintaining the Extranet Service and that Franchisor may adjust the monthly fee from time to time in its sole discretion by notice over the Extranet.

9.2. Network Member acknowledges that a monthly Network Membership fee will apply for each month (or portion thereof) that Network Member's shall require access to the Extranet Service. The Extranet Service shall be provided until either party terminates the Network Member's account and this Agreement.

10.   HARDWARE AND OTHER EQUIPMENT

Network Member is responsible for and must purchase or otherwise provide all telephone and other equipment and services necessary to access and use the Extranet Service.

11.   COPYRIGHT AND LICENSES

11.1. Franchisor reserves all copyrights and other rights in and to any content available through the Extranet Service and which is identified as, claimed by Franchisor as, or known by Network Member to be, proprietary to Franchisor (or its licensors). The content on the Extranet Service is protected under applicable copyright law, including as a collective work. All copying, modification, distribution, publication or other use by Network Member, or by any user of Network Member's account, of any such content or other works is prohibited, except as expressly permitted by Franchisor.

FA 2014: Exhibit D

3

11.2.    Each Network Member, and User grants to Franchisor and its affiliates a non-exclusive, paid-up, perpetual and worldwide right to copy on any medium, distribute, display, perform, translate, adapt, modify and otherwise use in connection with the business of Franchisor and its affiliates any and all software, files, information, communications and other content which it places on the Extranet. Each Network Member who places software, files, information, communications or other content on the Extranet Service retains any proprietary rights Network Member may have in such content, and the license granted under this paragraph shall not be construed as a conveyance of such proprietary rights to Franchisor or its affiliates.

12.    USE OF DATA, INFORMATION, AND COMMUNICATIONS

Network Member acknowledges and agrees that Franchisor may, at its sole discretion and on a worldwide basis, distribute, transfer, loan, sell or otherwise share with other persons or entities user lists. "User lists" includes name and address data and other identifying data of Network Members and Users.

Network Member acknowledges that User lists may be used for:

a.    Directing e-mail or other communications from Franchisor to the Network Member.

b.    Sharing User Lists with Franchisor franchises and affiliates.

c.    Directing limited commercial or promotional communications to Network Members pursuant to Franchisor's Referred and Preferred Vendor Programs.

d.    Other uses as deemed appropriate solely by Franchisor for its internal information and records and for the conduct of business between Franchisor and its franchises and affiliates.

Network Member has the right and the obligation to correct errors in Network Member records through the use of the remote administration facilities provided by Franchisor. Network Member acknowledges and agrees that User lists may be (i) collected directly from Network Members, (ii) derived from Network Member and User access to or use of the Extranet Service and, (iii) obtained, stored, distributed and otherwise managed by Franchisor, its affiliates, and contractors.

Franchisor, in its reasonable and good faith discretion and without notice, may provide information and records relating to Network Member and Users to courts, law enforcement agencies, or others involved in prosecuting claims or investigations for conduct or conditions alleged or believed to be illegal or to violate or threaten the rights of any person or entity.

Information generated by or in connection with the administration of the Extranet Service shall be and remain the exclusive property of Franchisor.

Network Member acknowledges that advertising and promotion may occur on the Extranet Service and that neither Network Member nor any User shall have any claim with respect to any proceeds from such activities.

13.    DISCLAIMER OF WARRANTIES AND EXCLUSION OF LIABILITY

13.1.    NETWORK MEMBER EXPRESSLY AGREES THAT USE OF THE SERVICE IS AT NETWORK MEMBER'S SOLE RISK. THE SERVICE IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO

WARRANTIES THAT THE SERVICE WILL BE UNINTERRUPTED OR ERROR FREE, WARRANTIES OF TITLE OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.

13.2. NEITHER FRANCHISOR NOR ANY OF ITS AFFILIATES, INFORMATION OR CONTENT PROVIDERS, SERVICE PROVIDERS, LICENSORS, EMPLOYEES OR AGENTS ("FRANCHISOR GROUP") SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF USE OF THE EXTRANET SERVICE OR INABILITY TO USE THE EXTRANET SERVICE OR OUT OF ANY BREACH OF ANY REPRESENTATION OR WARRANTY. NONE OF THE FRANCHISOR GROUP SHALL HAVE ANY LIABILITY WHATSOEVER IN CONNECTION WITH THIS AGREEMENT IN EXCESS OF AN AMOUNT EQUAL TO THE COST OF ONE YEARS EXTRANET SERVICE. EXCLUDED FROM THIS LIMITATION OF LIABILITY IS LIABILITY DIRECTLY ARISING OUT OF (i) A BREACH BY FRANCHISOR OF A BASIC OBLIGATION TO OFFER AN EXTRANET SERVICE AS PROVIDED FOR UNDER THIS AGREEMENT, AND (ii) FRANCHISOR KNOWINGLY ACTING TO INTENTIONALLY BREACH ITS CONTRACTUAL OBLIGATIONS UNDER THIS AGREEMENT. THESE PROVISIONS SHALL APPLY REGARDLESS OF ANY ALLEGATION OR FINDING THAT A REMEDY FAILED OF ITS ESSENTIAL PURPOSE, REGARDLESS OF THE FORM OF ACTION OR THEORY OF LIABILITY (INCLUDING, WITHOUT LIMITATION, ANY FORM OF NEGLIGENCE) AND EVEN IF ANY MEMBER OF THE FRANCHISOR GROUP WAS ADVISED OR AWARE OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES OR LIABILITY.

13.3. IF FRANCHISOR SHALL MISTAKENLY OR WRONGFULLY OVERCHARGE NETWORK MEMBER, NOTHING IN THIS AGREEMENT SHALL LIMIT FRANCHISOR'S OBLIGATION TO REFUND SUCH OVERCHARGE PLUS INTEREST.

13.4. NETWORK MEMBER EXPRESSLY ACKNOWLEDGES THAT THE PROVISIONS OF THIS SECTION SHALL ALSO APPLY TO ANY AND ALL CLAIMS RELATING TO "THIRD PARTY MATERIAL" (DEFINED ABOVE) AND ANY OTHER CONTENT AVAILABLE THROUGH THE EXTRANET SERVICE. NETWORK MEMBER AGREES THAT IT WILL NOT IN ANY WAY HOLD FRANCHISOR RESPONSIBLE FOR ANY SELECTION OR RETENTION OF, OR THE ACTS OR OMISSIONS OF, THIRD PARTIES IN CONNECTION WITH THE EXTRANET SERVICE.

13.5. SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN WARRANTIES. THEREFORE, THE ABOVE EXCLUSIONS OR LIMITATIONS MIGHT NOT APPLY TO THAT EXTENT, AND NONE OF THE ABOVE SHOULD BE CONSTRUED AS EXCLUDING OR LIMITING ANY WARRANTY BEYOND WHAT IS PERMISSIBLE UNDER APPLICABLE LAW.

14. INDEMNITY

Network Member hereby indemnifies and holds harmless the Franchisor Group against all claims, liability, damages, costs and expenses, including but not limited to reasonable attorneys' fees, arising out of or related to any and all use of Network Member's account. This includes, without limitation, responsibility for all such consequences of Network Member's and User's violations of this Agreement or placement on or over, or retrieval from or through, the Extranet Service of any software, file, information, communication or other content.

FA 2014: Exhibit D

15.    CHOICE OF LAW TIME FOR BRINGING CLAIMS

This Agreement is made in the State of California. This Agreement and all of the parties' respective rights and duties in connection herewith shall be governed by and construed in accordance with the laws of the United States of America and, excluding conflicts rules, of the State of California. Any cause of action of Network Member, or by any User, with respect to the Extranet Service or this Agreement must be instituted within one year after the claim or cause of action has arisen or be barred. The United Nations Convention on Contracts for the International Sale of Goods does not apply to this Agreement and it is acknowledged that this is a contract for services and not a contract for the sale of goods. Network Member agrees that this Agreement is set forth in the English language for the mutual convenience and benefit of the parties.

16.    FURTHER ASSUANCES

Each party agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform the terms, provisions and conditions of this Agreement.

Acknowledged and agreed on August 1, 2014.

FRANCHISEE:

**NH PHILADELPHIA LLC**

By: _____

Mark McManus, Jr.
President

## EXHIBIT E-1 TO FRANCHISE AGREEMENT

### GUARANTEE

This Guarantee ("Guarantee") dated as of August 1, 2014 is made by NHNE LLC, a Michigan limited liability company with a principal place of business at 14115 Farmington Road, Livonia, MI 48154 ("Guarantor"), in favor of New Horizons Franchising Group, Inc., a Delaware corporation having its corporate headquarters at 1900 South State College Boulevard, Suite 450, Anaheim, California, 92806 ("Franchisor").

**Guarantee.** In consideration of the execution of the Franchise Agreement for Philadelphia, PA dated August 1, 2014, ("Franchise Agreement") between Franchisor and NH Philadelphia LLC, a Michigan limited liability company with a principal place of business at 565 East Swedesford Road, Wayne, PA 19087 ("Franchisee"), Guarantor unconditionally guarantees the performance of the Franchise Documents, and all obligations and indebtedness of Franchisee under the terms of the Franchise Documents. This includes the Franchise Agreement and all ancillary agreements, which Franchisee executes in favor of Franchisor, and any Promissory Note made by Franchisee in favor of Franchisor. Also included are any open account balances for royalties, fees and other payments and interest due from Franchisee, or any affiliate of Franchisee, to Franchisor. This Guarantee covers dealings arising between Franchisee and Franchisor, or from dealings by which Franchisor may become a creditor of Franchisee. (The Franchise Documents and Monetary Obligations individually and collectively, as the case may be, are referred to as the Obligations.")

As used in this Guarantee, the terms "indebtedness" and "obligations" are used in their most comprehensive meaning and include:

All debts, obligations and liabilities of Franchisee incurred with or without notice to Guarantor, whether voluntary or involuntary, and whether Franchisee is liable individually or jointly with others.

Guarantor agrees that the covenants of non-competition, nondisclosure and non-transfer, as described in the Franchise Agreement, also apply to Guarantor as an individual.

**Maximum Liability.** The maximum liability of Guarantor under this Guarantee will not exceed the amount of the Obligations described above, plus all costs and expenses of enforcement of this Guarantee.

**Nature of Guarantee.** Guarantor intends to guarantee, at all times, prompt payment when due, whether at maturity, or earlier by reason of acceleration, or otherwise.

**Duration of Guarantee.** This Guarantee will take effect when received by Franchisor without necessity of any acceptance by Franchisor, and without notice to Guarantor or Franchisee. It will continue in full force until all Obligations have been fully paid and all other obligations of Guarantor under this Guarantee have been performed in full.

**Guarantor's Authorization to Franchisor.** Guarantor authorizes Franchisor, from time to time, without notice or demand and without lessening Guarantor's liability under this Guarantee, to: (a) Make one or more additional secured or unsecured loans to Franchisee; (b) alter, compromise, renew, extend, accelerate, or otherwise change the time for payment or other terms of the Obligations or any part of the indebtedness, including increases and decreases of the rate of interest (extensions may be repeated and may be for longer than the original loan term); (c) determine how, when and what application of

payments and credits will be made on the indebtedness; (d) sell, transfer, assign, or grant participations in all or any part of the indebtedness; and (e) assign or transfer this Guarantee in whole or in part.

**Guarantor's Representations and Warranties.** Guarantor warrants to Franchisor that: (a) No representations or agreements of any kind have been made to Guarantor which would limit or qualify the terms of this Guarantee; (b) this Guarantee is executed at Franchisee's request and not at the request of Franchisor; (c) Guarantor has full authority to enter into this Guarantee; (d) the provisions of this Guarantee do not create default under any instrument binding upon Guarantor, and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (e) upon Franchisor's request, Guarantor will provide true, correct and current financial and credit information in a form acceptable to Franchisor; (f) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Franchisor, and no event has occurred which may potentially do so; (g) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (h) Franchisor has made no representation to Guarantor as to the creditworthiness of Franchisee; and (i) Guarantor has established adequate means of obtaining information regarding Franchisee's financial condition from Franchisee on a continuing basis.

**Guarantor's Waivers.** Except as prohibited by applicable law, Guarantor waives any right to require Franchisor to (a) make notice of any kind, including notice of change of terms of repayment of the Obligations, default by Franchisee, any action or non-action taken by Franchisee or Franchisor, or the creation of new or additional indebtedness; (b) proceed against any person, including Franchisee, before proceeding against Guarantor; (c) apply any payment of proceeds received against the Obligations in any order; (d) disclose any information about the Obligations, the Franchisee, or about any action or non-action of Franchisor; or (e) pursue any remedy or course of action in Franchisor's power. Guarantor also waives any rights or defenses regarding (f) any disability or defenses of Franchisee; (g) the termination of this Agreement, other than by payment in full of the Obligation; (h) the application of proceeds of the Obligations by Franchisee for purposes other than the purposes understood and intended by Guarantor and Franchisor; (i) any act of omission or commission by Franchisor which directly or indirectly results in or contributes to the discharge of Franchisee, or the Obligations; (j) any statute of limitations in any action under this guarantee or on the Obligations; or (k) any modification in terms of the Obligations including, without limitation, the renewal, extension, acceleration, or other change in the time payment of the Obligations, and any change in the interest rate.

Guarantor waives any right to trial by jury with respect to any action or proceeding brought by Guarantor, Franchisee, Franchisor, or any other person relating to: (i) a loan or any understandings or prior dealings between the parties or (ii) this Guarantee, to which Franchisee is a party. Guarantor agrees that this Guarantee constitutes a written consent to waiver of trial by jury pursuant to the provisions of California Code of Civil Procedure § 631. Guarantor appoints Franchisor as its attorney-in-fact, which appointment is coupled with an interest, and Guarantor authorizes Franchisor, in the name and place of Guarantor, to file this Guarantee with the clerk or judge of any court of competent jurisdiction as a statutory written consent to waiver of trial by jury.

Guarantor understands that the foregoing waivers are waivers of substantive rights and defenses to which Guarantor might otherwise be entitled to under state and federal law. Guarantor acknowledges that Guarantor has waived these with the intention that they be fully relied upon by Franchisor. Until all indebtedness is paid in full, Guarantor waives any right to enforce any remedy Franchisor may have against Franchisee.

**Guarantor's Understanding with Respect to Waivers.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and

that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver will be effective only to the extent permitted by law or public policy.

**Subordination of Borrower's Debts to Guarantor.** Guarantor agrees that the Obligations of Franchisee to Franchisor, whether present or future, are paramount to any claim that Guarantor may have at any time against Franchisee, whether or not Franchisee becomes insolvent. Guarantor therefore subordinates any claim Guarantor may have against Franchisee, to any claim Franchisor may have against Franchisee, now or in the future. In the event of Franchisee's insolvency and consequent liquidation of assets, by any method, those assets applicable to the claims of both Franchisor and Guarantor will first be paid to Franchisor. Franchisor will apply such assets to the Obligations of Franchisee to Franchisor.

Guarantor assigns to Franchisor all present and future claims against Franchisee, or against any assignee or trustee in bankruptcy of Franchisee, providing that such assignment is only for the purpose of assuring full payment of the indebtedness in legal tender to Franchisor. If Franchisor so requests, any credit agreements evidencing debts or obligations of Franchisee to Guarantor will be marked with a legend showing they are subject to this Guarantee, and delivered to Franchisor.

Guarantor authorizes Franchisor to execute and file financing statements and continuation statements from time to time, and to execute any documents and/or actions Franchisor deems appropriate to perfect, preserve and enforce its right under this Guarantee.

**Integration Amendment.** Guarantor agrees that this Guarantee, together with any incorporated exhibits or schedules, fully incorporates the agreements and understandings of Guarantor with Franchisor, and all prior negotiations, drafts and other extrinsic communications between Guarantor and Franchisor have no evidentiary effect. Guarantor further agrees that Guarantor has read and fully understands the terms of the Guarantee; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guarantee; the Guarantee fully reflects Guarantor's intentions and oral or verbal evidence plays no part in interpreting the terms of this Guarantee. Guarantor indemnifies Franchisor, and holds harmless from all losses, claims, damages, and costs (including Franchisor's attorney's fees) incurred by Franchisor as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph. No alteration or amendment to this Guarantee will be effective unless given in writing and signed by the parties sought to be bound by the alteration or amendment.

**Applicable Law.** This Guarantee will be governed by and construed in accordance with the laws of the State of California.

**Attorney's Fees; Expenses.** Guarantor agrees to pay all of Franchisor's costs and expenses, including attorney's fees and legal expenses, incurred in connection with the enforcement of this Guarantee, whether or not this involves a lawsuit, upon demand. Should Franchisor pay someone else to help enforce this Guarantee, Guarantor will also pay the costs and expenses of such enforcement.

**Notices.** All notices required to be given by either party to the other under this Limited Guarantee will be in writing, and may be sent by fax (unless otherwise required by law). Such notices will be effective at the time of hand delivery or when deposited with a nationally recognized overnight courier, or United States mail. If sent by mail it must be with first class postage prepaid, addressed to the noticed party at the address shown above [or to such other address as either party may designate to the other in writing]. Guarantor agrees to keep Franchisor informed at all times of Guarantor's current address.

**Service.** Guarantor consents to service of process by delivery of an air courier package to its registered agent, or to its corporate office during normal business hours in lieu of any other form of service.

Guarantor waives all other forms of service of process as listed in the California Code of Civil Procedure or any other statute.

**Interpretation.** The words "Guarantor," "Franchisee," and "Franchisor," include the heirs, successors, assigns and transferees of each of them. If a court of competent jurisdiction finds any provision of this Guarantee to be invalid or unenforceable as to any person or circumstance, that provision will not be invalid or unenforceable as to any other persons or circumstances, and all provisions of this Guarantee in all other respects will remain valid and enforceable. If any one or more of Franchisee or Guarantor are corporations or partnerships, it is not necessary for Franchisor to inquire into the powers of Franchisee or Guarantor or of the officers, directors, partners or agents acting or purporting to act on their behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers will be guaranteed under this Guarantee.

**Waiver.** This Guarantee provides for Franchisor's required consent in certain instances. The granting of this consent does not establish continuing consent in subsequent instances, whether similar or otherwise. Rather, such consent may, or may not, be granted at the sole discretion of Franchisor.

Franchisor will not be deemed to have waived any rights under this Guarantee unless such waiver is given in writing and signed by Franchisor. Once waived, Franchisor will not be declared to have waived Franchisor's right to demand strict compliance with that provision or any other provision of this Guarantee. No prior waiver by Franchisor, nor any course of dealing between Franchisor and Guarantor, constitutes a waiver of any of Franchisor's rights or any of Guarantor's obligations as to any future transactions. Additionally, no delay or omission on the part of Franchisor in exercising any right will operate as a waiver of such right.

THE UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTEE AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTEE IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTEE TO HOLDER AND THAT THE GUARANTEE WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTEE."

NHNE LLC

By: _____

Mark McManus, Jr.
President

## GUARANTEE

This Guarantee ("Guarantee") dated as of August 1, 2014 is made by New Horizons Great Lakes Holding Corporation, a Michigan corporation with a principal place of business at 14115 Farmington Road, Livonia, MI 48154 ("Guarantor"), in favor of New Horizons Franchising Group, Inc., a Delaware corporation having its corporate headquarters at 1900 South State College Boulevard, Suite 450, Anaheim, California, 92806 ("Franchisor").

**Guarantee.** In consideration of the execution of the Franchise Agreement for Philadelphia, PA dated August 1, 2014, ("Franchise Agreement") between Franchisor and NH Philadelphia LLC, a Michigan limited liability company with a principal place of business at 565 East Swedesford Road, Wayne, PA 19087 ("Franchisee"), Guarantor unconditionally guarantees the performance of the Franchise Documents, and all obligations and indebtedness of Franchisee under the terms of the Franchise Documents. This includes the Franchise Agreement and all ancillary agreements, which Franchisee executes in favor of Franchisor, and any Promissory Note made by Franchisee in favor of Franchisor. Also included are any open account balances for royalties, fees and other payments and interest due from Franchisee, or any affiliate of Franchisee, to Franchisor. This Guarantee covers dealings arising between Franchisee and Franchisor, or from dealings by which Franchisor may become a creditor of Franchisee. (The Franchise Documents and Monetary Obligations individually and collectively, as the case may be, are referred to as the Obligations.")

As used in this Guarantee, the terms "indebtedness" and "obligations" are used in their most comprehensive meaning and include:

All debts, obligations and liabilities of Franchisee incurred with or without notice to Guarantor, whether voluntary or involuntary, and whether Franchisee is liable individually or jointly with others.

Guarantor agrees that the covenants of non-competition, nondisclosure and non-transfer, as described in the Franchise Agreement, also apply to Guarantor as an individual.

**Maximum Liability.** The maximum liability of Guarantor under this Guarantee will not exceed the amount of the Obligations described above, plus all costs and expenses of enforcement of this Guarantee.

**Nature of Guarantee.** Guarantor intends to guarantee, at all times, prompt payment when due, whether at maturity, or earlier by reason of acceleration, or otherwise.

**Duration of Guarantee.** This Guarantee will take effect when received by Franchisor without necessity of any acceptance by Franchisor, and without notice to Guarantor or Franchisee. It will continue in full force until all Obligations have been fully paid and all other obligations of Guarantor under this Guarantee have been performed in full.

**Guarantor's Authorization to Franchisor.** Guarantor authorizes Franchisor, from time to time, without notice or demand and without lessening Guarantor's liability under this Guarantee, to: (a) Make one or more additional secured or unsecured loans to Franchisee; (b) alter, compromise, renew, extend, accelerate, or otherwise change the time for payment or other terms of the Obligations or any part of the indebtedness, including increases and decreases of the rate of interest (extensions may be repeated and may be for longer than the original loan term); (c) determine how, when and what application of payments and credits will be made on the indebtedness; (d) sell, transfer, assign, or grant participations in all or any part of the indebtedness; and (e) assign or transfer this Guarantee in whole or in part.

FA 2014: Exhibit E

**Guarantor's Representations and Warranties.** Guarantor warrants to Franchisor that: (a) No representations or agreements of any kind have been made to Guarantor which would limit or qualify the terms of this Guarantee; (b) this Guarantee is executed at Franchisee's request and not at the request of Franchisor; (c) Guarantor has full authority to enter into this Guarantee; (d) the provisions of this Guarantee do not create default under any instrument binding upon Guarantor, and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (e) upon Franchisor's request, Guarantor will provide true, correct and current financial and credit information in a form acceptable to Franchisor; (f) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Franchisor, and no event has occurred which may potentially do so; (g) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (h) Guarantor has made no representation to Guarantor as to the creditworthiness of Franchisee; and (i) Guarantor has established adequate means of obtaining information regarding Franchisee's financial condition from Franchisee on a continuing basis.

**Guarantor's Waivers.** Except as prohibited by applicable law, Guarantor waives any right to require Franchisor to (a) make notice of any kind, including notice of change of terms of repayment of the Obligations, default by Franchisee, any action or non-action taken by Franchisee or Franchisor, or the creation of new or additional indebtedness; (b) proceed against any person, including Franchisee, before proceeding against Guarantor; (c) apply any payment of proceeds received against the Obligations in any order; (d) disclose any information about the Obligations, the Franchisee, or about any action or non-action of Franchisor; or (e) pursue any remedy or course of action in Franchisor's power. Guarantor also waives any rights or defenses regarding (f) any disability or defenses of Franchisee; (g) the termination of this Agreement, other than by payment in full of the Obligation; (h) the application of proceeds of the Obligations by Franchisee for purposes other than the purposes understood and intended by Guarantor and Franchisor; (i) any act of omission or commission by Franchisor which directly or indirectly results in or contributes to the discharge of Franchisee, or the Obligations; (j) any statute of limitations in any action under this guarantee or on the Obligations; or (k) any modification in terms of the Obligations including, without limitation, the renewal, extension, acceleration, or other change in the time payment of the Obligations, and any change in the interest rate.

Guarantor waives any right to trial by jury with respect to any action or proceeding brought by Guarantor, Franchisee, Franchisor, or any other person relating to: (i) a loan or any understandings or prior dealings between the parties or (ii) this Guarantee, to which Franchisee is a party. Guarantor agrees that this Guarantee constitutes a written consent to waiver of trial by jury pursuant to the provisions of California Code of Civil Procedure § 631. Guarantor appoints Franchisor as its attorney-in-fact, which appointment is coupled with an interest, and Guarantor authorizes Franchisor, in the name and place of Guarantor, to file this Guarantee with the clerk or judge of any court of competent jurisdiction as a statutory written consent to waiver of trial by jury.

Guarantor understands that the foregoing waivers are waivers of substantive rights and defenses to which Guarantor might otherwise be entitled to under state and federal law. Guarantor acknowledges that Guarantor has waived these with the intention that they be fully relied upon by Franchisor. Until all indebtedness is paid in full, Guarantor waives any right to enforce any remedy Franchisor may have against Franchisee.

**Guarantor's Understanding with Respect to Waivers.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver will be effective only to the extent permitted by law or public policy.

FA 2014: Exhibit E

**Subordination of Borrower's Debts to Guarantor.** Guarantor agrees that the Obligations of Franchisee to Franchisor, whether present or future, are paramount to any claim that Guarantor may have at any time against Franchisee, whether or not Franchisee becomes insolvent. Guarantor therefore subordinates any claim Guarantor may have against Franchisee, to any claim Franchisor may have against Franchisee, now or in the future. In the event of Franchisee's insolvency and consequent liquidation of assets, by any method, those assets applicable to the claims of both Franchisor and Guarantor will first be paid to Franchisor. Franchisor will apply such assets to the Obligations of Franchisee to Franchisor.

Guarantor assigns to Franchisor all present and future claims against Franchisee, or against any assignee or trustee in bankruptcy of Franchisee, providing that such assignment is only for the purpose of assuring full payment of the indebtedness in legal tender to Franchisor. If Franchisor so requests, any credit agreements evidencing debts or obligations of Franchisee to Guarantor will be marked with a legend showing they are subject to this Guarantee, and delivered to Franchisor.

Guarantor authorizes Franchisor to execute and file financing statements and continuation statements from time to time, and to execute any documents and/or actions Franchisor deems appropriate to perfect, preserve and enforce its right under this Guarantee.

**Integration Amendment.** Guarantor agrees that this Guarantee, together with any incorporated exhibits or schedules, fully incorporates the agreements and understandings of Guarantor with Franchisor, and all prior negotiations, drafts and other extrinsic communications between Guarantor and Franchisor have no evidentiary effect. Guarantor further agrees that Guarantor has read and fully understands the terms of the Guarantee; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guarantee; the Guarantee fully reflects Guarantor's intentions and oral or verbal evidence plays no part in interpreting the terms of this Guarantee. Guarantor indemnifies Franchisor, and holds harmless from all losses, claims, damages, and costs (including Franchisor's attorney's fees) incurred by Franchisor as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph. No alteration or amendment to this Guarantee will be effective unless given in writing and signed by the parties sought to be bound by the alteration or amendment.

**Applicable Law.** This Guarantee will be governed by and construed in accordance with the laws of the State of California.

**Attorney's Fees; Expenses.** Guarantor agrees to pay all of Franchisor's costs and expenses, including attorney's fees and legal expenses, incurred in connection with the enforcement of this Guarantee, whether or not this involves a lawsuit, upon demand. Should Franchisor pay someone else to help enforce this Guarantee, Guarantor will also pay the costs and expenses of such enforcement.

**Notices.** All notices required to be given by either party to the other under this Limited Guarantee will be in writing, and may be sent by fax (unless otherwise required by law). Such notices will be effective at the time of hand delivery or when deposited with a nationally recognized overnight courier, or United States mail. If sent by mail it must be with first class postage prepaid, addressed to the noticed party at the address shown above [or to such other address as either party may designate to the other in writing]. Guarantor agrees to keep Franchisor informed at all times of Guarantor's current address.

**Service.** Guarantor consents to service of process by delivery of an air courier package to its registered agent, or to its corporate office during normal business hours in lieu of any other form of service. Guarantor waives all other forms of service of process as listed in the California Code of Civil Procedure or any other statute.

**Interpretation.** The words "Guarantor," "Franchisee," and "Franchisor," include the heirs, successors, assigns and transferees of each of them. If a court of competent jurisdiction finds any provision of this Guarantee to be invalid or unenforceable as to any person or circumstance, that provision will not be invalid or unenforceable as to any other persons or circumstances, and all provisions of this Guarantee in all other respects will remain valid and enforceable. If any one or more of Franchisee or Guarantor are corporations or partnerships, it is not necessary for Franchisor to inquire into the powers of Franchisee or Guarantor or of the officers, directors, partners or agents acting or purporting to act on their behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers will be guaranteed under this Guarantee.

**Waiver.** This Guarantee provides for Franchisor's required consent in certain instances. The granting of this consent does not establish continuing consent in subsequent instances, whether similar or otherwise. Rather, such consent may, or may not, be granted at the sole discretion of Franchisor.

Franchisor will not be deemed to have waived any rights under this Guarantee unless such waiver is given in writing and signed by Franchisor. Once waived, Franchisor will not be declared to have waived Franchisor's right to demand strict compliance with that provision or any other provision of this Guarantee. No prior waiver by Franchisor, nor any course of dealing between Franchisor and Guarantor, constitutes a waiver of any of Franchisor's rights or any of Guarantor's obligations as to any future transactions. Additionally, no delay or omission on the part of Franchisor in exercising any right will operate as a waiver of such right.

THE UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTEE AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTEE IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTEE TO HOLDER AND THAT THE GUARANTEE WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTEE."

NEW HORIZONS GREAT LAKES HOLDING CORPORATION

By: _____

Mark McManus, Jr.
President

EXHIBIT E-2 TO FRANCHISE AGREEMENT

INTENTIONALLY OMITTED

## EXHIBIT F TO FRANCHISE AGREEMENT

## NEW HORIZONS CENTER MANAGEMENT SYSTEM

### (MULTIPLE LOCATION)

This New Horizons Center Management System Agreement and Amendment to Franchise Agreement ("Agreement") is entered into between New Horizons Franchising Group, Inc. ("Franchisor") and NH Philadelphia LLC, a Michigan limited liability company doing business as New Horizons Computer Learning Center of Philadelphia, PA ("Franchisee"), on August 1, 2014.

### RECITALS

A.      Franchisor is an international franchisor of computer training centers. Franchisor has developed an international network of franchised and company owned computer learning Centers (the "Network").

B.      Franchisor and Franchisee have entered into a franchise agreement (the "Franchise Agreement") pursuant to which Franchisor has granted Franchisee a license to operate a New Horizons Computer Learning Center.

C.      Franchisor has developed a Center Management System ("CMS.net") by the integration and further development of certain third party software for use by its franchisees and company owned locations.

D.      Franchisee now wishes to access and use the CMS.net on the terms and subject to the conditions contained herein.

NOW THEREFORE for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**1.      Definitions.** All capitalized terms used herein shall have the meanings ascribed to them in the Franchise Agreement including the Confidential Operations Manual except as otherwise specifically defined herein.

1.1.    "Center" shall mean any individual "Center" location where students attend classes and the place of business from where AE's carry out the Franchised Business. All Centers are required to conduct Site Surveys. Satellite Centers (as defined below) will be included in the definition of a Center for the purposes of counting the number of Users within a Territory. A Satellite Center will not be a Center for the purposes of a required Site Survey, or for the purpose of required CMS.net or IS Administrator certifications. There may be more than one Center in a Territory.

1.2.    "CMS.net Hardware" shall mean the minimum and recommended hardware required to operate CMS.net in any Center within the Territory from time to time and the appropriate internet access and service as described in Exhibit "B" attached hereto and incorporated herein by this reference.

1.3.    "CMS.net Database" shall mean the data created by the use of CMS.net by Franchisor, Franchisee and other Franchisees including but not limited to data relating to centers, employees, local defaults and business rules, clients, students, scheduling, registration and accounts receivable.

1.4.    "CMS.net Live Date" shall mean the date when CMS.net shall first be accessed in the normal course of the Franchised Business at any Center. This date shall be scheduled after the Site Survey has been completed.

1.5.    "CMS.net Software" shall mean the New Horizons Center Management System, customized and integrated software product provided by Franchisor and as modified from time to time by Franchisor to be used at each Center in the conduct of the Franchised Business within the Territory.

1.6.    "Conversion CMS.net Agreement" shall mean a CMS.net agreement used by a Franchisee which is currently using Franchisor's CMS-Local software and/or database and which is converting to Franchisor's CMS.net software and/or CMS.net database.

1.7.    "Electronic Information" shall mean any information stored in the CMS.net database or exchanged between the Franchisor's Website (as defined below) and the CMS.net database including but not limited to information about financial transactions, products sold, contact information, customer information and training schedule information.

1.8.    "Franchisor's Website" shall mean www.newhorizons.com and any other Franchisor owned URL or domain name or web portal, which is linked to or leads a user customer to www.newhorizons.com.

1.9.    "ISP" means Internet Service Provider.

1.10.    "Multiple Location CMS.net Agreement" shall mean a CMS.net Agreement used by a Franchisee which has been designated by Franchisor as a "Multiple Location Franchisee".

1.11.    "Satellite Center" means a location which is solely a delivery center for the Franchised Business, the location and operation of which have been approved by Franchisor, and which is not a location where any AE's report to carry out the Franchised Business.

1.12.    "Site Survey" means the survey of the Center by a CMS.net Hardware vendor required prior to installation of CMS.net.

1.13.    "Standard CMS.net Agreement" shall mean a Center which either (1) is not currently using any form of Franchisor's CMS software and/or database or (2) is currently using Franchisor's CMS-ASP software and/or database.

1.14.    "Territory" for the purposes of this Agreement, shall in some instances, have a different meaning from the term Territory as defined in the Franchise Agreement. In some instances there is more than one territory defined within one Franchise Agreement and in others additional territories have been later acquired by an amendment to the Franchise Agreement. In those and other similar situations, the term Territory shall refer to each such Territory individually. Franchisee will be required to enter into an Agreement like this one and pay the required fees for each Territory requiring CMS.net.

2.    **Access to CMS.net**

2.1.    The Franchisee shall pay a monthly usage fee for access to CMS.net (the "Usage Fee"). The Usage Fee will depend upon the total number of non-satellite centers and the number of users within each center requiring access to CMS.net within the Territory as set out on Exhibit "A" attached hereto and by this reference incorporated herein.

FA 2014: Exhibit F

2.2    Franchisee shall designate one CMS.net administrator, one Sales Manager, one Operations Manager, and one Accounting Manager as CMS.net subject matter experts. These individuals will review a set of CMS.net self-paced learning materials, provided to the franchisee by the franchisor. Franchisee may also request additional training. If Franchisor is required to visit any Center within the Territory to provide training services, then Franchisor shall charge Franchisee according to the fees set forth in Exhibit "A" attached hereto by this reference incorporated herein.

2.3    Access to CMS.net is conditional upon:

2.3.1    the payment of the first month's Usage Fee, as set out in Exhibit "A" at least seven (7) days prior to the scheduled CMS.net Live Date, and

2.3.2    the completion of a Site Survey at each of Franchisee's Center(s) within the Territory and the installation of the CMS.net Hardware as described in Exhibit "B".

2.4    Franchisor shall provide Franchisee access to CMS.net for the number of users applicable to the Usage Fee paid.

2.5    The Franchisee shall pay to Franchisor the Usage Fee in accordance with the rates designated in Exhibit "A".

2.6    Failure to pay the Usage Fee shall be an event of default under the Franchise Agreement and under this Agreement. Failure to pay the Usage Fee shall result in cessation of help desk support and cessation of access to CMS.net. Payment of the Usage Fee shall be payable on the same day as royalty payments are due under Franchisee's Franchise Agreement, commencing on the first date that royalties are due after CMS.net is first accessed.

**3.    Use of CMS.net**

3.1.    Franchisee shall be entitled to add and grant access to CMS.net for its chosen number of users ("Account Users"). Franchisee's IS Administrator shall be responsible for setting up and deleting individual accounts for its Account Users. When the number of users reaches the number of Account Users paid for by Franchisee, CMS.net access will be automatically denied to any additional users.

3.2.    To expand the number of users who may access CMS.net, Franchisee may increase its number of Account Users by delivery to Franchisor of a written notice which specifies the revised number of Account Users and payment to Franchisor of the upgrade fees as set out in Exhibit "A." Any changes to the fees charged under this Agreement shall be prorated based upon the date when the request becomes effective.

3.3.    Franchisor shall provide to Franchisee an "Access Tool" which may be used by Franchisee to convert its data into CMS.net data format. It shall be Franchisee's responsibility to input its data onto the Access Tool. Franchisor shall then load the converted data onto the CMS.net Database. Franchisor shall not be responsible for any loss of Franchisee's data due to Franchisee's error in using the Access Tool or in not following Franchisor's directions as to how to use the Access Tool. Franchisee shall make a complete back up copy of its data before using the Access Tool. Franchisor hereby disclaims any representation or warranty that the Access Tool shall complete the data conversion. Franchisor and Franchisee shall co-operate with each other in good faith to achieve data conversion.

3.4.    Franchisee agrees to use CMS.net and the CMS.net Software solely in connection with the Franchised Business at the Center located at the address(es) as set out on Exhibit "C" attached hereto

and by this reference incorporated herein. Franchisee shall not allow any person or entity to use CMS.net and the CMS.net Software in connection with the business of any firm, person, or organization other than Franchisee or its successor in interest without the prior written consent of Franchisor which consent may be withheld in the sole discretion of Franchisor.

3.5.     Upon reasonable notice, during the term of this Agreement, Franchisee shall purchase, install, and maintain whatever equipment is necessary for the proper operation of CMS.net as it may from time to time be configured by Franchisor.

3.6.     Franchisee acknowledges and agrees that the costs of installation, conversion of data, maintenance or the costs of any software or hardware required to use CMS.net, all of which are the sole responsibility of Franchisee.

### 4.     Use of Electronic Information

4.1.     Because Franchisor is entrusted to maintain a CMS.net Database for Franchisee, Franchisor has the right and responsibility to make backup copies of information and store them in a secured facility. Franchisor will not allow this information to be released or accessed by any third party except as described in this document. In the course of Franchisee's conducting business using CMS.net, Franchisor will collect, accumulate and store Electronic Information in Franchisor databases. Subject to the provisions of this Agreement, Franchisee shall be deemed to be the owner of the Electronic Information, but Franchisor shall have the absolute right to use the Electronic Information as provided in this Agreement and ownership of the Electronic Information will automatically transfer to Franchisor under the conditions identified in this Agreement.

### 4.2.     Electronic Information will be used by Franchisor for the following:

4.2.1    Accumulate statistical information about trends in sales, scheduling, product sales, revenue and other Electronic Information available. This statistical information will be used by Franchisor to understand and communicate (on a no names basis) statistics and trends in the marketplace and geographical locations.

4.2.2    Capture and distribute Website activity information.     As a resource to Franchisee's customers, Franchisor Website will provide certain valuable resources including the incorporation of Franchisor's eLearning initiative.  As a result of the use of the Franchisor Website, Franchisor gathers information from the Franchisee's customer. Franchisor will use this information to understand customer behavior.  Franchisor will share this information with the Franchisee when Franchisee is using CMS.net by electronically moving a copy of customer's activity to the CMS.net database.

4.3      Franchisor may use Electronic Information for the following:

4.3.1    With the prior consent of Franchisee, to perform direct email marketing for the benefit of Franchisee to Franchisee customers ("Direct Marketing").  Franchisor may create email marketing campaigns and business rules (the "Business Rules") that allow direct marketing to Franchisee customers.   When Franchisee opts in to any Direct Marketing campaigns and Business Rules, Franchisee's participation in each shall continue until Franchisee gives at least 30 days written notice that it wishes to opt out.

4.3.2 To communicate, to franchise owners only, franchise sales statistics, rankings and other useful information and to deliver customer service messages that have been previously reviewed by the Franchisee Marketing Advisory Council for content and frequency.

4.4 During the term of the Franchise Agreement, Franchisor will not sell or otherwise provide, Electronic Information to a third party including other franchisees without the written permission of the franchisee.

4.5 Franchisor shall not use the Electronic Information to compete with Franchisee's Franchised Business in the Territory.

5. Support

5.1. In consideration of the payment of the Usage Fee, Franchisor shall provide Franchisee with the following support and services (together the "User Services"):

5.1.1 telephone support during business hours 5:00 a.m. – 5:00 p.m. (Pacific Standard Time) Monday to Friday, except for Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day and New Years Day, and on other holidays recognized in the USA from time to time, to answer all Franchisee questions regarding the use, operation and maintenance of CMS.net; and

5.1.2 on-line E-mail support with a target response time of one (1) business day provided that if the response will take longer than three (3) business days, Franchisor shall inform Franchisee and outline the anticipated response time.

5.1.3 In no event shall Franchisor provide any service or assistance with questions relating to PC servers, communications, database or other software related to CMS.net Hardware, infrastructure or Internet connection.

5.2 The provision of the User Services by Franchisor is conditional upon Franchisee obtaining and maintaining valid client licenses for each of the workstations at each of the Center(s) and Satellite Center(s) within the Territory, including Microsoft Windows 98, NT, Windows 2000 or XP, Microsoft Office and client server licenses for its Terminal Server (or later industry equivalents).

5.3 Franchisee shall allow Franchisor to access Franchisee's Database Server (SQL) using diagnostic tools for the purposes of providing the maintenance services only. Franchisee acknowledges and agrees that CMS.net may be unavailable from time to time for scheduled maintenance. Franchisor will notify Franchisee electronically of such maintenance and will attempt to limit downtime to non-working hours on weekends and late nights. Franchisor will attempt to provide 72 hours notice prior to such downtime if possible. Franchisor will maintain CMS.net back ups and keep weekly offsite storage.

5.4 For every hour that CMS.net may be down due solely to Franchisor's error, Franchisor will credit Franchisee one (1) day (prorated) of that month's Usage Fee. Credits shall not exceed one month's Usage Fees. Downtime shall mean that all workstations at any of the Center(s) within the Territory cannot access any portion of CMS.net. This credit shall not be available for any downtime due to Franchisee's ISP Internet access.

5.5 Franchisor will also make available one copy of Franchisor's proprietary courseware developed for use with CMS.net and describing the operation of CMS.net (the "CMS.net Courseware") directly in electronic media to Franchisee.

FA 2014: Exhibit F

5

5.6 Franchisor will provide maintenance releases and bug fixes, as the same are made available to Franchisor by the vendors of the core applications within CMS.net. Franchisor is not obligated to but may provide modifications, enhancements and updates as described in section 8 below.

5.7 If Franchisor is required to visit any Center within the Territory to provide maintenance services, then Franchisee shall pay Franchisor a one-time fee in accordance with the Schedule of One-Time Fees as set out in Exhibit "A".

5.8 Franchisee acknowledges and agrees that CMS.net has been integrated specifically for the Network and Franchisee acknowledges that Franchisor is the sole provider of CMS.net maintenance and support.

### 6. CMS.net Training

6.1. Franchisee may obtain CMS.net training from Franchisor. If Franchisor is required to visit any Center within the Territory to provide training services or data migration, then Franchisor shall charge Franchisee according to Usage fees outlined in Exhibit "A".

### 7. Disclaimer of Warranties.

7.1. Franchisor warrants that CMS.net was integrated specifically for Franchisor and that Franchisor has the right to enter into this Agreement.

7.2. Franchisor will maintain security systems to insure that data access is limited to authorized users but Franchisor cannot and does not guarantee that CMS.net will be completely invulnerable from attacks by third party computer hackers. If Franchisor becomes aware that CMS.net has been the subject of an attack it will notify Franchisee and take all reasonable commercial measures to protect the integrity of CMS.net.

7.3. Franchisor cannot and does not guarantee CMS.net performance (program response time) but will make every reasonable commercial effort to provide a system that responds fast enough to support user needs. Franchisee acknowledges and agrees that Franchisor has no control over its ISP's performance.

7.4. FRANCHISOR MAKES NO WARRANTY OR REPRESENTATION, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO THE PERFORMANCE OF CMS.NET OR THE CMS.NET SOFTWARE, INCLUDING THE QUALITY, PERFORMANCE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES THAT CMS. NET OR THE CMS.NET SOFTWARE WILL BE UNINTERRUPTED OR ERROR FREE. NEITHER FRANCHISOR NOR ANY ONE ELSE INVOLVED IN THE CREATION, PRODUCTION, DELIVERY OR DISTRIBUTION OF CMS.NET OR THE CMS.NET SOFTWARE SHALL IN ANY EVENT BE LIABLE FOR DIRECT, INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OF OR INABILITY TO USE CMS.NET OR THE CMS.NET SOFTWARE, even if Franchisor is advised of the possibility of such damages. Without limitation on the generality of the foregoing, Franchisor is not responsible for any costs, including, but not limited to, those incurred as a result of lost profits or revenue, loss of use of CMS.net or the CMS.net Software, loss of data, the cost of recovering software or data, the cost of substitute software or claims by third parties. In no event shall Franchisor's liability exceed the amount of the license fee paid by Franchisee.

7.5.    THE WARRANTY AND REMEDIES SET FORTH ABOVE ARE INCLUSIVE AND IN LIEU OF ALL OTHERS, ORAL OR WRITTEN, EXPRESSED OR IMPLIED. No agent or employee of Franchisor is authorized to make any modification or addition to this warranty.

## 8.    Modifications, Enhancements and Replacements

8.1.    During the term hereof, Franchisor may in its sole discretion, on the same terms and conditions as any license of the CMS.net Software, make available to Franchisee, such modifications, enhancements and updates ("Modifications") as may generally be incorporated into the CMS.net Software. If such Modifications require additional user training, Franchisee shall be required to pay the fees charged for such additional training and to ensure that at least one employee of Franchisee attends such training class. Franchisor may in its sole discretion provide a subsequent version or alternative to the CMS.net Software (the "Alternative"). Franchisee shall use such Modifications or Alternative in accordance with this Agreement. Franchisor is under no obligation to furnish to Franchisee any Modifications or Alternative to the CMS.net Software.

8.2.    In the event of damage, destruction or theft of the CMS.net Hardware or if other disaster occurs to the CMS.net Hardware installed, Franchisee shall promptly replace the CMS.net Hardware.

8.3.    Franchisor shall use its reasonable commercial efforts to correct promptly, at no charge, all errors, defects and malfunctions of CMS.net, the CMS.net Software and any Modifications or Alternatives brought to Franchisor's attention by Franchisee.

8.4.    Franchisor shall not be responsible for any changes made to CMS.net or the CMS.net Software by any party other than itself without the written permission of Franchisor. Any changes made to the CMS.net Software without the written permission of Franchisor shall immediately release Franchisor from any and all obligations under this Agreement but in no way shall alter or modify Franchisee's duty and obligation to maintain the confidentiality of the CMS.net Software.

8.5.    Franchisee agrees that other than Franchisor or its agents, no program other than the CMS.net Software itself shall write to, or otherwise modify the CMS.net Database. Franchisor specifically disclaims all liability for any third party modifications and Franchisee specifically assumes all liability including damages to Franchisor for any modifications, damages or interferences with the CMS.net Software and the CMS.net Database caused by Franchisee, its employees, contractors, agents and representatives.

8.6.    Any reports, database queries or other information extracted from the CMS.net Database shall be the sole responsibility of Franchisee and shall not be the subject of any support pursuant to section 5 of this Agreement.

8.7.    Upon the development of any new version or modification of the CMS.net Software, Franchisor may, on thirty (30) days written notice to Franchisee, increase the Usage Fee. The Usage Fee shall not be increased more than ten percent (10%) in any calendar year.

8.8.    Except as specifically modified by this Agreement, the Franchise Agreement shall remain in full force and effect, provided that if there is any inconsistency between the terms of this Agreement and the terms of the Franchise Agreement then the terms of this Agreement shall prevail.

## 9. Ownership, Confidentiality and Nondisclosure

9.1. The CMS.net, the CMS.net Software and CMS.net Courseware and any and all copies thereof, whether in whole or in part, are the sole and exclusive property of Franchisor. Franchisee shall own the Electronic Information, subject, however, to Franchisor's right to use the Electronic Information as provided in this Agreement. Furthermore, the parties agree to the following terms and conditions: (i) upon the expiration of the Franchise Agreement all of Franchisee's right, title and interest in and to the Electronic Information shall be automatically transferred to Franchisor and both Franchisor and Franchisee shall retain mutual ownership of the Electronic Information if (y) Franchisee is in good standing with Franchisor on the date that the Franchise Agreement expires, and (z) the Franchise Agreement contains a covenant in favor of Franchisor for Franchisee not to compete; (ii) upon Franchisor's termination of the Franchise Agreement based upon Franchisee's material breach of the Franchise Agreement or this Agreement all of Franchisee's right, title and interest in and to the Electronic Information shall automatically transfer to Franchisor and, in such event, Franchisee shall retain no interest in the Electronic Information; and (iii) upon the expiration of the Franchise Agreement none of Franchisee's right, title and interest in and to the Electronic Information shall be transferred to Franchisor if (y) Franchisee is in good standing with Franchisor on the date that the Franchise Agreement expires, and (z) the Franchise Agreement does not contain a covenant in favor of Franchisor for Franchisee not to compete. The "expiration of the Franchise Agreement" occurs when the Franchise Agreement ends on the last day of its then-current term and not due to the termination of the Franchise Agreement pursuant to its terms, by mutual agreement of the parties or otherwise.

9.2. Franchisee agrees to use its best efforts to maintain the security of the CMS.net Software and the CMS.net Courseware and shall not allow parties other than authorized employees or agents of Franchisee to have access to the CMS.net Software or any of its component parts.

9.3. Franchisee understands and agrees that the CMS.net Software and the CMS.net Courseware constitutes Franchisor's trade secrets (the "Confidential Information"). Franchisee shall not disclose any Confidential Information to any person or entity, or use, or permit any person or entity to use, any of such Confidential Information, excepting only: (a) disclosures on a confidential basis to and used by the directors, officers, employees, and agents of that Franchisee, or its affiliates, who have a reasonable need to know such Confidential Information in connection with Franchisee's performance of the Franchise Agreement, and (b) disclosures which are required by law, or legal process, as reasonably determined by that Franchisee or its legal counsel, or are made on a confidential basis to Franchisee's accountants, and other professional advisors in connection with matters relating to this Agreement or the Franchise Agreement. In addition, the specific material terms of this Agreement shall be deemed to be Confidential Information of Franchisee and Franchisor.

9.4. The obligation of confidentiality hereunder shall survive the termination of this Agreement for a period of five (5) years.

9.5. Franchisee agrees to notify Franchisor immediately of the existence of any circumstances surrounding any unauthorized knowledge, possession, disclosure or use of the CMS.net Software or any part thereof by any person or entity.

## 10. Term of Agreement

The Agreement shall be coterminous with the term of the Franchise Agreement.

## 11.    Termination Rights

11.1.    This Agreement terminates when the Franchise Agreement terminates.

11.2.    Franchisee hereby acknowledges and agrees that if Franchisee is in breach of the Franchise Agreement, Franchisor may terminate Franchisee's use of the CMS.net Software electronically. Accordingly Franchisor may cut-off Franchisee's use of CMS.net if Franchisee is in default of the Franchise Agreement and shall in no event be liable to Franchisee for any losses, damages or costs of any kind that may result from such action.

11.3.    If Franchisee fails to cure a material default of this Agreement or the Franchise Agreement and as a result Franchisor terminates the Franchise Agreement for cause, then all of Franchisee's right, title and interest in and to the Electronic Information shall automatically transfer to Franchisor concurrently upon Franchisor's termination of the Franchise Agreement for cause after which Franchisee shall retain no interest in, or right to use, the Electronic Information and no right to make or retain a copy of the Electronic Information.

11.4.    During the term of this Agreement and conditional upon Franchisee's compliance with this Agreement, Franchisor shall not encrypt the CMS.net Database or in any other way impede Franchisees access to the data therein.

11.5.    Except for circumstances involving a termination of the Franchise Agreement based upon Franchisee's material breach of the Franchise Agreement or this Agreement as set forth in Section 11.3, above, upon any other type of termination (such as, for example, by mutual agreement) or upon the expiration of the Franchise Agreement, the following terms and conditions shall apply: (i) if the Franchise Agreement contains a covenant in favor of Franchisor for Franchisee not to compete and Franchisee is in good standing with Franchisor on the date of the termination or expiration of the Franchise Agreement then: (y) Franchisor and Franchisee shall be deemed mutual owners of the Electronic Information, and (z) Franchisee shall immediately return to Franchisor all copies of the CMS.net Courseware, manuals and/or support materials; and (ii) if the Franchise Agreement does not contain a covenant in favor of Franchisor for Franchisee not to compete and Franchisee is in good standing with Franchisor on the date of the termination or expiration of the Franchise Agreement then: (y) Franchisee shall be deemed the exclusive owner of the Electronic Information, and (z) Franchisee shall immediately return to Franchisor all copies of the CMS.net Courseware, manuals and/or support materials.

11.6.    The provisions of sections 4, 7, 8, 10, 11, 12, 13, 14, and 15 hereof shall survive termination of this Agreement.

## 12.    Taxes

12.1.    Franchisee agrees to pay any sales, use, ad valorem, personal property, general intangibles tax, and any registration fees arising out of this Agreement and the transactions contemplated herein, except for any taxes based upon the gross income of Franchisor.

12.2.    Franchisee shall not deduct from payments to Franchisor, any amounts paid or payable to third parties, however designated.

## 13.    Liens

13.1.    Franchisee acknowledges and agrees that it shall keep all specified hardware and other equipment utilized in connection with CMS.net free and clear from any and all liens or encumbrances.

Franchisor reserves the right to file appropriate notices (including a UCC-1) in order to give notice to the public of its ownership interest in CMS.net. Franchisee agrees to execute any such notices as requested by Franchisor.

13.2.    The provisions of section 13.1 above shall not prohibit Franchisee from leasing or renting equipment and hardware ("Hardware") on which to operate CMS.net, provided that Franchisee shall give notice to the owner of the Hardware of Franchisor's proprietary rights to the CMS.net Software and the financing arrangement shall include an acknowledgment that if the Hardware is repossessed CMS.net must be removed and returned to Franchisor.

### 14.    Assignment

Franchisee may assign all of its rights and obligations under this Agreement in connection with the assignment or transfer of the Franchise Agreement but only in accordance with the terms of the Franchise Agreement. Except as set forth in the proceeding sentence, Franchisee has no right to assign or transfer any rights under this Agreement.

### 15.    Indemnification

15.1.    Franchisor shall not be liable for any claim or suit based on any United States copyright, patent, or the trademark, trade secret, or unfair competition rights of a third party based on any modification made to CMS.net or the CMS.net Software by Franchisee or any other third party.

15.2.    Franchisee agrees to indemnify, defend and hold Franchisor harmless from any and all costs, claims, liabilities, damages and expenses incurred (including reasonable attorney's fees) by Franchisor or any third parties resulting from or incidental to the breach of any of the terms and conditions of this Agreement, the use or misuse or other operation of the CMS.net Hardware, CMS.net or the CMS.net Software, or alteration of the CMS.net Database as a result of Franchisee interfacing other software or applications with CMS.net or the CMS.net Software.

15.3.    Franchisee hereby acknowledges that (i) CMS.net will be available to and will be used by other franchisees and affiliates of Franchisor and that all copies of the CMS.net Software may be interconnected via the Internet or other network and (ii) any misuse or unapproved modification of CMS.net or the CMS.net Software and/or the CMS.net Database could cause extreme damage to the entire network of Franchisees.

### 16.    Further Assurances

Each party agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform the terms, provisions and conditions of this Agreement.

[CONTINUED ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**FRANCHISOR:**

**NEW HORIZONS FRANCHISING GROUP, INC.**

By: _____

Earle Pratt
President

**FRANCHISEE:**

**NH PHILADELPHIA LLC**

By: _____

Mark McManus, Jr.
President

EXHIBIT "A"

## CMS.NET CONVERSION USAGE FEE STRUCTURE & ONE TIME COST FOR DATA MIGRATION AND TRAINING

MULTIPLE LOCATION CMS.NET

| MULTIPLE LOCATION CMS.NET USAGE FEES PER MONTH PER CENTER | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 – 10 USERS | 11 – 20 USERS | 21 – 40 USERS | 41 – 60 USERS | 61 – 80 USERS | 81 + USERS | |
| LESS 2.5% | $837.53 | $1,123.20 | $1,900.28 | $2,847 | $3,706.95 | $3,706.95 | +$45 / additional User over 80 Users |
| LESS 5% | $816.05 | $1,094.40 | $1,851.55 | $2,774 | $3,611.90 | $3,611.90 | +$45 / additional User over 80 Users |
| LESS 7.5% | $794.58 | $1,065.60 | $1,802.83 | $2,701 | $3,516.85 | $3,516.85 | +$45 / additional User over 80 Users |

| ADDITIONAL VOLUME DISCOUNT FOR MULTIPLE LOCATION AGGREGATE USERS | | |
|---|---|---|
| MAXIMUM NUMBER OF LICENSES FOR ALL LOCATIONS | | |
| 51-75 USERS | 76-100 USERS | 101+ USERS |
| LESS 2.5% | LESS 5% | LESS 7.5% |

| SCHEDULE OF ONE-TIME FEES | | | |
|---|---|---|---|
| | CURRENT ASP CENTERS | CURRENT LOCAL CENTERS | NON-CMS CENTERS |
| Data Migration | NC | NC | $500/Day    (2-5 Days) |
| Training (OLA / OLL) | NC | NC | NC / $250/Day (3-5 Days) |
| Training (Onsite) | $500/Day + T&E (2-4 Days) | $500/Day + T&E (2-4 Days) | $500/Day + T&E (2-4 Days) |
| On Site Start-up Support | $500/Day + T&E (2-4 Days) | $500/Day + T&E (2-4 Days) | $500/Day + T&E (2-4 Days) |

FA 2014: Exhibit F

13

## EXHIBIT "B"

### CMS.NET HARDWARE

| CMS.NET TECHNICAL SPECIFICATIONS | |
|---|---|
| **HARDWARE** | |
| **Training PC (Minimum Requirements)** | 2.9 Gigahertz (GHz) or faster x86- or x64-bit dual core with SSE2 instruction set<br>2 GB RAM<br>1.5 GB available hard disk space<br>SVGA graphics<br>17" monitor<br>10/1000Mb NIC |
| **Training PC (Recommended)** | 3.3 Gigahertz (GHz) or faster 64-bit dual core processor with SSE2 instruction set and 3 MB or more L3 cache<br>4 GB RAM<br>3 GB available hard disk space<br>SVGA graphics (1280x1024 or higher)<br>20" monitor (1280x1024 or higher)<br>10/1000Mb NIC |
| **SOFTWARE** | |
| **Training PC Minimum Requirements** | Windows 7 (all versions)<br>Internet Explorer 8.0 (or higher)<br>Adobe Flash Player<br>Microsoft Silverlight Player |
| **Training PC (Recommended)** | Windows 8 Professional<br>Internet Explorer 10.0 (or higher)<br>Adobe Flash Player<br>Microsoft Silverlight Player |
| **NETWORK CABLING** | |
| **Cabling System** | 10/1000 (with cat 5 certification) |
| **NETWORK COMMUNICATION REQUIREMENT** | |
| **Network Switch (Business users & servers** | Managed Layer 3 switch capable of basic routing and basic security between VLANs (separated logical networks) using access control lists. (Example: Cisco 3560 Series) |
| **Router** | Firewall capable of site to site IPSEC VPNs and capable of throughput of 300 Mbps. (Example: Cisco ASA 5512) |
| **Minimum Connectivity** | Bandwidth greater than 50 KBps / User<br>Latency under 150 ms |
| **Recommended Connectivity** | Bandwidth greater than 100 KBps / User<br>Latency under 150 ms |

**EXHIBIT "C"**

## ADDRESSES OF CENTERS

565 East Swedesford Road, Wayne, PA 19087

ADDRESS OF QUALIFYING SATELLITE CENTER (if applicable)

TBD

FA 2014: Exhibit F

15

## EXHIBIT G TO FRANCHISE AGREEMENT

### INTEGRATED LEARNING AGREEMENT

This New Horizons Integrated Learning Agreement ("Agreement") is entered into between New Horizons Franchising Group, Inc. ("Franchisor") and NH Philadelphia LLC, a Michigan limited liability company doing business as New Horizons Computer Learning Center of Philadelphia, PA ("Franchisee"), on August 1, 2014.

RECITALS

A.      Franchisor is an international franchisor of computer training centers. Franchisor has developed an international network of franchised and company owned computer learning Centers (the "Network").

B.      Franchisor and Franchisee have entered into a franchise agreement (the "Franchise Agreement") pursuant to which Franchisor has granted Franchisee a license to operate a New Horizons Computer Learning Center.

C.      Franchisor has developed the ability to deliver "eLearning" as defined below, for use by its franchisees and company owned locations and Franchisee now wishes to participate in the eLearning opportunities on the terms and subject to the conditions contained herein.

NOW THEREFORE for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**1.      Definitions.** All capitalized terms used herein shall have the meanings ascribed to them in the Franchise Agreement, except as otherwise specifically defined, modified or added to the Franchise Agreement by their inclusion in this Agreement and consequently the Franchise Agreement, in this section 1 as set out below:

1.1.    "Classroom Learning Content" shall mean all printed materials and eContent provided to customers in ILT and Mentored Learning for use during and after the class.

1.2.    "CMS" shall refer to the Center Management System known as CMS.net that Franchisee shall implement, at each Center. CMS provides contact management, manages student enrollments, class inventories and accounts receivable. eBusiness will use CMS as its student enrollment receptacle. It is anticipated that students will purchase and enroll in classes through eBusiness web technology

1.3.    "eBusiness" shall mean the use of CMS and all electronic commerce transactions, relative to the Franchised Business, that occur on any Network website, the collection and use of demographic information, scheduling and course delivery from any Network website, and/or the use of any Network website or electronic system for managing the existing Network business processes.

1.4.    "eContent" shall mean any learning content distributed via electronic means, including but not limited to, electronic versions of printed, instructional and support materials, in electronic form including electronic course materials and electronic resources such as Labs on Demand.

1.5.    "eLearning" shall mean Franchisor's eLearning programs and all other forms of computer training and professional skills training available over the internet, or electronically behind a

firewall, including synchronous and asynchronous classes such as New Horizons Online Live, New Horizons Online Anytime, and any other form of training delivered in whole or in part electronically.

1.6. "Electronic Information" shall mean any information stored in the Franchisor's learning management system ("LMS"), its CMS Database, or exchanged between the Franchisor's Website and the LMS including, but not limited to, financial transactions, products sold, contact information, customer information and training schedule information.

1.7. "Extranet" shall mean that certain electronic communications device implemented by Franchisor for the benefit of Franchisor and the Network, or any successor electronic communications device implemented by Franchisor, for use by Franchisor and the Network.

1.8. "Franchised Business" shall mean Acting as a Computer Learning Center.

1.9. "Franchisor's Website" shall mean www.newhorizons.com and any other Franchisor owned internet site identified by URL or domain name, which is linked to or leads a customer to www.newhorizons.com.

1.10. "Labs on Demand" shall mean the New Horizons-branded, cloud-based, hands-on lab service Franchisor provides to students so they can practice the knowledge gained during the lecture part of their class in a real world environment.

1.11. "Master Product List" and "MPL" refer to Franchisor's complete list of offerings of New Horizons courses and products, as we may modify them from time to time, including, but not limited to, all eLearning courses and eContent products, the details of which are available on the Franchisor's Extranet.

1.12. "Mentored Learning" shall mean a premier classroom solution offering the student a multi-dimensional approach to learning which is adaptive to individual learning styles through a mentor who guides and teaches the student by using assessments, reinforcement techniques and content consisting of written courseware and streaming video. To aid in the delivery of Mentored Learning, Franchisee will have access to Franchisee's LMS in order to process registrations and track student activities. If available for the course being delivered, the use of New Horizons-branded Mentored Learning content is required to deliver Mentored Learning.

1.13. "Network" shall mean all of the New Horizons franchisees and Franchisor owned and operated Centers.

1.14. "New Horizons Online Live" and "OLL" refer to Franchisor's synchronous Elluminate platform, the details of which are available on the Franchisor's Extranet.

1.15. "New Horizons Online Anytime" and "OLA" refer to Franchisor's asynchronous eLearning program, the details of which are available on the Franchisor's Extranet.

1.16. "System" shall mean a comprehensive marketing and operational system prescribed by Franchisor to be used in the conduct of the Franchised Business, as set forth in this Agreement, the Franchise Agreement and the Confidential Operations Manual, as amended from time to time. The System shall include, among other things, the Service Marks, Classroom Learning Content, eLearning and certain advertising, marketing and sales programs and techniques, the Franchisor's Website, eBusiness, methods of operation, training programs, artwork, graphics, layouts, slogans, names, titles, text and other intellectual property that Franchisor makes available to Franchisee, including, in any case in

which Franchisee has purchased the Franchised Business from Franchisor or any of its affiliates, certain intellectual property used by the business prior to the purchase by Franchisee. In its sole discretion, Franchisor may improve and/or change the System from time to time (including without limitation adding to, deleting or modifying elements of the System, establishing categories or classifications of franchisees and amending the Confidential Operations Manual) for the intended purpose of making the System more effective, efficient, economical or competitive; adapting to or taking advantage of competitive conditions, opportunities, technology, materials or local marketing needs and conditions; enhancing the reputation or public acceptance of the System; and/or better serving the public.

1.17.   "Territorial Rules of Conduct" or "TROC" shall mean the rules and guidelines that govern the relationships between and among Network Members and are set forth in the COM.

**2.      Sale and Delivery of eLearning**

2.1.   Within the Territory granted by the Franchise Agreement it will be permissible for customers to purchase and receive eLearning, directly from Franchisor's Website and all other System sales methods. Subject to the terms of this Agreement, Delivery Fees (as defined in section 2.3 below) and the Franchise Agreement, Franchisee shall be credited with all purchase monies received from the registrants who (a) purchase such eLearning directly from Franchisor's Website, and (b) are located within Franchisee's Territory. "Located" shall mean either: (a) if the customer is an individual, that a customer's residential address is located within the Franchisee's Territory, or (b) if the customer is a company, partnership, business, government or other entity, that the user's principal office is located at an address within Franchisee's Territory.

2.2.   Franchisee agrees that Franchisor may deliver eLearning in Franchisee's Territory but will not directly sell eLearning within the Territory, except in certain circumstances the Franchisor will be considered the Seller acting on behalf of the Network including government accounts required to be billed through the GSA schedule and other enterprise accounts where Franchisor has been requested, by Franchisee or a Network member, to provide selling services.

2.3.   Franchisee will pay Franchisor a delivery fee for the delivery of eLearning by Franchisor, (the "Delivery Fee"). Franchisor may reasonably establish and change the Delivery Fee rate from time to time in accordance with section 6 below. Franchisor shall give Franchisee reasonable notice, of at least 30 days, before making any changes to the Delivery Fee by posting the amount of the Delivery Fee and any changes thereto on Franchisor's Extranet.

2.4.   As part of the eLearning experience Franchisor may provide directly to each customer the appropriate course kit, customer service, mentoring, student community, technical support, and any other learning resources for the particular eLearning course as described in the MPL, and as updated from time to time.

2.5.   Except in accordance with each of the provisions below, only Franchisor may deliver eLearning that is branded with any of the Franchisor's name, service marks, trademarks, proprietary slogans or marketing taglines. Franchisee may offer, sell and deliver synchronous and asynchronous web-based training as set out below.

2.5.1   Subject to 2.5.3 below, Franchisee may offer, sell and deliver non-branded synchronous and asynchronous web-based training using any delivery technology or content, but only with Franchisor's prior written approval.

2.5.2 Subject to 2.5.3 below, Franchisee may offer, sell and deliver branded synchronous and asynchronous web-based training if Franchisee shall fulfill all the reasonable requirements of an authorized eLearning program, which requirements shall be created by Franchisor and shall be listed on the Extranet from time to time. Such requirements shall include normal and customary provisions to protect the Service Marks, brand and best interests of the Network, including, but not limited to: instructor training, certification, quality and performance of delivery technology and course content.

2.5.3 Franchisee may only offer, sell and deliver any synchronous and asynchronous web-based training to customers inside its territory and inside open territories in accordance with TROC. Franchisee must not advertise any synchronous web-based training in any public media, which reaches customers in the territory of other franchisees, or, except in accordance with TROC, directly solicit customers in the territory of other franchisees

2.6 Franchisee acknowledges that other centers may sell eLearning to customers who reside in Franchisee's territory in accordance with the TROC. Further, the Originating Center (as defined in the TROC) will retain all revenues from such sales and will not share in such revenues with Franchisee.

2.7 If the Franchise Agreement is terminated or if Franchisee is in breach of established credit limits then Franchisor may cease to accept purchases of eLearning from customers in Franchisee's Territory and may cease to deliver eLearning to customers in Franchisee's Territory. Franchisor shall not be liable to Franchisee for any losses, damages or costs of any kind that may result from such action.

### 3. eLearning Revenues and Delivery Fees

3.1. All eLearning revenues shall be included within the definition of Gross Revenues as defined in the Franchise Agreement and shall be accounted for in accordance with the Franchise Agreement.

3.2. Franchisor shall pay to Franchisee on a monthly basis all eLearning revenues received directly from customers who purchase eLearning through Franchisor's Website less all associated Delivery Fees, and shall deliver an itemized statement to Franchisee at least monthly.

3.3. The Delivery Fees payable by Franchisee to Franchisor for the delivery of New Horizons Online Live shall be billed when delivery of the relevant class begins or, for club sales, when the order is received from Franchisee and shall be paid within thirty days thereafter.

3.4. The Delivery Fees payable by Franchisee to Franchisor for the delivery of New Horizons Online Anytime shall be billed when the order is fulfilled and shall be paid within thirty days thereafter. The order shall be deemed fulfilled at the date when the customer access to New Horizons Online Anytime is enabled.

### 4. New Horizons Online Anytime Licenses and Billings

4.1. Franchisor and Franchisee must both sign all New Horizons Online Anytime customer license agreements with total expected revenues greater than $40,000, in a timely manner. Franchisor will not be obligated to fulfill New Horizons Online Anytime orders in excess of this amount that do not have a valid license agreement executed by the customer and Franchisee. Franchisor shall periodically review the threshold figure of $40,000 and may reasonably adjust such figure. Any changes shall be communicated to Franchisee via the Extranet and shall be effective 30 days after the date of such notice.

4.2.     Franchisor may establish reasonable credit limits for amounts due from franchisees and accordingly may require that Franchisee prepay Delivery Fees prior to Franchisor delivering the Online Anytime, unless other arrangements are mutually agreed upon.

## 5.     Learning Guides and New Horizons Online Anytime Access Codes

5.1.     Franchisee may order printed learning guides and course kits, together "Learning Guides", from one of Franchisor's authorized vendors ("Learning Guide Vendor"). Ordering shall occur online in accordance with Learning Guide Vendor's posted policies. The costs and availability of the Learning Guides shall be published on the Learning Guide Vendor's ordering website and on the Extranet.

5.2.     The purchase of a Learning Guide will entitle Franchisee access to corresponding New Horizons Online Anytime eContent if available for use contemporaneously with Franchisee's delivery of the course at no additional cost.

5.3.     For each Learning Guide ordered from the Learning Guide Vendor, Franchisee may order one access code for the corresponding New Horizons Online Anytime eContent (the "Eligible Access Code") from one of Franchisor's approved eContent vendors ("eContent Vendor"). Some Learning Guides may not have corresponding eContent.

5.4.     Franchisee will use the Eligible Access Codes only for providing eContent to customers enrolled in an ILT class. Franchisor will reconcile the number of Learning Guides ordered by Franchisee against the number of Eligible Access Codes ordered by Franchisee on a regular basis. Learning Guides and access codes ordered between January 1st and June 30th will be reconciled in the month of July the same year. Learning Guides and access codes ordered between July 1st and December 31st will be reconciled in the month of January in the following year.

5.5.     If Franchisee has ordered more access codes than the Eligible Access Codes then Franchisor shall promptly notify Franchisee of any excess access codes ordered and invoice Franchisee a fee for each excess access code. The fees for the excess access codes shall be the same as the cost of the corresponding New Horizons Online Anytime product sold separately.

5.6.     Franchisee shall pay all such invoices within thirty (30) days of the invoice date. Franchisee shall notify Franchisor of any dispute with such invoice within ten days of receiving the invoice, and Franchisor and Franchisee shall promptly reconcile the dispute. When payment is made Franchisor shall reset the Eligible Access Code count to zero as of the date of the reconciliation. In no event will unused Eligible Access Codes entitle Franchisee to a refund of any sums paid for Learning Guides.

5.7.     Franchisor shall review any proposed changes to the above reconciliation process with the Franchise Advisory Council prior to implementing any changes and shall give a minimum of 30 days notice to Franchisee via the Extranet in the event of any changes.

## 6.     Franchisor's Profit from the Sale of Classroom Learning Content, OLL and OLA

6.1.     Franchisee shall purchase Classroom Learning Content from Franchisor, through its authorized vendors, when available.

6.2.     On sales of Classroom Learning Content Franchisor may charge prices that will allow Franchisor to earn a profit. Franchisor's pricing of branded Classroom Learning Content shall be

reasonably competitive to comparable products available to Franchisee through other vendors. For Classroom Learning Content Franchisor may earn a pre tax profit targeted at 15% to 20% but not to exceed twenty per cent (20%) of the aggregate selling price of all such content. On an annual basis Franchisor shall disclose, to those members of the Franchise Advisory Council who have executed non-disclosure agreements, the revenues, costs and profits from Franchisor's sale of Existing Content to the Network. If Franchisor's total pre tax profit exceeds 20% of the aggregate selling price of all Existing Content in any fiscal year, Franchisor shall rebate to Franchisee its proportionate share of such excess based on Franchisee's relative share of total Existing Content purchased.

6.3.    OLA Delivery Fees charged by Franchisor to Franchisee currently include a gross profit to Franchisor of 10% of the Suggested Retail Price. Franchisor agrees not to increase this gross profit margin without first reviewing any proposed increase with the Franchise Advisory Council and providing reasonable justification and disclosure of all relevant facts. Franchisor further agrees that the gross profit margin will not be increased for a minimum of 12 months from the date this Agreement is made available to the Network.

6.4.    Since the inception of OLL Franchisor has not earned a profit on this offering. In the future, if OLL begins to generate a net profit to Franchisor, Franchisor will review its pricing policies and make adjustments as necessary to ensure its profit is commercially reasonable.

## 7.    Master Product List

Franchisor will maintain a Master Product List as defined above. The MPL will be updated and maintained by Franchisor and will be available to Franchisee for reference on the Extranet. The products and courses are described in detail on the MPL.

## 8.    Use of Electronic Information

8.1.    In the course of providing the eLearning opportunities Franchisor and Franchisee will collect, accumulate, and store Electronic Information. Franchisee shall own all Electronic Information stored in its CMS database.

8.2.    Electronic Information will be used by Franchisor in accordance with privacy laws and Franchisor's privacy policy only for the following:

8.2.1    To accumulate statistical information about trends, scheduling, product sales, revenue and other Electronic Information available. This statistical information will be used by Franchisor to understand and communicate (on a no names basis) statistics and trends in the marketplace and geographical locations.

8.2.2    With the prior consent of Franchisee, to perform direct email marketing for the benefit of Franchisee to Franchisee customers ("Direct Marketing"). Franchisor may create email marketing campaigns and business rules (the "Business Rules") that allow direct marketing to Franchisee customers. When Franchisee opts in to any Direct Marketing campaigns and Business Rules, Franchisee's participation in each shall continue until Franchisee gives at least 30 days written notice that it wishes to opt out.

8.2.3    To communicate, to franchise owners only, franchise sales statistics, rankings and other useful information and to deliver customer service messages that have been previously reviewed by the Franchisee and Marketing Advisory Council for content and frequency.

8.3     Franchisor will not use the Electronic Information to compete with Franchisee's Franchised Business in the Territory, provided that, Franchisor shall market and deliver eLearning in the Territory on the terms and conditions of this Agreement and the Franchise Agreement.

8.4     During the term of the Franchise Agreement, Franchisor will not sell transfer or share the Electronic Information with any third party other than for the purposes described in this section.

8.5     Upon termination of the Franchise Agreement, Franchisor shall not retain a copy of any portion of the Electronic Information except in the following circumstances when Franchisor may use Electronic Information to make arrangements to fulfill Franchisee's undelivered training obligations to its customers: (i) if the Franchise Agreement terminates for Abandonment, (ii) if there is a transfer of the Franchised Business in breach of the Franchise Agreement, (iii) if Franchisee elects to operate Franchised Business under any other name or Service Mark in violation of the Franchise Agreement, and (iv) if Franchisee is terminated by Franchisor for cause under the Franchise Agreement.

8.6     Upon termination of the Franchise Agreement, at the request of Franchisee, Franchisor shall deliver to Franchisee a copy of all Electronic Information stored in the LMS database relating solely to Franchisee's exclusive customers. Franchisor shall own and retain all Electronic Information stored in its LMS database.

## 9.     Refunds and Cancellation policies

Franchisor may publish reasonable commercial refund and cancellation policies for eLearning from time to time by notice on the Extranet. Customers will be directed, by Franchisor, to contact their Account Executive for the refund policy of the relevant Center. Franchisee agrees that all sales are subject to any refund policies required by local laws, rules, and regulations of its Territory.

## 10.     Amendments to Franchise Agreement

10.1.     It is the intention and effect of this Agreement that the terms of this Agreement supersede each and every provision to the contrary in the Franchise Agreement with respect to the subject matter hereof whether or not the specific sections of the Franchise Agreement are referred to in this Agreement. Except as specifically modified by this Agreement, the Franchise Agreement shall remain in full force and effect, provided that if there is any inconsistency between the terms of this Agreement and the terms of the Franchise Agreement then the terms of this Agreement shall prevail. In addition if there is any inconsistency between the terms of this Agreement and the terms of any CMS.net License Agreement executed between Franchisor and Franchisee then the terms of this Agreement shall prevail.

10.2.     The definitions in section 1 of this Agreement modify amend and add to the definitions of the Franchise Agreement and are hereby incorporated into the Franchise Agreement by this reference.

## 11.     Disclaimer of Warranties

11.1.     Franchisor cannot and does not guarantee eLearning program response time but will make every reasonable commercial effort to provide a system that responds fast enough to support user needs and will take reasonable security precautions so that New Horizons branded eLearning will be reasonably protected from hackers, virus and similar outside disruption, through the services of a reliable ISP. Franchisee acknowledges that Franchisor has no control over its Internet Service Provider's performance.

FA 2014: Exhibit G

7

11.2.    FRANCHISOR MAKES NO WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE PERFORMANCE OF ELEARNING, INCLUDING THE QUALITY, PERFORMANCE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES THAT ELEARNING WILL BE UNINTERRUPTED OR ERROR FREE.  NEITHER FRANCHISOR NOR ANY ONE ELSE INVOLVED IN THE CREATION, PRODUCTION, DELIVERY OR DISTRIBUTION OF ELEARNING SHALL IN ANY EVENT BE LIABLE FOR DIRECT, INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OF OR INABILITY TO USE ELEARNING, even if Franchisor is advised of the possibility of such damages. Without limitation on the generality of the foregoing, Franchisor is not responsible for any costs, including, but not limited to, those incurred as a result of lost profits or revenue, loss of use of eLearning, loss of data, the cost of recovering software or data, the cost of substitute software or claims by third parties.  In no event shall Franchisor's liability exceed the amount of the eLearning Revenues received from customers.

11.3.    THE WARRANTY AND REMEDIES SET FORTH ABOVE ARE INCLUSIVE AND IN LIEU OF ALL OTHERS, ORAL OR WRITTEN, EXPRESS OR IMPLIED.  No agent or employee of Franchisor is authorized to make any modification or addition to this warranty.

11.4.    Notwithstanding the above, if any third party brings any action or suit against Franchisee claiming (i) that any New Horizons branded eLearning did not perform in accordance with any representations published by Franchisor or (ii) that Franchisor had no right to grant the rights set out in this Agreement, then Franchisor will seek indemnification for Franchisee in accordance with its indemnification rights against its third party suppliers and vendors.

**12.    Term of Agreement**

This Agreement shall be coterminous with the term of the Franchise Agreement.

**13.    Further Assurances**

Each party agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform the terms, provisions and conditions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**FRANCHISOR:**

**NEW HORIZONS FRANCHISING GROUP, INC.**

By: _____

Earle Pratt
President

**FRANCHISEE:**

**NH PHILADELPHIA LLC**

By: _____

Mark McManus, Jr.
President

EXHIBIT H TO FRANCHISE AGREEMENT

## SCHEDULE OF INITIAL FRANCHISE FEES AND MONTHLY MINIMUM CONTINUING ROYALTY FEES DURING AN INITIAL TERM

(This schedule covers 3 pages; page 1 of 3)

| Type and Subclass of Territory | | Population | | Initial Franchise Fee | |
|---|---|---|---|---|---|
| | | | | Start Up Franchise | Conversion Franchise |
| | | Min. Band | Max. Band | | |
| Mega | | | | | |
| | M - 1 | 8,000,000 | + | $150,000 | $93,750 |
| | M - 2 | 6,000,000 | 7,999,999 | $125,000 | $93,750 |
| | M - 3 | 4,000,000 | 5,999,999 | $125,000 | $93,750 |
| Large | | | | | |
| | L - 1 | 3,000,000 | 3,999,999 | $100,000 | $56,250 |
| | L - 2 | 2,000,000 | 2,999,999 | $100,000 | $56,250 |
| Medium | | | | | |
| | Med | 1,000,000 | 1,999,999 | $75,000 | $56,250 |
| Small | | | | | |
| | S - 1 | 750,000 | 999,999 | $60,000 | $45,000 |
| | S - 2 | 300,000 | 749,999 | $60,000 | $45,000 |

FA 2014: Exhibit H

## SCHEDULE OF INITIAL FRANCHISE FEES AND MONTHLY MINIMUM CONTINUING ROYALTY FEES DURING AN INITIAL TERM

(This schedule covers 3 pages; page 2 of 3)

| Type and Subclass of Territory | | Population | | Minimum Continuing Royalty Fee - Initial Term | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | 4 mos. to 12 mos. | | Year 2 | | Year 3 | | Year 4 | | Year 5 to end | |
| | | Min Band | Max Band | Royalty | Revenue | Royalty | Revenue | Royalty | Revenue | Royalty | Revenue | Royalty | Revenue |
| Mega | | | | | | | | | | | | | |
| | M - 1 | 8,000,000 | + | $5,000 | $83,333 | $10,000 | $166,667 | $15,000 | $250,000 | $20,000 | $333,333 | $25,000 | $416,667 |
| | M - 2 | 6,000,000 | 7,999,999 | $4,600 | $76,667 | $9,200 | $153,333 | $13,800 | $230,000 | $18,400 | $306,667 | $23,000 | $383,333 |
| | M - 3 | 4,000,000 | 5,999,999 | $3,200 | $53,333 | $6,400 | $106,667 | $9,600 | $160,000 | $12,800 | $213,333 | $16,000 | $266,667 |
| Large | | | | | | | | | | | | | |
| | L - 1 | 3,000,000 | 3,999,999 | $2,600 | $43,333 | $5,200 | $86,667 | $7,800 | $130,000 | $10,400 | $173,333 | $13,000 | $216,667 |
| | L - 2 | 2,000,000 | 2,999,999 | $1,800 | $30,000 | $3,600 | $60,000 | $5,400 | $90,000 | $7,200 | $120,000 | $9,000 | $150,000 |
| Medium | | | | | | | | | | | | | |
| | Med | 1,000,000 | 1,999,999 | $1,500 | $25,000 | $3,000 | $50,000 | $4,500 | $75,000 | $6,000 | $100,000 | $7,500 | $125,000 |
| Small | | | | | | | | | | | | | |
| | S - 1 | 750,000 | 999,999 | $1,300 | $21,667 | $2,600 | $43,333 | $3,900 | $65,000 | $5,200 | $86,667 | $6,500 | $108,333 |
| | S - 2 | 300,000 | 749,999 | $900 | $15,000 | $1,800 | $30,000 | $2,700 | $45,000 | $3,600 | $60,000 | $4,500 | $75,000 |

FA 2014:  Exhibit H

## SCHEDULE OF MONTHLY MINIMUM CONTINUING
## ROYALTY FEES DURING A RENEWAL TERM

(This schedule covers 3 pages; page 3 of 3)

| Type and Subclass of Territory | | Population | | Renewal Royalty Schedule (Applicable Only to The First Renewal Term) | | | Renewal Royalty Schedule (Applicable to All Renewals Other Than The First Renewal Term) | Classrooms | AE's |
|---|---|---|---|---|---|---|---|---|---|
| | | Min. Band | Max. Band | 1st 12 Mos. | 13-24 Mo. | 25-60 Mo. | 1-60 Mo. | | |
| Mega | | | | | | | | | |
| | M - 1 | 8,000,000 | + | $7,500 | $17,500 | $25,000 | $25,000 | 6 | 10 |
| | M - 2 | 6,000,000 | 7,999,999 | $7,500 | $16,100 | $23,000 | $23,000 | 6 | 8 |
| | M - 3 | 4,000,000 | 5,999,999 | $7,500 | $11,200 | $16,000 | $16,000 | 6 | 6 |
| Large | | | | | | | | | |
| | L - 1 | 3,000,000 | 3,999,999 | $7,500 | $9,100 | $13,000 | $13,000 | 5 | 5 |
| | L - 2 | 2,000,000 | 2,999,999 | $7,500 | $8,250 | $9,000 | $9,000 | 5 | 5 |
| Medium | | | | | | | | | |
| | Med | 1,000,000 | 1,999,999 | $7,500 | $7,500 | $7,500 | $7,500 | 4 | 4 |
| Small | | | | | | | | | |
| | S - 1 | 750,000 | 999,999 | $6,500 | $6,500 | $6,500 | $6,500 | 3 | 3 |
| | S - 2 | 300,000 | 749,999 | $4,500 | $4,500 | $4,500 | $4,500 | 3 | 3 |

FA 2014:  Exhibit H

3

## EXHIBIT "2"

Amendments to Franchise Agreement (attached)

## FIRST AMENDMENT TO FRANCHISE AGREEMENT
(Philadelphia, Pennsylvania)

This First Amendment to Franchise Agreement ("Amendment") is dated August 1, 2014, and will modify certain provisions of the Franchise Agreement and Exhibits "A" through "H" attached thereto dated August 1, 2014 (the "Franchise Agreement"), by and between **New Horizons Franchising Group, Inc.** ("Franchisor"); **NH Philadelphia LLC,** a Michigan limited liability company proposing to do business in Pennsylvania as New Horizons Computer Learning Center of Philadelphia, PA ("Franchisee"); and **NHNE LLC** ("Equity Holder"). Initially capitalized terms not defined herein are used as defined in the Franchise Agreement.

### RECITALS

**WHEREAS,** Franchisee and New Horizons Computer Learning Center of Philadelphia, LLC ("Former Franchisee") are parties to that certain Asset Purchase Agreement (the "Asset Purchase Agreement") dated August 1, 2014 in which Franchisee purchased the business and the assets (the "Assets") of the Franchised Business from Former Franchisee.

**WHEREAS,** Franchisor consented to the sale of the Franchised Business and requested that Franchisee execute a new franchise agreement, all as memorialized by that certain Consent to Transfer of Franchise Agreement and Release (the "Consent Agreement") dated August 1, 2014.

**WHEREAS,** Franchisor, Franchisee and Equity Holder desire to amend the Franchise Agreement as set forth below.

**NOW THEREFORE,** in consideration of the foregoing facts, and other good and valuable consideration, the receipt of which is hereby acknowledged, Franchisor, Franchisee and Equity Holder agree that the Franchise Agreement is hereby modified as follows:

1. **Recitals**: Franchisor, Franchisee and Equity Holder acknowledge and agree that the above Recitals are true and correct.

2. **Conditions Precedent**: Franchisee hereby acknowledges and agrees that the effectiveness of the Franchise Documents is conditional upon the following:

    (a) the execution and performance of the Franchise Agreement and Exhibits attached thereto; and

    (b) the execution and performance of the Consent Agreement as well as the Promissory Note & Guaranty attached as Exhibit "A" thereto.

3. **Modification to Section 1.28**: The defined term "Initial Term" in Article I of the Franchise Agreement is hereby stricken in its entirety and replaced with the following:

    1.28. Initial Term.

The term "Initial Term" refers specifically to the period beginning on the Agreement Date through and including July 31, 2019 and is only applicable to the parties if this Agreement is being entered into in connection with the initial award of Franchise rights.

4.     **CMS**: Notwithstanding Sections 1.14, 4.5, 8.2(a) of the Franchise Agreement and Section 1.2 of the Integrated Learning Agreement to the contrary, Franchisee may, but shall not be obligated to, use CMS.net for the Initial Term beginning August 1, 2014 through and including July 31, 2019.

5.     **Modification to Exhibit H Schedule of Initial Franchisee Fees and Monthly Minimum Continuing Royalty Fees During An Initial and Renewal Term.** The schedule on page 2 of Exhibit H of the Franchise Agreement entitled Schedule of Initial Franchise Fees and Monthly Minimum Continuing Royalty Fees During an Initial Term is hereby modified such that the Minimum Continuing Royalty Fee for an M-3 Territory is deleted in its entirety and replaced with the following:

| Type and Subclass of Territory | | Population | | Minimum Continuing Royalty Fee - Initial Term | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | August 1, 2014 – December 31, 2014 | | January 1, 2015 – December 31, 2015 | | January 1, 2016 – December 31, 2016 | | January 1, 2017 to end | |
| | | Min Band | Max Band | Royalty | Revenue | Royalty | Revenue | Royalty | Revenue | Royalty | Revenue |
| Mega | | | | | | | | | | | |
| | M - 3 | 4,000,000 | 7,999,999 | $0 | $53,333 | $8,500 | $106,667 | $11,200 | $160,000 | $16,000 | $213,333 |

6.     **Incorporation Clause**:  By this reference, this Amendment is incorporated into the Franchise Agreement as though set forth therein in its entirety.

7.     **Full Force**:  To the extent not modified by this Amendment, all other terms of the Franchise Agreement remain in full force and effect.

8.     **Confidential**:  Franchisor deems this Amendment to be confidential between Franchisor and Franchisee, and accordingly it shall not be disclosed to any third person without the express written consent of Franchisor.

9.     **Counterparts**:  This Amendment may be executed in any number of copies each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

10.     **Integration Clause**:  To the extent permitted by law, this Amendment constitutes the entire agreement between Franchisor and Franchisee concerning the subject matter herein and supersedes and cancels all proposals and other written or oral agreements between the parties related to the subject matter set forth herein.  Franchisee acknowledges that it is not entering into this Amendment on the basis of any representations not expressly contained in this Amendment. Any modification to this Amendment must be in writing and signed by authorized representatives of Franchisor and Franchisee.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be effective as of the date first written above.

**FRANCHISOR:**

**NEW HORIZONS FRANCHISING GROUP, INC.**

By: _____
   Earle Pratt
   President

**FRANCHISEE:**

**NH PHILADELPHIA LLC**

By: _____
   Mark McManus, Jr.
   President

**EQUITY HOLDER:**

**NHNE LLC**

By: _____
   Mark McManus, Jr.
   President